07 C 6438

JUDGE PALLMEYER
MAGISTRATE JUDGE BROWN

# EXHIBIT B

# LOAN AND SECURITY AGREEMENT

by and among

LASALLE BUSINESS CREDIT, LLC, as Agent,

THE FINANCIAL INSTITUTIONS FROM TIME TO TIME
A PARTY HERETO, as Lenders,

and

BLACKHAWK AUTOMOTIVE PLASTICS, INC., as Borrower

dated as of October 4, 2006

CHICAGO/#1466603.10

# TABLE OF CONTENTS

Page

1. DEFINITIONS ..................................................................................................... 1
2. LOANS ............................................................................................................... 12
   (a) Revolving Loans ..................................................................................... 12
   (b) Term Loan A ........................................................................................... 15
   (c) Term Loan B ........................................................................................... 15
   (d) Repayments ............................................................................................. 15
   (e) Notes ....................................................................................................... 16
3. LETTERS OF CREDIT ...................................................................................... 16
   (a) General Terms ......................................................................................... 16
   (b) Requests for Letters of Credit ................................................................. 17
   (c) Obligations Absolute ............................................................................... 17
   (d) Expiration Dates of Letters of Credit ...................................................... 17
   (e) Participation ............................................................................................ 18
4. INTEREST, FEES AND CHARGES .................................................................. 18
   (a) Interest Rate ............................................................................................ 18
   (b) Other LIBOR Provisions ......................................................................... 19
   (c) Fees and Charges .................................................................................... 21
   (d) Maximum Interest ................................................................................... 22
5. COLLATERAL ................................................................................................... 22
   (a) Grant of Security Interest to Agent ......................................................... 22
   (b) Other Security ......................................................................................... 23
   (c) Possessory Collateral .............................................................................. 23
   (d) Electronic Chattel Paper ......................................................................... 23
6. PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY
   INTERESTS THEREIN ...................................................................................... 24
7. POSSESSION OF COLLATERAL AND RELATED MATTERS ..................... 24
8. COLLECTIONS .................................................................................................. 24
9. COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND
   SCHEDULES ...................................................................................................... 26
   (a) Weekly Reports ....................................................................................... 26
   (b) Monthly Reports ..................................................................................... 27
   (c) Financial Statements ............................................................................... 27
   (d) Annual Projections .................................................................................. 27

# TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| | (f) | Public Reporting | 27 |
| | (g) | Other Information | 28 |
| 10. | | TERMINATION; AUTOMATIC RENEWAL | 28 |
| 11. | | REPRESENTATIONS AND WARRANTIES | 29 |
| | (a) | Financial Statements and Other Information | 29 |
| | (b) | Locations | 29 |
| | (c) | Loans by Borrower | 29 |
| | (d) | Accounts and Inventory | 29 |
| | (e) | Liens | 29 |
| | (f) | Organization, Authority and No Conflict | 30 |
| | (g) | Litigation | 30 |
| | (h) | Compliance with Laws and Maintenance of Permits | 30 |
| | (i) | Affiliate Transactions | 30 |
| | (j) | Names and Trade Names | 31 |
| | (k) | Equipment | 31 |
| | (l) | Enforceability | 31 |
| | (m) | Solvency | 31 |
| | (n) | Indebtedness | 31 |
| | (o) | Margin Security and Use of Proceeds | 31 |
| | (p) | Parent, Subsidiaries and Affiliates | 32 |
| | (q) | No Defaults | 32 |
| | (r) | Employee Matters | 32 |
| | (s) | Intellectual Property | 32 |
| | (t) | Environmental Matters | 32 |
| | (u) | ERISA Matters | 33 |
| 12. | | AFFIRMATIVE COVENANTS | 33 |
| | (a) | Maintenance of Records | 33 |
| | (b) | Notices | 33 |
| | (c) | Compliance with Laws and Maintenance of Permits | 34 |
| | (d) | Inspection and Audits | 35 |
| | (e) | Insurance | 35 |
| | (f) | Collateral | 37 |
| | (g) | Use of Proceeds | 37 |
| | (h) | Taxes | 37 |
| | (i) | Intellectual Property | 37 |
| | (j) | Checking Accounts and Cash Management Services | 38 |
| | (k) | Patriot Act, Bank Secrecy Act and Office of Foreign Assets Control | 38 |

# TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| | (f) | Public Reporting | 27 |
| | (g) | Other Information | 28 |
| 10. | | TERMINATION; AUTOMATIC RENEWAL | 28 |
| 11. | | REPRESENTATIONS AND WARRANTIES | 29 |
| | (a) | Financial Statements and Other Information | 29 |
| | (b) | Locations | 29 |
| | (c) | Loans by Borrower | 29 |
| | (d) | Accounts and Inventory | 29 |
| | (e) | Liens | 29 |
| | (f) | Organization, Authority and No Conflict | 30 |
| | (g) | Litigation | 30 |
| | (h) | Compliance with Laws and Maintenance of Permits | 30 |
| | (i) | Affiliate Transactions | 30 |
| | (j) | Names and Trade Names | 31 |
| | (k) | Equipment | 31 |
| | (l) | Enforceability | 31 |
| | (m) | Solvency | 31 |
| | (n) | Indebtedness | 31 |
| | (o) | Margin Security and Use of Proceeds | 31 |
| | (p) | Parent, Subsidiaries and Affiliates | 32 |
| | (q) | No Defaults | 32 |
| | (r) | Employee Matters | 32 |
| | (s) | Intellectual Property | 32 |
| | (t) | Environmental Matters | 32 |
| | (u) | ERISA Matters | 33 |
| 12. | | AFFIRMATIVE COVENANTS | 33 |
| | (a) | Maintenance of Records | 33 |
| | (b) | Notices | 33 |
| | (c) | Compliance with Laws and Maintenance of Permits | 34 |
| | (d) | Inspection and Audits | 35 |
| | (e) | Insurance | 35 |
| | (f) | Collateral | 37 |
| | (g) | Use of Proceeds | 37 |
| | (h) | Taxes | 37 |
| | (i) | Intellectual Property | 37 |
| | (j) | Checking Accounts and Cash Management Services | 38 |
| | (k) | Patriot Act, Bank Secrecy Act and Office of Foreign Assets Control | 38 |

# TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| 13. | NEGATIVE COVENANTS | | 38 |
| | (a) | Guaranties | 38 |
| | (b) | Indebtedness | 38 |
| | (c) | Liens | 39 |
| | (d) | Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business | 39 |
| | (e) | Dividends and Distributions | 39 |
| | (f) | Investments; Loans | 40 |
| | (g) | Fundamental Changes, Line of Business | 41 |
| | (h) | Equipment | 41 |
| | (i) | Affiliate Transactions | 41 |
| | (j) | Settling of Accounts | 41 |
| | (k) | Management Fees; Compensation | 41 |
| | (l) | Sale and Leaseback Documentation | 42 |
| 14. | FINANCIAL COVENANTS | | 42 |
| | (a) | EBITDA | 42 |
| | (b) | Debt Service Coverage | 42 |
| | (c) | Maximum Capital Expenditure Limitation | 43 |
| 15. | DEFAULT | | 43 |
| | (a) | Payment | 43 |
| | (b) | Breach of this Agreement | 43 |
| | (c) | Breaches of Other Obligations | 43 |
| | (d) | Breach of Representations and Warranties | 43 |
| | (e) | Loss of Collateral | 43 |
| | (f) | Levy, Seizure or Attachment | 43 |
| | (g) | Bankruptcy or Similar Proceedings | 44 |
| | (h) | Appointment of Receiver | 44 |
| | (i) | Judgment | 44 |
| | (j) | Dissolution of Obligor | 44 |
| | (k) | Default or Revocation of Guaranty | 44 |
| | (l) | Criminal Proceedings | 45 |
| | (m) | Change of Control | 45 |
| | (n) | Change of Management | 45 |
| | (o) | Material Adverse Change | 45 |
| 16. | REMEDIES UPON AN EVENT OF DEFAULT | | 45 |
| 17. | CONDITIONS PRECEDENT | | 46 |

# TABLE OF CONTENTS
(continued)

Page

18. SETTLEMENTS, DISTRIBUTIONS AND APPORTIONMENT OF PAYMENTS ............ 47
19. AGENT ............ 48
   (a) Appointment of Agent ............ 48
   (b) Nature of Duties of Agent ............ 48
   (c) Lack of Reliance on Agent ............ 48
   (d) Certain Rights of Agent ............ 49
   (e) Reliance by Agent ............ 49
   (f) Indemnification of Agent ............ 49
   (g) Agent in its Individual Capacity ............ 50
   (h) Holders of Notes ............ 50
   (i) Successor Agent ............ 50
   (j) Collateral Matters ............ 51
   (k) Actions with Respect to Defaults ............ 52
   (l) Delivery of Information ............ 52
   (m) Demand ............ 53
   (n) Notice of Default ............ 53
20. ASSIGNABILITY ............ 53
21. AMENDMENTS, ETC ............ 55
22. NONLIABILITY OF AGENT AND LENDERS ............ 56
23. INDEMNIFICATION ............ 56
24. NOTICE ............ 57
25. CHOICE OF GOVERNING LAW; CONSTRUCTION; FORUM SELECTION ............ 57
26. HEADINGS OF SUBDIVISIONS ............ 58
27. POWER OF ATTORNEY ............ 58
28. CONFIDENTIALITY ............ 58
29. COUNTERPARTS ............ 59
30. ELECTRONIC SUBMISSIONS ............ 59
31. WAIVER OF JURY TRIAL; OTHER WAIVERS ............ 59

