"**Term Loan B Commitment**" shall mean, with respect to any Lender, the maximum amount of Term Loan B which such Lender has agreed to make, subject to the terms and conditions of this Agreement, as set forth on the signature page hereto or any Assignment and Acceptance Agreement executed by such Lender.

"**Term Loans**" shall mean, collectively, Term Loan A and Term Loan B.

**07 C 6438**

"**Tier-e**" shall mean Tier-e Automotive Group, a Delaware corporation.

"**Tooling**" means tools, dies, jigs, fixtures, gauges, molds, special purpose equipment and substantially similar items.

"**Tooling Account**" means an Account representing a sale of Tooling and (i) the purchaser of such Tooling (the Account Debtor) has finally approved (through the Production Parts Approval Process) such Tooling and such Tooling has satisfied the Account Debtor's quality standards as reflected in writing, or (ii) the purchaser of such Tooling (the Account Debtor) has approved in writing invoicing for such Tooling in accordance with the purchase order relating to such Tooling and such Tooling or portion thereof related to a specific Account is not subject to any further approval by the purchaser thereof.

**JUDGE PALLMEYER**
**MAGISTRATE JUDGE BROWN**

2.      Loans.

    (a)      Revolving Loans.

        Subject to the terms and conditions of this Agreement and the Other Agreements, during the Original Term and any Renewal Term, each Lender, severally and not jointly, agrees to fund its Pro Rata Share of revolving loans and advances (the "**Revolving Loans**") requested by and approved by Agent in its sole discretion, up to such Lender's Revolving Loan Commitment so long as after giving effect to such Revolving Loans, the sum of the aggregate unpaid principal balance of the Revolving Loans and the Letter of Credit Obligations does not exceed an amount up to the sum of the following sublimits (the "**Revolving Loan Limit**"):

        (i)      Up to eighty-five percent (85%) of an amount equal to the face amount, less maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of Borrower's business, of Borrower's Eligible Accounts; provided that such advance rate shall be reduced by one (1) percentage point for each whole or partial percentage point by which Dilution (as determined by Agent in good faith based on the results of the most recent twelve (12) month period for which Agent has conducted a field audit of Borrower) exceeds five percent (5%); plus

        (ii)      Without duplication of clause (i) above, up to eighty-five percent (85%) of an amount equal to the face amount, less maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of Borrower's business, of Borrower's Non-PPAP Tooling Accounts provided that such Non-PPAP Tooling Accounts which are subject to advances hereunder shall at all times be subject to a guaranty in form and substance acceptable to Agent executed by Key Equity Capital in favor of Agent; plus

12

CHICAGO/#1466603.10

(iii)     Up to fifty-five percent (55%) of the lower of cost or market value of Borrower's Eligible Inventory or Six Million and No/100 Dollars ($6,000,000.00), whichever is less; minus

(iv)     a Tooling reserve in the amount of One Million Four Hundred Twenty Thousand Dollars ($1,420,000); minus

(v)     such other reserves as Agent elects, in its reasonable discretion to establish from time to time;

provided, that, the Revolving Loan Limit shall in no event exceed Thirty Million and No/100 Dollars ($30,000,000) (the "Maximum Revolving Loan Limit"), except as such amount may be increased by Lenders, in their sole discretion.

The aggregate unpaid principal balance of the Revolving Loans shall not at any time exceed the lesser of the (i) Revolving Loan Limit minus the Letter of Credit Obligations and (ii) the Maximum Revolving Loan Limit minus the Letter of Credit Obligations. If at any time the outstanding Revolving Loans exceeds either the Revolving Loan Limit or the Maximum Revolving Loan Limit, in each case minus the Letter of Credit Obligations, or any portion of the Revolving Loans and Letter of Credit Obligations exceeds any applicable sublimit within the Revolving Loan Limit, Borrower shall immediately, and without the necessity of demand by Agent, pay to Agent such amount as may be necessary to eliminate such excess and Agent shall apply such payment to the Revolving Loans in such order as Agent shall determine in its sole discretion; provided that Agent may, in its sole discretion, permit such excess (the "Interim Advance") to remain outstanding and continue to advance Revolving Loans to Borrower on behalf of Lenders without the consent of any Lender for a period of up to thirty (30) calendar days, so long as (i) the amount of the Interim Advances does not exceed at any time Three Million and No/100 Dollars ($3,000,000.00), and (ii) the aggregate outstanding principal balance of the Revolving Loans does not exceed the Maximum Revolving Loan Limit. If the Interim Advance is not repaid in full within thirty (30) days of the initial occurrence of the Interim Advance, no future advances may be made to Borrower without the consent of all Lenders until the Interim Advance is repaid in full.

Neither Agent nor any Lender shall be responsible for any failure by any other Lender to perform its obligations to make Revolving Loans hereunder, and the failure of any Lender to make its Pro Rata Share of any Revolving Loan hereunder shall not relieve any other Lender of its obligation, if any, to make its Pro Rata Share of any Revolving Loans hereunder.