| | | |
|---|---|---|
| EXHIBIT A | - | BUSINESS AND COLLATERAL LOCATIONS |
| EXHIBIT B | - | COMPLIANCE CERTIFICATE |
| EXHIBIT C | - | COMMERCIAL TORT CLAIMS |
| EXHIBIT D | - | FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT |
| SCHEDULE 1 | - | PERMITTED LIENS |
| SCHEDULE 11 (c) | - | LOANS |
| SCHEDULE 11 (g) | - | LITIGATION |
| SCHEDULE 11 (i) | - | AFFILIATE TRANSACTIONS |
| SCHEDULE 11 (n) | - | INDEBTEDNESS |
| SCHEDULE 11 (p) | - | PARENT, SUBSIDIARIES AND AFFILIATES |
| SCHEDULE 11(j) | - | NAMES |
| SCHEDULE 14(f) | - | INVESTMENTS |
| SCHEDULE 17(a) | - | CLOSING DOCUMENT CHECKLIST |

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this "Agreement") made this 4th day of October, 2006 by and among LASALLE BUSINESS CREDIT, LLC, a Delaware limited liability company (in its individual capacity, "LaSalle"), as agent (in such capacity as agent, "Agent") for itself and all other lenders from time to time a party hereto ("Lenders"), having an address at 2600 West Big Beaver, Mail Code M0900-345, Troy, MI 48084, all other Lenders and BLACKHAWK AUTOMOTIVE PLASTICS, INC., a Delaware corporation, having its principal place of business at 800 Pennsylvania Avenue, Salem, Ohio 44460 ("Borrower").

WITNESSETH:

WHEREAS, Borrower may, from time to time, request Loans (as defined below) from Agent and Lenders, and the parties wish to provide for the terms and conditions upon which such Loans or other financial accommodations, if made by Agent and Lenders, shall be made.

NOW, THEREFORE, in consideration of any Loan (including any Loan by renewal or extension) hereafter made to Borrower by Agent and/or Lenders, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Borrower, the parties agree as follows:

1. Definitions.

"Account", "Account Debtor", "Chattel Paper", "Commercial Tort Claims", "Deposit Accounts", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Right", "Proceeds" and "Tangible Chattel Paper" shall have the respective meanings assigned to such terms in the Illinois Uniform Commercial Code, as the same may be in effect from time to time.

"Affiliate" shall mean any Person (i) which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Borrower, (ii) which beneficially owns or holds five percent (5%) or more of the voting control or equity interests of Borrower, or (iii) five percent (5%) or more of the voting control or equity interests of which is beneficially owned or held by Borrower.

"Applicable Margin" shall mean, initially, three-quarters of one percent (0.75%) for Prime Rate Loans, and three and one-half percent (3.5%) for LIBOR Rate Loans. Notwithstanding the foregoing, following receipt by Agent of Borrower's audited financial statements for the Fiscal Year ended December 31, 2006, the Applicable Margin shall be based on the applicable level as determined based on the following table:

|  | Debt Service Coverage | Excess Availability | Applicable Margin for LIBOR Rate Loans | Applicable Margin for Prime Rate Loans |
|---|---|---|---|---|
| Level I | 1.10 and over | $0 to $1,499,000 | 3.75 | 1.00 |
| Level II | 1.10 to 1.40 | $1,500,000 to $3,500,000 | 3.50 | 0.75 |
| Level III | 1.41 to 1.74 | $3,501,000 to $6,499,000 | 3.25 | 0.50 |
| Level IV | 1.75 or more | $6,500,000 or more | 3.00 | 0.25 |

The Applicable Margin for each Loan shall be adjusted, to the extent applicable, on the 30th day after the end of each calendar quarter based on the applicable level determined above as of the last day of such calendar quarter; it being understood that Borrower must satisfy both (a) the Debt Service Coverage requirement and (b) the Excess Availability requirement to qualify for the Applicable Margin. To the extent the Borrower meets one of the two criteria set forth above for a reduction of the Applicable Margin but fails to satisfy the other, the Applicable Margin shall not be adjusted and shall remain at the higher rate. If the Borrower fails to deliver the financial statements on a timely basis as required by Section 9(c), in addition to any rights and remedies available to Agent and Lenders upon an Event of Default, the Applicable Margin shall immediately be reset to the highest percentage specified above. Notwithstanding the foregoing, no reduction to the foregoing interest rates shall become effective at any time when an Event of Default has occurred. For purposes of determining Borrower's Debt Service Coverage for the quarters ending December 31, 2006 and March 31, 2007, shall be determined as if principal payments on the Term Loans had commenced 30 days following the Closing Date instead of being deferred.