If Borrower makes a request for a Revolving Loan as provided herein and Agent approves such advances, Agent shall do either of the following:

(i)     advance the amount of the proposed Revolving Loan to Borrower disproportionately (a "Disproportionate Advance") out of Agent's own funds on behalf of Lenders, which advance shall be on the same day as Borrower's request therefor if Borrower notifies Agent of such request by 1:00 P.M. (Troy, Michigan time) on such day, and request settlement in accordance with Section 18 hereof such that upon such settlement each Lender's

13

share of the outstanding Revolving Loans (including, without limitation, the amount of any Disproportionate Advance) equals its Pro Rata Share; or

(ii)    Notify each Lender by telecopy, electronic mail or other similar form of teletransmission of the proposed advance on the same day Agent is notified or deemed notified by Borrower of Borrower's request for an advance pursuant to this Section 2(a). Each Lender shall remit, to the demand deposit account designated by Borrower (i) with respect to Prime Rate Loans, at or prior to 3:00 P.M., Troy, Michigan time, on the date of notification, if such notification is made before 1:00 P.M., Troy, Michigan time, or 10:00 A.M., Troy, Michigan time, on the Business Day immediately succeeding the date of such notification, if such notification is made after 1:00 P.M., Troy, Michigan time, and (ii) with respect to LIBOR Rate Loans, at or prior to 10:30 A.M., Troy, Michigan time, on the date such LIBOR Rate Loans are to be advanced, immediately available funds in an amount equal to such Lender's Pro Rata Share of such proposed advance.

If and to the extent that a Lender does not settle with Agent as required under this Agreement (a "**Defaulting Lender**"), Borrower and Defaulting Lender severally agree to repay to Agent forthwith on demand such amount required to be paid by such Defaulting Lender to Agent, together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to Agent (x) in the case of a Defaulting Lender at the rate published by the Federal Reserve Bank of New York on the next succeeding Business Day as the "Federal Funds Rate" or if no such rate is published for any Business Day, at the average rate quoted for such day for such transactions from three (3) federal funds brokers of recognized standing selected by Agent, and (y) in the case of Borrower, at the interest rate applicable at such time for such Loans; provided, that Borrower's obligation to repay such advance to Agent shall not relieve such Defaulting Lender of its liability to Agent for failure to settle as provided in this Agreement.

Borrower hereby authorizes Agent, upon notice to Borrower, to charge any of Borrower's accounts or advance Revolving Loans to make any payments of principal, interest, fees, costs or expenses required to be made under this Agreement or the Other Agreements.

A request for a Revolving Loan shall be made or shall be deemed to be made, each in the following manner: Borrower shall give Agent same day notice, no later than 1:00 P.M. (Troy, Michigan time) for such day, of its request for a Revolving Loan as a Prime Rate Loan, and at least three (3) Business Days prior notice of its request for a Revolving Loan as a LIBOR Rate Loan, in which notice Borrower shall specify the amount of the proposed borrowing and the proposed borrowing date; provided, however, that no such request may be made at a time when there exists an Event of Default or an event which, with the passage of time or giving of notice, will become an Event of Default. In the event that Borrower maintains a controlled disbursement account at LaSalle Bank, each check presented for payment against such controlled disbursement account and any other charge or request for payment against such controlled disbursement account shall constitute a request for a Revolving Loan as a Prime Rate Loan. As an accommodation to Borrower, Agent may permit telephone requests for Revolving Loans and electronic transmittal of instructions, authorizations, agreements or reports to Agent by Borrower. Unless Borrower specifically directs Agent in writing not to accept or act upon telephonic or electronic communications from Borrower, Agent shall have no liability to

Borrower for any loss or damage suffered by Borrower as a result of Agent's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to Agent by Borrower and Agent shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

Borrower hereby irrevocably authorizes Agent to disburse the proceeds of each Revolving Loan requested by Borrower, or deemed to be requested by Borrower, as follows: the proceeds of each Revolving Loan requested under Section 2(a) shall be disbursed by Agent in lawful money of the United States of America in immediately available funds, in the case of the initial borrowing, in accordance with the terms of the written disbursement letter from Borrower, and in the case of each subsequent borrowing, by wire transfer or Automated Clearing House (ACH) transfer to such bank account as may be agreed upon by Borrower and Agent from time to time, or elsewhere if pursuant to a written direction from Borrower.

       (b)    Term Loan A.

Subject to the terms and conditions of this Agreement and the Other Agreements, on the date that the conditions to the initial Loans are satisfied, each Lender severally and not jointly agrees to make a term loan to Borrower in an amount equal to its Pro Rata Share of Ten Million and No/100 Dollars ($10,000,000).

       (c)    Term Loan B.

Subject to the terms and conditions of this Agreement and the Other Agreements, on the date that the conditions to the initial Loans are satisfied, each Lender severally and not jointly agrees to make a term loan to Borrower in an amount equal to its Pro Rata Share of One Million Five Hundred Thousand and No/100 Dollars ($1,500,000).

       (d)    Repayments.