"Assignment and Acceptance" shall have the meaning in Section 20 hereof.

"Business Day" shall mean any day other than a Saturday, a Sunday or (i) with respect to all matters, determinations, fundings and payments in connection with LIBOR Rate Loans, any day on which banks in London, England or Chicago, Illinois are required or permitted to close, and (ii) with respect to all other matters, any day that banks in Chicago, Illinois are required or permitted to close.

"Capital Expenditures" shall mean with respect to any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including expenditures for capitalized lease obligations) by Borrower during such period that are required by generally accepted accounting principles, consistently applied, to be included in or reflected by the property, plant and equipment or similar fixed asset accounts (or intangible accounts subject to amortization) on the balance sheet of Borrower.

"Closing Date" shall mean October 4, 2006.

"Collateral" shall mean all of the property of Borrower described in Section 5 hereof, together with all other real or personal property of any Obligor or any other Person now or hereafter pledged to Agent, for the benefit of Agent and Lenders, to secure, either directly or indirectly, repayment of any of the Liabilities.

2

CHICAGO/#1466603.10

"**Debt Service Coverage**" shall mean, with respect to any period, the ratio of (i) Borrower's pre-tax income for such period (excluding any after-tax gains or losses on the sale of assets (other than the sale of Inventory in the ordinary course of business) and excluding other after-tax extraordinary gains or losses), plus depreciation and amortization deducted in determining net income for such period, minus Capital Expenditures for such period not financed, minus any cash dividends paid and cash withdrawals paid or accrued to shareholders or other Affiliates for such period which were not calculated in determining net income after taxes, plus interest expense and plus the after-tax increase in LIFO reserves, or minus the after tax decrease in LIFO reserves, minus any income taxes paid in cash, to (ii) Borrower's current principal maturities of long term debt and capitalized leases paid or scheduled to be paid during such period, plus interest expense, plus any prepayments on indebtedness owed to any Person (except trade payables and revolving loans) and paid during such period, in each case as determined in accordance with GAAP consistently applied.

"**Defaulting Lender**" shall have the meaning set forth in subsection 2(a) hereof.

"**Dilution**" shall mean, with respect to any period, the percentage obtained by dividing (i) the sum of all credits against Accounts (including, but not limited to returns, adjustments and rebates paid in cash or given as a credit against amounts due) of Borrower for such period, plus pending or probable, but not yet applied, non-cash credits against Accounts of Borrower for such period, as determined by Agent in its sole discretion by (ii) gross invoiced sales of Borrower for such period.

"**EBITDA**" means as to the Borrower, to be calculated as of the last day of each fiscal quarter, for the four (4) quarter period ending on that date, all to be determined in accordance with GAAP consistently applied, the aggregate of (a) the Net Income (or loss) for such period, plus (b) tax expense for such period, plus (c) cash interest expense (including the amortization of deferred financing costs, interest expense on deferred compensation arrangements, if any, and payments made to obtain interest rate protection agreements), plus (d) depreciation and amortization of assets for such period, plus (e) extraordinary or unusual non-cash losses not incurred in the ordinary course of business but which were counted in the net income calculation for such period, plus (f) management fees for such period to the extent permitted under this Agreement minus (g) extraordinary gains not incurred in the ordinary course of business but which were counted in the net income calculation for such period, plus (h) restructuring expenses not to exceed $110,000 per month through December 31, 2006; provided that any portion of such monthly limit which is not expensed may be expensed in the subsequent month up to and until December 31, 2006.