       (i)    Repayment of Revolving Loans. The Revolving Loans and all other Liabilities (other than the Term Loans) shall be repaid on the last day of the Original Term or any Renewal Term if this Agreement is renewed pursuant to Section 10 hereof.

       (ii)    Repayment of Term Loan A. Term Loan A shall be repaid in thirty-three (33) equal monthly installments of One Hundred Nineteen Thousand and Forty-Eight Dollars ($119,048) payable on the day that is ninety (90) days from the date of such advance and on the second corresponding Business Day of each month thereafter; provided that any remaining outstanding principal balance of Term Loan A shall be repaid at the end of the Original Term or any Renewal Term if this Agreement is renewed pursuant to Section 10 hereof. If any such payment due date is not a Business Day, then such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and fees due hereunder.

15

promissory note or notes to the order of the assignee in amounts equal to such assignee's commitments and outstanding Loans hereunder and, if the assigning Lender has retained a portion of the Loans, a new promissory note or notes to the order of the assigning Lender in an amount equal to the remaining commitments and outstanding loans hereunder of such assigning Lender under the terms of this Agreement. Such new promissory note or notes shall re-evidence the indebtedness outstanding under the old promissory note or notes and shall be in the aggregate principal amount of such surrendered promissory note or notes, shall be dated of even date herewith and shall otherwise be in substantially the form of the promissory note or notes subject to such assignment.

(g)     Each Lender may sell participations (without the consent of Agent, Borrower or any other Lender) to one or more parties, in or to all (or a portion) of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Revolving Loan Commitment, Term Loan A Commitment and Term Loan B Commitment or the Loans owing to it); provided, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) Borrower, Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) such Lender shall not transfer, grant, assign or sell any participation under which the participant shall have rights to approve any amendment or waiver of this Agreement.

(h)     Each Lender agrees that, without the prior written consent of Borrower and Agent, it will not make any assignment hereunder in any manner or under any circumstances that would require registration or qualification of, or filings in respect of, any Loan or other Liabilities under the securities laws of the United States of America or of any jurisdiction.

(i)     In connection with the efforts of any Lender to assign its rights or obligations or to participate interests, such Lender may disclose any information in its possession regarding Borrower.

21.    Amendments, Etc.

No amendment or waiver of any provision of this Agreement or any of the Other Agreements, nor consent to any departure by any Obligor therefrom, shall in any event be effective unless the same shall be in writing and signed by Requisite Lenders, or if Lenders shall not be parties thereto, by the parties thereto and consented to by Requisite Lenders, and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, that no amendment, waiver or consent shall, unless in writing and signed by all Lenders, do any of the following: (i) increase the Revolving Loan Commitment, Term Loan A Commitment and Term Loan B Commitment of Lenders or subject Lenders to any additional obligations to extend credit to Borrower, (ii) reduce the principal of, or interest on, the Loans (other than as expressly permitted herein) or any fees hereunder, (iii) postpone any date fixed for any payment in respect of principal of, or interest on, the Loan or any fees hereunder, (iv) change the Pro Rata Shares of Lenders, or any minimum requirement necessary for Lenders or Requisite Lenders to take any action hereunder, (v) amend or waive this Section 21, or change the definition of Requisite Lenders, (vi) increase the advance rates set

55

forth in subsection 2(a) hereof, (vii) amend or waive any financial covenant set forth in Section 14 hereof, or (viii) except in connection with the financing, refinancing, sale or other disposition of any asset of Borrower permitted under this Agreement (or to the extent Requisite Lender approval only is required with any such release pursuant to subsection 19(j) hereof), release or subordinate any liens in favor of Agent, for the benefit of Agent and Lenders, on any of the Collateral and provided further, that no amendment, waiver or consent affecting the rights or duties of Agent under this Agreement or any Other Agreement shall in any event be effective, unless in writing and signed by Agent in addition to Lenders required hereinabove to take such action. Notwithstanding any of the foregoing to the contrary, (a) for purposes of voting or consenting to matters with respect to this Agreement and the Other Agreements, a Defaulting Lender shall not be considered a Lender and such Defaulting Lender's Revolving Loan Commitment, Term Loan A Commitment and Term Loan B Commitment shall each be deemed to be $0 until such Defaulting Lender makes the payments required in this Agreement and (b) the consent of Borrower shall not be required for any amendment, modification or waiver of the provisions of this Section 21.

In the event that any consent, waiver or amendment requiring the agreement of all Lenders as set forth above is agreed to by the Requisite Lenders, but not all Lenders, Agent may, in its sole discretion, cause any non-consenting Lender to assign its rights and obligations under this Agreement and the Other Agreements to one or more new Lenders or existing Lenders in the manner and according to the terms set forth in Section 20 of this Agreement; provided, that (i) no Lender may be required to assign its rights and obligations to a new Lender because such existing Lender is unwilling to increase its own loan commitments, (ii) such new Lender must be willing to consent to the proposed amendment, waiver or consent and (iii) in connection with such assignment the new Lender pays the assigning Lender an amount equal to the Liabilities owing to such assigning Lender, including all principal, accrued and unpaid interest and accrued and an unpaid fees to the date of assignment. Such assignment shall occur within thirty (30) days of notice by Agent to such non-consenting Lender of Agent's intent to cause such non-consenting Lender to assign its interests hereunder.