"**Eligible Account**" shall mean an Account owing to Borrower which is acceptable to Agent in its reasonable discretion for lending purposes. Without limiting Agent's discretion, Agent shall, in general, consider an Account to be an Eligible Account if it meets, and so long as it continues to meet, the following requirements:

(i)  it is genuine and in all respects what it purports to be;

(ii) it is owned by Borrower, Borrower has the right to subject it to a security interest in favor of Agent or assign it to Agent and it is subject to a first priority perfected

3

CHICAGO/#1466603.10

security interest in favor of Agent and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Liens;

   (iii) it arises from (A) the performance of services by Borrower in the ordinary course of Borrower's business, and such services have been fully performed and acknowledged and accepted by the Account Debtor thereunder; or (B) the sale or lease of Goods or Tooling by Borrower in the ordinary course of Borrower's business, and (x) such Goods have been completed in accordance with the Account Debtor's specifications (if any) and delivered (to the extent required for payment) to the Account Debtor, (y) such Account Debtor has not refused to accept, returned or offered to return, any of the Goods which are the subject of such Account, and (z) Borrower has possession of, or Borrower has delivered to Agent (at Agent's request) shipping and delivery receipts evidencing delivery of such Goods;

   (iv) it is evidenced by an invoice rendered to the Account Debtor thereunder, is not outstanding more than ninety (90) days from the date of the invoice therefor or past due more than sixty (60) days after its due date, which shall not be later than thirty (30) days after the invoice date; provided, however, that (i) solely with respect to Tooling Accounts, the period for eligibility past the invoice date shall be increased to one hundred fifty (150) days and (ii) solely with respect to Non-PPAP Tooling Accounts, the limitation on eligibility past the invoice date shall not apply for such Non-PPAP Tooling Accounts so long as such Accounts are supported by the Guaranty of Key Equity Capital;

   (v) it is a valid, legally enforceable and unconditional obligation of the Account Debtor thereunder, and is not subject to (x) setoff, counterclaim, credit, allowance or adjustment by such Account Debtor, or (y) or to any claim by such Account Debtor denying liability thereunder in whole or in part; provided, however, that in the event that the aggregate amount owed to Borrower by such Account Debtor exceeds the aggregate amount owed to such Account Debtor by the Borrower, the amount of such excess shall be deemed eligible;

   (vi) it does not arise out of a contract or order which fails in any material respect to comply with the requirements of applicable law;

   (vii) the Account Debtor thereunder is not a director, officer, employee or agent of Borrower, or a Subsidiary, Parent or Affiliate;

   (viii) it is not an Account with respect to which the Account Debtor is the United States of America or any state or local government, or any department, agency or instrumentality thereof, unless Borrower assigns its right to payment of such Account to Agent pursuant to, and in full compliance with, the Assignment of Claims Act of 1940, as amended, or any comparable state or local law, as applicable;

   (ix) it is not an Account with respect to which the Account Debtor is located in a state which requires Borrower, as a precondition to commencing or maintaining an action in the courts of that state, either to (A) receive a certificate of authority to do business and be in good standing in such state; or (B) file a notice of business activities report or similar report with such state's taxing authority, unless (x) Borrower has taken one of the actions described in clauses (A) or (B); (y) the failure to take one of the actions described in either clause (A) or

4

CHICAGO/#1466603.10

(B) may be cured retroactively by Borrower at its election; or (z) Borrower has proven, to Agent's reasonable satisfaction, that it is exempt from any such requirements under any such state's laws;

(x) the Account Debtor is located within the United States of America or Canada; provided, however, that up to $250,000 in the aggregate of Accounts owing by Account Debtors which are Subsidiaries of General Motors Corporation or DaimlerChrysler Corporation domiciled in Mexico shall be eligible hereunder to the extent they otherwise meet all requirements for eligibility hereunder;

(xi) it is not an Account with respect to which the Account Debtor's obligation to pay is subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale on approval, sale or return or consignment basis;

(xii) it is not an Account (A) with respect to which any representation or warranty contained in this Agreement is untrue; or (B) which violates any of the covenants of Borrower contained in this Agreement;

(xiii) the Account is not owing by an Account Debtor or a group of affiliated Account Debtors, other than General Motors, Lear Corporation, or Daimler Chrysler Corporation to Borrower whose then existing Accounts owing to Borrower individually exceed in an aggregate face amount twenty percent (20%) of the Borrower's total Eligible Receivables; provided, however, that for purposes of this clause (xiii), only the Accounts of such Account Debtor or group of affiliated Account Debtors in excess of twenty percent (20%) shall be deemed to be ineligible;

(xiv) it is not an Account with respect to which the prospect of payment or performance by the Account Debtor is or will be impaired, as determined by Agent in its reasonable discretion;

(xv) the Account is not owing by an Account Debtor for which fifty percent (50%) or more of such Account Debtor's other Accounts due to Borrower are non-Eligible Accounts; and

(xvi) to the extent such Account constitutes a Tooling Account, it satisfies in all respects all criteria set forth herein for Eligible Accounts.