22.    Nonliability of Agent and Lenders.

The relationship between Borrower, Agent and Lenders shall be solely that of borrower and lender. Neither Agent nor any Lender shall have any fiduciary responsibilities to Borrower. Neither Agent nor any Lender undertakes any responsibility to Borrower to review or inform Borrower of any matter in connection with any phase of Borrower's business or operations.

23.    Indemnification.

Borrower agrees to defend (with counsel satisfactory to Agent), protect, indemnify and hold harmless Agent and each Lender, each affiliate or subsidiary of Agent and each Lender, and each of their respective shareholders, members, officers, directors, managers, employees, attorneys and agents (each an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature (including, without limitation, the disbursements and the reasonable fees of counsel for the Indemnified Parties in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnified Party shall be designated a

56

party thereto), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities laws and regulations, Environmental Laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement or any Other Agreement, or any act, event or transaction related or attendant thereto, the making or issuance and the management of the Loans or any Letters of Credit or the use or intended use of the proceeds of the Loans or any Letters of Credit; provided, however, that Borrower shall not have any obligation hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and, failing prompt payment, shall, together with interest thereon at the highest rate then applicable to Loans hereunder from the date incurred by each Indemnified Party until paid by Borrower, be added to the Liabilities of Borrower and be secured by the Collateral. The provisions of this Section 23 shall survive the satisfaction and payment of the other Liabilities and the termination of this Agreement.

24. Notice.

All written notices and other written communications with respect to this Agreement shall be sent by ordinary, certified or overnight mail, by telecopy or delivered in person, and in the case of Agent shall be sent to the address set forth on the signature page hereto, in the case of a Lender shall be sent to the address set forth below its name on the signature page hereto or in the Assignment and Acceptance Agreement and in the case of Borrower shall be sent to it at the address set forth on the signature page hereto or as otherwise directed by Borrower in writing. All notices shall be deemed received upon actual receipt thereof or refusal of delivery.

25. Choice of Governing Law; Construction; Forum Selection.

This Agreement and the Other Agreements are submitted by Borrower to Agent and Lenders for their acceptance or rejection at Agent's principal place of business as an offer by Borrower to borrow monies from Agent and Lenders now and from time to time hereafter, and shall not be binding upon Agent or any Lender or become effective until accepted by Agent and Lenders, in writing, at said place of business. If so accepted by Agent and Lenders, this Agreement and the Other Agreements shall be deemed to have been made at said place of business. **THIS AGREEMENT AND THE OTHER AGREEMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, INCLUDING, WITHOUT LIMITATION, THE LEGALITY OF THE INTEREST RATE AND OTHER CHARGES, BUT EXCLUDING PERFECTION OF THE SECURITY INTERESTS IN COLLATERAL LOCATED OUTSIDE OF THE STATE OF ILLINOIS, WHICH SHALL BE GOVERNED AND CONTROLLED BY THE LAWS OF THE RELEVANT JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED.** If any provision of

this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or remaining provisions of this Agreement.

To induce Agent and Lenders to accept this Agreement, Borrower irrevocably agrees that, subject to Agent's sole and absolute election, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER AGREEMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST BORROWER BY AGENT OR LENDERS IN ACCORDANCE WITH THIS SECTION.

26.    Headings of Subdivisions.

The headings of subdivisions in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the provisions of this Agreement.

27.    Power of Attorney.

Borrower acknowledges and agrees that upon an Event of Default that has occurred and is continuing its appointment of Agent as its attorney and agent-in-fact for the purposes specified in this Agreement is an appointment coupled with an interest and shall be irrevocable until all of the Liabilities are satisfied and paid in full and this Agreement is terminated.

28.    Confidentiality.

Borrower, Agent and each Lender hereby agrees to use commercially reasonable efforts to assure that any and all information relating to Borrower which is (i) furnished by Borrower to Agent or any Lender (or to any affiliate of Agent or any Lender) and (ii) non-public, confidential or proprietary in nature, shall be kept confidential by Agent and such Lender or such affiliate in accordance with applicable law; provided, however, that such information and other credit information relating to Borrower may be distributed by such party to such party's directors, officers, employees, attorneys, affiliates, assignees, participants, auditors, agents and regulators, to Agent and any other Lender and upon the order of a court or other governmental agency having jurisdiction over Agent or such Lender or such affiliate, to any other party. In addition such information and other credit information may be distributed by Agent or any Lender to potential participants or assignees of any portion of the Liabilities, provided, that such

58

CHICAGO/#1466603.10

potential participant or assignee agrees to follow the confidentiality requirements set forth herein. Borrower, Agent and each Lender further agree that this provision shall survive the termination of this Agreement. Notwithstanding the foregoing, Borrower hereby consents to Agent publishing a tombstone or similar advertising material relating to the financing transaction contemplated by this Agreement.

29.   Counterparts.

This Agreement, any of the Other Agreements and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which counterparts together shall constitute but one agreement.