"Eligible Inventory" shall mean Inventory of Borrower which is acceptable to Agent in its reasonable discretion for lending purposes. Without limiting Agent's discretion, Agent shall, in general, consider Inventory to be Eligible Inventory if it meets, and so long as it continues to meet, the following requirements:

(i) it is owned by Borrower, Borrower has the right to subject it to a security interest in favor of Agent and it is subject to a first priority perfected security interest in favor of Agent and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Liens;

(ii) it is located on one of the premises listed on Exhibit A (or other locations of which Agent has been advised in writing pursuant to subsection 12(b)(i) hereof and for which Agent has received a collateral access agreement in form and substance acceptable to Agent), such locations are within the United States and is not in transit;

(iii) if held for sale or lease or furnishing under contracts of service, it is (except as Agent may otherwise consent in writing) new and unused and free from defects which would, in Agent's reasonable determination, affect its market value;

(iv) it is not stored with a bailee, consignee, warehouseman, processor or similar party unless Agent has given its prior written approval and Borrower has caused any such bailee, consignee, warehouseman, processor or similar party to issue and deliver to Agent, in form and substance reasonably acceptable to Agent, such Uniform Commercial Code financing statements, warehouse receipts, waivers and other documents as Agent shall reasonably require;

(v) Agent has determined, in accordance with Agent's customary business practices, that it is not unacceptable due to age, type, category or quantity, it being understood and agreed that any Inventory greater than three hundred sixty (360) days old shall not be eligible;

(vi) it is not Inventory (A) with respect to which any of the representations and warranties contained in this Agreement are untrue; (B) which violates any of the covenants of Borrower contained in this Agreement; (C) which is work-in-process; or (D) Tooling; and

(vii) it is not Inventory consisting of finished goods that are not for a customer's current model year production, supplies, packaging materials, labels, parts utilized for the repair of equipment or tool crib items.

"Environmental Laws" shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to Borrower's business or facilities owned or operated by Borrower, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, modified or restated from time to time.

"Event of Default" shall have the meaning specified in Section 15 hereof.

"Excess Availability" shall mean, as of any date of determination by Agent, the lesser of (i) the Maximum Revolving Loan Limit less the sum of the outstanding Revolving Loans and Letter of Credit Obligations and (ii) the Revolving Loan Limit less the sum of the outstanding Revolving Loans and Letter of Credit Obligations, in each case as of the close of business on such date and assuming, for purposes of calculation, that all accounts payable (excluding

accounts payable for the purchase or acquisition of Tooling) which remain unpaid more than sixty (60) days after the due date thereof (provided that such due date is thirty (30) days past invoice date in all instances) as the close of business on such date are treated as additional Revolving Loans outstanding on such date.

"Fiscal Year" shall mean each twelve (12) month accounting period of Borrower, which ends on December 31 of each year.

"GAAP" means, unless the context requires otherwise, generally accepted accounting principles in the United States of America in effect from time to time, or, in the case of the calculation of the financial covenants contained in Section 14 and with respect to the definitions applicable thereto, "GAAP" means generally accepted accounting principles in the United States of America in effect on the Closing Date.

"Guarantors" means each of Tier-e and Key Equity Capital Corporation.

"Hazardous Materials" shall mean any hazardous, toxic or dangerous substance, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law).

"Hedging Agreement" means any interest rate, currency or commodity swap agreement, cap agreement or collar agreement, and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"Indebtedness" of a Person means at any date the total Liabilities of such Person at such time determined in accordance with GAAP consistently applied.

"Indemnified Party" shall have the meaning specified in Section 18 hereof.

"Interest Period" shall have the meaning specified in subsection 4(a)(ii) hereof.

"Key Entities" means any and all of Blue Point Capital Partners LLC, Key Equity Capital Corporation, Key Equity Partners 99, Key Equity Partners 2000 or Key Capital Corporation and any of their affiliated partnerships.

"Key Equity Capital" means Key Equity Capital Corporation, an Ohio corporation.

"LaSalle Bank" shall mean LaSalle Bank National Association, Chicago, Illinois.

"Letter of Credit" shall mean any Letter of Credit issued on behalf of Borrower in accordance with this Agreement.

CHICAGO/#1466603.10

10/22/2007 22:40 FAX 312 609 5005      VEDDER PRICE KAUFMAN                    ⌐195

"Letter of Credit Obligations" shall mean, as of any date of determination, the sum of (i) the aggregate undrawn face amount of all Letters of Credit, and (ii) the aggregate unreimbursed amount of all drawn Letters of Credit not already converted to Loans hereunder.