30.   Electronic Submissions.

Upon not less than thirty (30) days' prior written notice (the "**Approved Electronic Form Notice**"), Agent may permit or require that any of the documents, certificates, forms, deliveries or other communications, authorized, required or contemplated by this Agreement or the Other Agreements, be submitted to Agent in "**Approved Electronic Form**" (as hereafter defined), subject to any reasonable terms, conditions and requirements in the applicable Approved Electronic Forms Notice. For purposes hereof "**Electronic Form**" means e-mail, e-mail attachments, data submitted on web-based forms or any other communication method that delivers machine readable data or information to Agent, and "**Approved Electronic Form**" means an Electronic Form that has been approved in writing by Agent (which approval has not been revoked or modified by Agent) and sent to Borrower in an Approved Electronic Form Notice. Except as otherwise specifically provided in the applicable Approved Electronic Form Notice, any submissions made in an applicable Approved Electronic Form shall have the same force and effect that the same submissions would have had if they had been submitted in any other applicable form authorized, required or contemplated by this Agreement or the Other Agreements.

31.   Waiver of Jury Trial; Other Waivers.

(a)   BORROWER, AGENT AND EACH LENDER EACH HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, ANY OF THE OTHER AGREEMENTS, THE LIABILITIES, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY BORROWER, AGENT OR SUCH LENDER OR WHICH, IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP AMONG BORROWER, AGENT AND LENDERS. IN NO EVENT SHALL AGENT OR ANY LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

(b)   Borrower hereby waives demand, presentment, protest and notice of nonpayment, and further waives the benefit of all valuation, appraisal and exemption laws.

(c)   Borrower hereby waives the benefit of any law that would otherwise restrict or limit Agent or any Lender or any affiliate of Agent or any Lender in the exercise of its

59

CHICAGO/#1466603.10

right, which is hereby acknowledged and agreed to, to set-off against the Liabilities, without notice at any time hereafter, any indebtedness, matured or unmatured, owing by Agent or any Lender or such affiliate of Agent or any Lender to Borrower, including, without limitation any Deposit Account at Agent or any Lender or such affiliate.

(d)    BORROWER HEREBY WAIVES ALL RIGHTS TO NOTICE AND HEARING OF ANY KIND PRIOR TO THE EXERCISE BY LENDER OF ITS RIGHTS TO REPOSSESS THE COLLATERAL OF BORROWER WITHOUT JUDICIAL PROCESS OR TO REPLEVY, ATTACH OR LEVY UPON SUCH COLLATERAL.

(e)    Agent's and/or Lenders' failure, at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement or any of the Other Agreements shall not waive, affect or diminish any right of Agent or any Lender thereafter to demand strict compliance and performance therewith.  Any suspension or waiver by Agent or any Lender of an Event of Default under this Agreement or any default under any of the Other Agreements shall not suspend, waive or affect any other Event of Default under this Agreement or any other default under any of the Other Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character.  No delay on the part of Agent or any Lender in the exercise of any right or remedy under this Agreement or any Other Agreement shall preclude other or further exercise thereof or the exercise of any right or remedy. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the Other Agreements and no Event of Default under this Agreement or default under any of the Other Agreements shall be deemed to have been suspended or waived by Agent and/or Lenders unless such suspension or waiver is in writing, signed by a duly authorized officer of Agent, Requisite Lenders or all Lenders, as required herein, and directed to Borrower specifying such suspension or waiver.

**[Signature Page Follows]**

60

*Loan and Security Agreement Signature Page*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

BLACKHAWK AUTOMOTIVE
PLASTICS, INC.

By: _____
Title: President & CEO

And

By: _____
Title: CFO

Address:    800 Pennsylvania Avenue
            Salem, Ohio 44460
            Attn: President
Facsimile: (330) 332 – 6568

CHICAGO/#1466603

*Loan and Security Agreement Signature Page (continued)*

LASALLE BUSINESS CREDIT, LLC, as
Agent and a Lender

By: W.M.J. Stewart
Title: FIRST VICE PRESIDENT

Address:   2600 Big Beaver
           Troy, MI  48084
Facsimile: (248) 822-5809

Revolving Loan Commitment:  $15,000,000
Term Loan A Commitment:  $5,000,000
Term Loan B Commitment:  $750,000

CHICAGO/#1466603

*Loan and Security Agreement Signature Page (continued)*

**CITIZENS BANK**, a Michigan banking corporation

By: _____
Title: _____

Address: c/o Citizens Bank Business
Finance
38701 Seven Mile Road
Suite 290
Livonia, MI 48152
Attn: Charles D. Stephenson
Facsimile: (248) 324-8616

Revolving Loan Commitment: $15,000,000
Term Loan A Commitment: $5,000,000
Term Loan B Commitment: $750,000

2

EXHIBIT A

BUSINESS AND COLLATERAL LOCATIONS

Attached to and made a part of that certain Loan and Security Agreement of even date herewith among BLACKHAWK AUTOMOTIVE PLASTICS, INC. ("Borrower") and LASALLE BUSINESS CREDIT, LLC, as Agent and all Lenders from time to time a party hereto.