"Liabilities" shall mean any and all obligations, liabilities and indebtedness of Borrower to Agent and each Lender or to any parent, affiliate or subsidiary of Agent and each Lender arising under this Agreement or the Other Agreements, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise (including, without limitation, obligations of performance), whether several, joint or joint and several.

"LIBOR Rate" shall mean, with respect to any LIBOR Rate Loan for any Interest Period, a rate per annum equal to (a) the offered rate for deposits in United States dollars for a period equal to such Interest Period as displayed in the Bloomberg Financial Markets system (or such other authoritative source as selected by Agent in its sole discretion) as of 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period divided by (b) a number equal to 1.0 minus the maximum reserve percentages (expressed as a decimal fraction) including, without limitation, basic supplemental, marginal and emergency reserves under any regulations of the Board of Governors of the Federal Reserve System or other governmental authority having jurisdiction with respect thereto, as now and from time to time in effect, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) which are required to be maintained by Agent by the Board of Governors of the Federal Reserve System. The LIBOR Rate shall be adjusted automatically on and as of the effective date of any change in such reserve percentage.

"LIBOR Rate Loans" shall mean the Loans bearing interest with reference to the LIBOR Rate.

"Loans" shall mean all loans and advances made by Agent and/or Lenders to or on behalf of Borrower hereunder.

"Lock Box" and "Lock Box Account" shall have the meanings specified in subsection 8(a) hereof.

"Material Adverse Effect" shall mean a material adverse effect on the business, property, assets, operations or financial condition of a Person.

"Maximum Revolving Loan Limit" shall have the meaning specified in subsection 2(a) hereof.

"Net Income" means the net income of Borrower as reflected on its financial statements as determined in accordance with GAAP.

"Non-PPAP Tooling Account" means a Tooling Account in existence on the Closing Date which otherwise meets all requirements of an Eligible Account, provided that the purchaser of such tooling giving rise to such Tooling Account has yet to provide the Borrower with final, written PPAP approval of such tooling through the Production Parts Approval Process.

8

CHICAGO/#1466603.10

"Obligor" shall mean Borrower and each other Person who is or shall become primarily or secondarily liable for any of the Liabilities, including, but not limited to, the Guarantor.

"Original Term" shall have the meaning specified in Section 10 hereof.

"Other Agreements" shall mean all agreements, instruments and documents, other than this Agreement, including, without limitation, guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements, intercreditor and subordination agreements, Hedging Agreements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of Borrower or any other Person and delivered to Agent and/or any Lender or to any parent, affiliate or subsidiary of Agent and/or any Lender in connection with the Liabilities or the transactions contemplated hereby, as each of the same may be amended, modified or supplemented from time to time.

"Parent" shall mean any Person now or at any time or times hereafter owning or controlling (alone or with any other Person) at least a majority of the issued and outstanding equity of Borrower and, if Borrower is a partnership, the general partner of Borrower.

"PBGC" shall have the meaning specified in subsection 12(b)(v) hereof.

"Permitted Asset Disposition" means any one or more of the following asset dispositions provided that unless otherwise expressly provided in this definition, each such asset disposition shall be made in the ordinary course of business:

(a)   sales of Inventory;

(b)   dispositions of worn, used, surplus or obsolete Equipment or intellectual property deemed uneconomical or obsolete, so long as all proceeds resulting therefrom are utilized to pay the Term Loans paid in accordance with the terms of Section 2(d)(v) of this Agreement;

(c)   usual and customary write-downs and other reductions of Accounts in connection with the compromise and collection of Accounts in the ordinary course of business;

(d)   asset dispositions which are the subject of a casualty or condemnation; and

(e)   any other asset disposition, provided that the aggregate net proceeds from all such other asset dispositions during any Fiscal Year shall not exceed $100,000 with all proceeds being paid to the Agent, on behalf of the Lenders, for prepayment of the Liabilities.

"Permitted Liens" shall mean (i) statutory liens of landlords, carriers, warehousemen, processors, mechanics, materialmen or suppliers incurred in the ordinary course of business and securing amounts not yet due or declared to be due by the claimant thereunder; (ii) liens or security interests in favor of Agent; (iii) all building codes, zoning and land use laws, zoning restrictions and easements, licenses, covenants and other restrictions affecting the use of real property that do not individually or in the aggregate have a material adverse effect on Borrower's ability to use such real property for its intended purpose in connection with Borrower's business;