A.    Borrower's business locations (please indicate which location is the principal place of business and at which locations originals and all copies of Borrower's books, records and accounts are kept).

        1.    800 Pennsylvania Ave., Salem, OH 44460 (Corporate office and books)

        2.    500 N. Warpole Street, Upper Sandusky, OH 43351 (books)

        3.    4219 Route 42, Mason, OH 45040 (books)

        4.    1111 W. Long Lake Rd., Suite 102  Troy, MI 48099-1259

B.    Other locations of Collateral (including, without limitation, warehouse locations, processing locations, consignment locations) and all post office boxes of Borrower.  Please indicate the relationship of such location to Borrower (i.e. public warehouse, processor, etc.).

| | | | |
|---|---|---|---|
| Warehouse | 300 Benton Rd. | Salem | OH |
| Warehouse | 101 South 15th St. | Sebring | OH |
| Warehouse | 3900 St RT 741 | Lebanon | OH |
| Warehouse | 960 Deneen Ave. | Monroe | OH |
| Sequencing – Ryder Integrated Logistics | 2901 S. Canal Rd | Lansing | MI |
| Sequencing - Plastech MSC | 4240 East Rive Rd. | Moraine | OH |
| GM – Lansing Assembly Plant | Lansing Grand River Assembly Plant | Lansing | MI |
| GM - Moraine Assembly Plant | 511 Byers Rd | Miamisburg | OH |
| Processor - Plastic Platers | 9921 Clinton Rd. | Cleveland | OH |
| Processor - Polymer Exchange | 1946 Trapas Ave., P.O. Box 26345 | Akron | OH |

C.    Bank Accounts of Borrower (other than those at LaSalle Bank):

| Bank (with address) | Account Number | Type of Account |
|---|---|---|
| 1. Bank One, Ohio | 629436544 | Payroll |
| 2. Bank One, Canada | 4663119-1-01 | A/P Disbursement ($CDN) |
| 3. Bank One, Canada | 4663119-2-10 | A/P Disbursement ($USD) |

A-1

## EXHIBIT B

## COMPLIANCE CERTIFICATE

Attached to and made a part of that certain Loan and Security Agreement, as it may be amended in accordance with its terms from time to time, including all exhibits attached thereto (the "**Agreement**") dated as of September __, 2006 among BLACKHAWK AUTOMOTIVE PLASTICS, INC. ("**Borrower**"), LASALLE BUSINESS CREDIT, LLC as agent ("**Agent**") and each lender from time to time a party thereto ("**Lenders**").

This Certificate is submitted pursuant to subsection 9(c) of the Agreement.

The undersigned hereby certifies to Agent and Lenders that as of the date of this Certificate:

1.     The undersigned is the _____ of Borrower.

2.     There exists no event or circumstance which is or which with the passage of time, the giving of notice, or both would constitute an Event of Default, as that term is defined in the Agreement, or, if such an event or circumstance exists, a writing attached hereto specifies the nature thereof, the period of existence thereof and the action that Borrower has taken or proposes to take with respect thereto.

3.     No material adverse change in the condition, financial or otherwise, business, property, or results of operations of Borrower has occurred since [**date of last Compliance Certificate/last financial statements delivered prior to closing**], or, if such a change has occurred, a writing attached hereto specifies the nature thereof and the action that Borrower has taken or proposes to take with respect thereto.

4.     Borrower is in compliance with the representations, warranties and covenants in the Agreement, or, if Borrower is not in compliance with any representations, warranties or covenants in the Agreement, a writing attached hereto specifies the nature thereof, the period of existence thereof and the action that Borrower has taken or proposes to take with respect thereto.

5.     The financial statements of Borrower being concurrently delivered herewith have been prepared in accordance with generally accepted accounting principles consistently applied and there have been no material changes in accounting policies or financial reporting practices of Borrower since [**date of the last Compliance Certificate/date of last financial statements delivered prior to closing**] or, if any such change has occurred, such changes are set forth in a writing attached hereto.

6.    Attached hereto as <u>Schedule 1</u> is a true and correct calculation of the financial covenants contained in the Agreement.

BLACKHAWK AUTOMOTIVE
PLASTICS, INC.

By:_____
Its:_____

B-2

# EXHIBIT C

## COMMERCIAL TORT CLAIMS

NONE

C-1

EXHIBIT D

FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

This Assignment and Acceptance Agreement (this "Assignment Agreement") between
_____ (the Assignor) and _____ (the "Assignee") is dated as of
_____, 200___. The parties hereto agree as follows:

1.    Preliminary Statement.    The Assignor is a party to a Loan and Security
Agreement (which, as it may be amended, modified, renewed or extended from time to time, is
herein called the "**Loan Agreement**") described in Item 1 of Schedule 1 attached hereto
("**Schedule 1**"). Capitalized terms used herein and not otherwise defined herein shall have the
meanings attributed to them in the Loan Agreement.