9

CHICAGO/#1466603.10

(iv) liens in connection with purchase money indebtedness and capitalized leases otherwise permitted pursuant to this Agreement, provided, that such liens attach only to the assets the purchase of which was financed by such purchase money indebtedness or which is the subject of such capitalized leases; (v) liens set forth on Schedule 1 hereto; (vi) liens specifically permitted by Agent in writing; (vii) Liens for taxes which are not delinquent or which are being contested in good faith and by appropriate proceedings, and such contest operates to suspend collection of the contested taxes and enforcement of a Lien; (viii) Liens for employee taxes and insurance which are not delinquent; (ix) deposits or pledges to secure obligations under workers' compensation, social security or similar laws, or under unemployment insurance in the ordinary course of business; and (x) judgment Liens to the extent the entry of such judgment does not constitute an Event of Default under the terms of this Agreement or result in the sale or levy of or execution on, any of the Collateral.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or foreign or United States government (whether federal, state, county, city, municipal or otherwise), including, without limitation, any instrumentality, division, agency, body or department thereof.

"Plan" shall have the meaning specified in subsection 12(b)(v) hereof.

"Pre-Settlement Determination Date" shall have the meaning specified in Section 18 hereof.

"Prime Rate" shall mean LaSalle Bank's publicly announced prime rate (which is not intended to be LaSalle Bank's lowest or most favorable rate in effect at any time) in effect from time to time.

"Prime Rate Loans" shall mean the Loans bearing interest with reference to the Prime Rate.

"Production Parts Approval Process" or "PPAP" means in respect of Tooling, the process employed by customers to confirm that Tooling is capable of producing component parts at production volumes conforming to all required customer specifications without further modifications or changes to the Tooling and, as a result of such confirmation, Borrower is authorized to invoice the customer for the purchase price of the Tooling.

"Pro Rata Share" shall mean at any time, with respect to any Lender, a fraction (expressed as a percentage in no more than nine (9) decimal places), the numerator of which shall be the sum of the Revolving Loan Commitment, Term Loan A Commitment and Term Loan B Commitment of such Lender at such time and the denominator of which shall be the Maximum Revolving Loan Limit plus the aggregate amount of all Lenders' Term Loan A Commitments plus the aggregate amount of all Lenders' Term Loan B Commitments at such time.

"Renewal Term" shall have the meaning specified in Section 10 hereof.

CHICAGO/#1466603.10

"Requisite Lenders" shall mean, at any time, Lenders having Pro Rata Shares aggregating at least fifty-one percent (51%) at such time; provided, however, notwithstanding the foregoing, Requisite Lenders shall at all times include LaSalle.

"Revolving Loan Commitment" shall mean, with respect to any Lender, the maximum amount of Revolving Loans which such Lender has agreed to make to Borrower, subject to the terms and conditions of this Agreement, as set forth on the signature page hereto or an Assignment and Acceptance Agreement executed by such Lender.

"Revolving Loan Limit" shall have the meaning specified in subsection 2(a) hereof.

"Revolving Loans" shall have the meaning specified in subsection 2(a) hereof.

"Sale and Leaseback' means the sale and leaseback of Borrower's property located at 800 Pennsylvania Avenue, Salem, Ohio and 4219 U.S. Route 42, Mason, Ohio in accordance with the Sale and Leaseback Documentation.

"Sale and Leaseback Documentation" shall mean that certain Real Estate Purchase and Sale Agreement between Borrower and Sage Aggregation, LLC dated as of October 4, 2006, and all documents executed in connection therewith.

"Settlement Date" shall have the meaning specified in Section 18 hereof.

"Subsidiary" shall mean any corporation of which more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time stock of any other class of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by Borrower, or any partnership, joint venture or limited liability company of which more than fifty percent (50%) of the outstanding equity interests are at the time, directly or indirectly, owned by Borrower or any partnership of which Borrower is a general partner.

"Tax" shall mean, in relation to any LIBOR Rate Loans and the applicable LIBOR Rate, any tax, levy, impost, duty, deduction, withholding or charges of whatever nature required to be paid by Agent or any Lender and/or to be withheld or deducted from any payment otherwise required hereby to be made by Borrower to Agent or any Lender; provided, that the term "Tax" shall not include any taxes imposed upon the net income of Agent or any Lender.

"Term Loan A" shall have the meaning specified in subsection 2(b) hereof.

"Term Loan A Commitment" shall mean, with respect to any Lender, the maximum amount of Term Loan A which such Lender has agreed to make, subject to the terms and conditions of this Agreement, as set forth on the signature page hereto or on any Assignment and Acceptance Agreement executed by such Lender.

"Term Loan B" shall have the meaning specified in subsection 2(c) hereof.

11

CHICAGO/#1466603.10