2.    Assignment and Assumption.    The Assignor hereby sells and assigns to the
Assignee, and the Assignee hereby purchases and assumes from the Assignor, an interest in and
to the Assignor's rights and obligations under the Loan Agreement such that after giving effect
to such assignment the Assignee shall have purchased pursuant to this Assignment Agreement
the percentage interest specified in Item 3 of Schedule 1 of all outstanding rights and obligations
under the Loan Agreement relating to the facilities listed in Item 3 of Schedule 1 and the Other
Agreements (collectively, the "Loan Documents"). The aggregate Revolving Loan Commitment
and Term Loan Commitment (each referred to hereinafter collectively as the "Commitment") (or
Loans, if the applicable Commitment has been terminated) purchased by the Assignee hereunder
is set forth in Item 4 of Schedule 1.

3.    Effective Date. The effective date of this Assignment Agreement (the "**Effective
Date**") shall be the later of the date specified in Item 5 of Schedule 1 or two (2) Business Days
(or such shorter period agreed to by the Agent) after a Notice of Assignment substantially in the
form of Appendix I (attached hereto) has been delivered to the Agent. Such Notice of
Assignment must include the consents, if any, required to be delivered to the Agent and the
Borrower by Section 21(c) of the Loan Agreement. In no event will the Effective Date occur if
the payments required to be made by the Assignee to the Assignor on the Effective Date under
Sections 4 and 5 hereof are not made on the proposed Effective Date. The Assignor will notify
the Assignee of the proposed Effective Date no later than the Business Day prior to the proposed
Effective Date. As of the Effective Date, (i) the Assignee shall have the rights and obligations of
a Lender under the Loan Documents with respect to the rights and obligations assigned to the
Assignee hereunder and (ii) the Assignor shall relinquish its rights and be released from its
corresponding obligations under the Loan Documents with respect to the rights and obligations
assigned to the Assignee hereunder.

4.    Payments Obligations. On and after the Effective Date, the Assignee shall be
entitled to receive from the Agent all payments of principal, interest and fees with respect to the
interest assigned hereby. The Assignee shall advance funds directly to the Agent with respect to
all Loans and reimbursement payments made on or after the Effective Date with respect to the
interest assigned hereby. In consideration for the sale and assignment of Loans hereunder, (i) the
Assignee shall pay the Assignor, on the Effective Date, an amount equal to the principal amount
of the portion of all Prime Rate Loans assigned to the Assignee hereunder and (ii) with respect to

each LIBOR Rate Loan made by the Assignor and assigned to the Assignee hereunder which is outstanding on the Effective Date, (a) on the last day of the Interest Period therefor or (b) on such earlier date agreed to by the Assignor and the Assignee or (c) on the date on which any such LIBOR Rate Loan either becomes due (by acceleration or otherwise) or is prepaid (the date as described in the foregoing clauses (a), (b) or (c) being hereinafter referred to as the "**Payment Date**"), the Assignee shall pay the Assignor an amount equal to the principal amount of the portion of such LIBOR Rate Loan assigned to the Assignee which is outstanding on the Payment Date. If the Assignor and the Assignee agree that the Payment Date for such LIBOR Rate Loan shall be the Effective Date, they shall agree to the interest rate applicable to the portion of such Loan assigned hereunder for the period from the Effective Date to the end of the existing Interest Period applicable to such LIBOR Rate Loan (the "**Agreed Interest Rate**") and any interest received by the Assignee in excess of the Agreed Interest Rate shall be remitted to the Assignor. In the event interest for the period from the Effective Date to but not including the Payment Date is not paid by the applicable Borrower with respect to any LIBOR Rate Loan sold by the Assignor to the Assignee hereunder, the Assignee shall pay to the Assignor interest for such period on the portion of such LIBOR Rate Loan sold by the Assignor to the Assignee hereunder at the applicable rate provided by the Loan Agreement. In the event a prepayment of any LIBOR Rate Loan which is existing on the Payment Date and assigned by the Assignor to the Assignee hereunder occurs after the Payment Date but before the end of the Interest Period applicable to such LIBOR Rate Loan, the Assignee shall remit to the Assignor the excess of the prepayment penalty paid with respect to the portion of such LIBOR Rate Loan assigned to the Assignee hereunder over the amount which would have been paid if such prepayment penalty was calculated based on the Agreed Interest Rate. The Assignee will also promptly remit to the Assignor (i) any principal payments received from the Agent with respect to LIBOR Rate Loans, prior to the Payment Date and (ii) any amounts of interest on Loans and fees received from the Agent which relate to the portion of the Loans assigned to the Assignee hereunder for periods prior to the Effective Date, in the case of Prime Rate Loans or fees, or the Payment Date, in the case of LIBOR Rate Loans, and not previously paid by the Assignee to the Assignor.[1] In the event that either party hereto receives any payment to which the other party hereto is entitled under this Assignment Agreement, then the party receiving such amount shall promptly remit it to the other party hereto.

5.    Fees Payable by the Assignee.  The [Assignee shall pay to the Assignor a fee on each day on which a payment of interest or commitment fees is made under the Loan Agreement with respect to the amounts assigned to the Assignee hereunder (other than a payment of interest or commitment fees for the period prior to the Effective Date or, in the case of LIBOR Rate Loans, the Payment Date, which the Assignee is obligated to deliver to the Assignor pursuant to Section 4 hereof).  The amount of such fee shall be the difference between (i) the interest or fee, as applicable, paid with respect to the amounts assigned to the Assignee hereunder and (ii) the interest or fee, as applicable, which would have been paid with respect to the amounts assigned to the Assignee hereunder if each interest rate was ___ of 1% less than the interest rate paid by any Borrower or if the commitment fee was of ___ 1% less than the commitment fee paid by any

---

[1]    Each Assignor may insert its standard payment provisions in lieu of the payment terms included in this Exhibit.

Borrower, as applicable. In addition, the] [Assignee] [Assignor] agrees to pay a $3,500 processing fee required to be paid to the Agent in connection with this Assignment Agreement.[2]

6.    Representations of The Assignor; Limitations on the Assignor's Liability.    The Assignor represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim created by the Assignor. It is understood and agreed that the assignment and assumption hereunder are made without recourse to the Assignor and that the Assignor makes no other representation or warranty of any kind to the Assignee. Neither the Assignor, the Agent, nor any other Lender, nor any of its officers, directors, employees, agents or attorneys shall be responsible for (i) the due execution, legality, validity, enforceability, genuineness, sufficiency or collectibility of any Other Agreement, including without limitation, documents granting the Assignor, Agent and the other Lenders a security interest in assets of any Borrower, (ii) any representation, warranty or statement made in or in connection with any of the Loan Documents, (iii) the financial condition or creditworthiness of any Borrower, (iv) the performance of or compliance with any of the terms or provisions of any of the Loan Documents, (v) inspecting any of the property, books or records of any Borrower, (vi) the validity, enforceability, perfection, priority, condition, value or sufficiency of any collateral securing or purporting to secure the Loans or (vii) any mistake, error of judgment, or action taken or omitted to be taken in connection with the Loans or the Loan Documents.

7.    Representations of the Assignee.    The Assignee (i) confirms that it has received a copy of the Loan Agreement, together with copies of the financial statements requested by the Assignee and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement, (ii) agrees that it will, independently and without reliance upon the Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (iii) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto, (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender, (v) agrees that its payment instructions and notice instructions are as set forth in the attachment to Schedule 1, (vi) confirms that none of the funds, monies, assets or other consideration being used to make the purchase and assumption hereunder are "plan assets" as defined under ERISA and that its rights, benefits and interests in and under the Loan Documents will not be "plan assets" under ERISA, [and (vii) attaches the forms prescribed by the Internal Revenue Service of the United States certifying that the Assignee is entitled to receive payments under the Loan Documents without deduction or withholding of any United States federal income taxes].[3]

---

[2]    Assignor and Assignee to insert applicable payment terms.

[3]    To be inserted if the Assignee is not incorporated under the laws of the United States, or a state thereof.

D-3

8.    Indemnity.  The Assignee agrees to indemnify and hold the Assignor harmless against any and all losses, costs and expenses (including, without limitation, reasonable attorneys' fees) and liabilities incurred by the Assignor in connection with or arising in any manner from the Assignee's non-performance of the obligations assumed under this Assignment Agreement.

9.    Subsequent Assignments.  After the Effective Date, the Assignee shall have the right pursuant to Section 20 of the Loan Agreement to assign the rights which are assigned to the Assignee hereunder to any entity or person, provided that (i) any such subsequent assignment does not violate any of the terms and conditions of the Loan Documents or any law, rule, regulation, order, writ, judgment, injunction or decree and that any consent required under the terms of the Loan Documents has been obtained and (ii) unless the prior written consent of the Assignor is obtained, the Assignee is not thereby released from its obligations to the Assignor hereunder, if any remain unsatisfied, including, without limitation, its obligations under Section 4, 5 and 8 hereof.

10.   Reductions of Aggregate Commitment.  If any reduction in the aggregate Commitment occurs between the date of this Assignment Agreement and the Effective Date, the percentage interest specified in Item 3 of Schedule 1 shall remain the same, but the dollar amount purchased shall be recalculated based on the reduced aggregate Commitment.

11.   Entire Agreement.  This Assignment Agreement and the attached Notice of Assignment embody the entire agreement and understanding between the parties hereto and supersede all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

12.   Governing Law.  This Assignment Agreement shall be governed by and interpreted and enforced in accordance with the internal laws (without regard to conflicts of law provisions) of the State of Illinois.

13.   Notices.  Notices shall be given under this Assignment Agreement in the manner set forth in the Loan Agreement.  For the purpose hereof, the addresses of the parties hereto (until notice of a change is delivered) shall be the address set forth in the attachment to Schedule 1.

[SIGNATURE PAGE FOLLOWS]

*Signature Page to Form of Assignment and Acceptance Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement by their duly authorized officers as of the date first above written.

[NAME OF ASSIGNOR]

By:_____

Name:_____

Title:_____

[NAME OF ASSIGNEE]

By:_____

Name:_____

Title:_____