## SCHEDULE 11(p)

### PARENT, SUBSIDIARIES AND AFFILIATES

07 C 6438

JUDGE PALLMEYER
MAGISTRATE JUDGE BROWN

Parent: 100% owned by Tier e Automotive Group, Inc. ("Tier e")

Subsidiary: BAP, LTD - essentially a shell company with no assets except a tax loss carryforward.

Management Services Agreement, dated as of May 27, 1999, by and between Borrower and Blue Point Capital Partners

Borrower purchases certain plastic parts from Nescor Plastics Corporation ("Nescor") in arms-length transactions in the ordinary course of business. Nescor is 49% owned by Borrower's parent, Tier e

SCHEDULE 14(f)

INVESTMENTS

NONE

Schedule 11(p)
Page 1

# SCHEDULE 17(a)

## CLOSING DOCUMENT CHECKLIST

LASALLE BUSINESS CREDIT, LLC, as Agent
LOANS TO
BLACKHAWK AUTOMOTIVE PLASTICS, INC.

Closing Date: October 4, 2006

## CLOSING CHECKLIST

I. PARTIES

    A. LaSalle Business Credit, LLC ("Agent")
       2600 West Big Beaver
       Mail Code: M0900-345
       Troy, MI 48084
       Attention: William J. Stewart, First Vice President
       Tel: 248-822-5854
       Fax: 248-822-5809
       E-mail Address: william.stewart@abnamro.com

    B. Blackhawk Automotive Plastics, Inc. ("Borrower")
       800 Pennsylvania Avenue
       Salem, OH 44460
       Attn: Clifford W. Crowley
       Tel: 330-332-6344
       Fax: 330-332-6568
       E-mail Address: cwcroley@blackhawkplastics.com

II. COUNSEL TO PARTIES

    A. Agent:

       Vedder, Price, Kaufman & Kammholz, P.C. ("VP")
       222 North LaSalle Street, Suite 2600
       Chicago, Illinois 60601

       Attn: Matthew T. O'Connor
       (312) 609-7539 (Telephone)
       (312) 609-5005 (Facsimile)
       E-Mail Address: moconnor@vedderprice.com

       Attn: David P. Kaminski
       (312) 609-7873 (Telephone)
       (312) 609-5005 (Facsimile)
       E-Mail Address: dkaminski@vedderprice.com

B.  Borrower:

Kirkland & Ellis LLP ("KE")
200 East Randolph Street
Chicago, IL 60601

Attn: Christopher Butler
(312) 861-2298 (Telephone)
(312) 861-2200 (Facsimile)
E-Mail Address: cbutler@kirkland.com

Attn: Richard Radney
(312) 861-3230 (Telephone)
(312) 861-2200 (Facsimile)
E-Mail Address: rradnay@kirkland.com

Attn: Patricia Betterly
(212) 446-4804 (Telephone)
(212) 446-4900 (Facsimile)
E-Mail Address: pbetterly@kirkland.com

Terms used herein that are not otherwise defined have the meaning ascribed to such terms in the Loan Agreement referenced below.

III. OPERATIVE DOCUMENTS

|   |   |   | Responsibility |
|---|---|---|---|
| A. | LOAN AGREEMENT AND ANCILLARY AGREEMENTS | | |
| | 1. | Loan and Security Agreement ("Loan Agreement") | VP |
| | | a. Exhibits | |
| | | (i) Exhibit A - Business and Collateral Locations<br>(ii) Exhibit B - Compliance Certificate<br>(iii) Exhibit C - Commercial Tort Claims<br>(iv) Exhibit D - Form of Assignment and Acceptance Agreement | |
| | | b. Schedules | |
| | | (i) Schedule 1 - Permitted Liens<br>(ii) Schedule 11 (c) - Loans<br>(iii) Schedule 11 (g) - Litigation<br>(iv) Schedule 11 (i) - Affiliate Transactions<br>(v) Schedule 11(j) - Names<br>(vi) Schedule 11 (n) - Indebtedness<br>(vii) Schedule 11 (p) - Parent, Subsidiaries and Affiliates<br>(viii) Schedule 14(f) - Investments<br>(ix) Schedule 17(a) - Closing Document Checklist | |
| | 2. | Revolving Notes in favor of: | VP |
| | | a. LaSalle Business Credit, LLC ($15,000,000) | |
| | | b. Citizens Banking Corp. ($15,000,000) | |
| | 3. | Term Loan A Notes in favor of: | VP |
| | | a. LaSalle Business Credit, LLC ($5,000,000) | |
| | | b. Citizens Banking Corp. ($5,000,000) | |
| | 4. | Term Loan B Notes in favor of: | |
| | | a. LaSalle Business Credit, LLC ($750,000) | |
| | | b. Citizens Banking Corp. ($750,000) | |

CHICAGO/#1462240.9

| | | | Responsibility |
|---|---|---|---|
| | 5. | Trademark Security Agreement, together with Schedules thereto | VP |
| | 6. | Patent Security Agreement, together with Schedules thereto | VP |
| | 7. | Guaranty of Tier e Automotive Group, Inc. ("Parent") | VP |
| | 8. | Pledge Agreement from Parent with respect to all outstanding capital stock of Borrower, together with Schedules thereto and: | VP |
| | | a. Stock Powers | VP |
| | | b. Stock Certificate | Borrower |
| | 9. | Limited Guaranty of Key Equity Capital Corp. ("Key" and together with "Parent", the "Guarantors") | VP |
| | 10. | Certificate of Officer of Borrower attesting to true and complete copies of sale-leaseback documents, in form and substance reasonably acceptable to Agent and Lenders | Borrower |
| | 11. | Officer's Certificate of the Borrower certifying to the following: | Borrower (form provided by VP) |
| | | a. Accuracy of Representations and Warranties | |
| | | b. No Event Default or Unmatured Event of Default | |
| | | c. Such other matters as Agent reasonably requests | |
| | 12. | Solvency Certificate together with: | Borrower (form provided by VP) |
| | | a. Pro Forma Balance Sheets for Borrower on a consolidated and consolidating basis giving effect to financings; and | |
| | | b. Projections for Borrower on a consolidated and consolidating bases | |
| | 13. | Opinion of Borrower's and Guarantors' Counsel | KE |
| B. | | **REAL ESTATE DOCUMENTS** | |
| | 14. | Mortgage/Deed of Trust for the parcel of real property described on Schedule A hereto (the "Mortgaged Property") | VP |

| | | | Responsibility |
|---|---|---|---|
| | 15. | Landlord Waivers for the parcels of real property described on Schedule B hereto | Borrower (form provided by VP) |
| | 16. | Bailee Agreements for all bailee/warehouse locations where inventory of Borrower is located | [Requirement waived by Agent] |
| | 17. | Environmental Indemnity Agreement with respect to the Mortgaged Property | VP |
| | 18. | Environmental Assessment satisfactory to Agent | Agent |
| | 19. | An ALTA Loan Title Insurance Policy, issued by an insurer acceptable to the Agent, insuring the Agent's lien on the Mortgaged Property and containing such endorsements as the Agent may reasonably require | Borrower |
| | 20. | Copies of all documents of record concerning the Mortgaged Property as shown on the commitment for each ALTA Loan Title Insurance Policy referred to above | Borrower |
| | 21. | A flood certification for the Mortgaged Property | Borrower |
| | 22. | If required pursuant to the applicable flood certification, flood insurance policy for the Mortgaged Property N/A | Borrower |
| | 23. | ALTA Survey for the Mortgaged Property | Borrower |
| | 24. | An Appraisal and Appraisal Report for the Mortgaged Property satisfactory to Agent | Borrower |
| C. | **UCC SEARCHES AND FILINGS** | | |
| | 25. | UCC, Tax Lien, Judgment and Pending Litigation Searches for Borrower in the following jurisdictions: | VP |
| | | a. Delaware<br>b. Ohio<br>c. Columbiana County, Ohio<br>d. Wyandot County, Ohio<br>e. Warren County, Ohio<br>f. Mahoning County, Ohio<br>g. Michigan<br>h. Oakland County, Michigan | |

5

| | | | Responsibility |
|---|---|---|---|
| | 26. | UCC Fixture Financing Statements with respect to the Mortgaged Property to be filed in the counties described on Schedule A hereto | VP |
| | 27. | Pre-filing authorization for UCC-1 Financing Statement for Borrower to be filed with the Delaware Secretary of State | VP |
| | 28. | UCC-1 Financing Statement for Borrower to be filed with the Delaware Secretary of State | VP |
| | 29. | UCC Financing Statement for each Guarantor with respect to Stock Pledge | VP |
| D. | | ITEMS RELATING TO INSURANCE | |
| | 30. | Certificate(s) of Insurance for Borrower (and covering the Mortgaged Property) together with copies of all insurance policies | Borrower |
| | 31. | Lenders' loss payable clause for all property and casualty insurance showing LaSalle Business Credit, LLC, as Agent, as lender's loss payee, together with sole loss payee letter to Agent | Borrower (form provided by VP) |
| | 32. | Assignment of Business Interruption Insurance Policy | Borrower |
| E. | | AUTHORIZING DOCUMENTS | |
| | 33. | Secretary's Certificate for Borrower attaching and certifying as to (i) Certificate of Incorporation, certified by the Delaware Secretary of State as of a recent date, (ii) By-Laws, (iii) Authorizing Resolutions and (iv) Incumbency of Officers | Borrower (form provided by VP) |
| | 34. | Good Standing Certificate (or equivalent) for Borrower from each of the following jurisdictions: | Borrower |
| | | a. Delaware | |
| | | b. Ohio | |
| | | c. Michigan | |
| | 35. | Good Standing Certificate of Parent from Delaware Secretary of State | Borrower |

6

CHICAGO/#1462240.9

| | | | Responsibility |
|---|---|---|---|
| | 36. | Secretary's Certificate for Parent attaching and certifying as to (i) Certificate of Incorporation, certified by the Delaware Secretary of State as of a recent date, (ii) By-Laws, (iii) Authorizing Resolutions and (iv) Incumbency of Officers | Borrower |
| F. | | CASH MANAGEMENT; LOAN MANAGEMENT; LETTER OF CREDIT DOCUMENTS | |
| | 37. | Deposit Account Control Agreements with each of the banks set forth on Schedule C hereto with respect to each deposit account | Borrower (form provided by VP) |
| | 38. | Controlled Disbursement Services Agreement | VP |
| | 39. | Form of Daily Loan Request Form | VP |
| | 40. | Wire Transfer Security Procedures – Telephone | VP |
| | 41. | Waiver Agreement | VP |
| | 42. | LaSalle Lock Box and Blocked Account Agreement (with respect to tri-party agreement among Borrower, Agent and LaSalle Bank National Association) | VP |
| | 43. | Collateral Report Authorization Letter | VP |
| | 44. | Master Letter of Credit Agreement | VP |
| G. | | PAYOFF AND DISBURSEMENT DOCUMENTS | |
| | 45. | Authorization to Disburse Loan Proceeds | Borrower (form provided by VP) |
| | 46. | Payoff letter from LaSalle Bank, N.A. regarding satisfaction of existing credit facility | Borrower |
| | 47. | UCC Termination Statements pertaining to satisfaction of existing credit facility with LaSalle Bank, N.A., for the following jurisdiction(s): | Borrower |
| | | a.　Delaware [Others TBD] | |
| H. | | OTHER | |
| | 48. | Accountant's Reliance Letter | VP |
| | 49. | Sarbanes Oxley Approval Memorandum | VP/Agent |

7

CHICAGO/#1462240.9

|   |     |                                       | Responsibility |
|---|-----|---------------------------------------|----------------|
|   | 50. | Post-Closing Agreement (if applicable) | VP             |
|   | 51. | Fee Side Letter                       | VP             |
|   | 52. | Appraisal Reliance Letter             | Agent          |

## SCHEDULE A

## MORTGAGED PROPERTY

1. 500 N. Warpole Street
   Upper Sandusky, OH 43351
   County: Wyandot

## SCHEDULE B

## LOCATIONS OF LEASED REAL PROPERTY

| Location | Lessor |
|---|---|
| 300 Benton Road<br>Salem, OH | Penny Lippiatt |
| 3900 South State Route 741<br>Lebanon, OH 45036 | K.P. Properties of Ohio LLC<br>8340 Carolines Trail<br>Cincinnati, OH 45242 |
| 800 Pennsylvania Avenue<br>Salem, OH 44460<br>County: Columbiana | Stag Capital Partners |
| 4219 Route 42<br>Mason, OH 45040<br>County: Warren | Stag Capital Partners |
| 960 Deneen Ave.<br>Monroe, OH 45050 | K.P. Properties of Ohio LLC<br>8340 Carolines Trail<br>Cincinnati, OH 45242 |
| 101 S. 15th Street<br>Sebring, OH | Zee Tech Warehousing, Inc.<br>101 S. 15th St.<br>Sebring, OH 44672 |
| 1111 W. Long Lake Road<br>Troy, MI<br>[WAIVED BY LASALLE -- SALES OFFICE] | N/A |

SCHEDULE C

BANK ACCOUNTS

| Bank | Account Number | Type of Account | Type of Account Agreement |
|---|---|---|---|
| Bank One | 6294436544 | | |
| | 6294436536 | | |
| LaSalle Bank | 5800339623 | | |
| | 5590055777 | | |
| | 5800339631 | | |
| | 5590090261 | | |
| | 5590091889 | | |

11

    (iii) <u>Repayment of Term Loan B</u>. Term Loan B shall be repaid in thirty (30) equal monthly installments of Seventeen Thousand Eight Hundred Fifty-Seven Dollars ($17,857) payable on the day that is one hundred eighty (180) days from the date of such advance and on the second corresponding Business Day of each month thereafter; provided that any remaining outstanding principal balance of Term Loan B shall be repaid at the end of the Original Term or any Renewal Term if this Agreement is renewed pursuant to Section 10 hereof. If any such payment due date is not a Business Day, then such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and fees due hereunder.

    (iv) <u>Mandatory Prepayments of the Term Loans</u>. Upon receipt of the proceeds of the sale or other disposition of any real property of Borrower which is subject to a mortgage in favor of Agent or any Equipment which is not replaced in accordance with the terms of <u>Section 13(d)</u>, or if any real property subject to such mortgage or any Equipment is damaged, destroyed or taken by condemnation in whole or in part, the proceeds thereof shall be paid by Borrower to Agent, for the benefit of Agent and Lenders, as a mandatory prepayment of the Term Loans, such payment to be applied (i) first against the remaining installments of principal of Term Loan B in the inverse order of their maturities until Term Loan B is repaid in full, (ii) second against the remaining installments of principal of Term Loan A, in the inverse order of their maturities, until repaid in full, and (iii) last against the other Liabilities, as determined by Agent, in its sole discretion.

  (e) <u>Notes</u>.

  The Loans shall, in Agent's and Lenders' sole discretion, be evidenced by one or more promissory notes in form and substance reasonably satisfactory to each Lender. However, if such Loans are not so evidenced, such Loans may be evidenced solely by entries upon the books and records maintained by Agent and each Lender.

  3. <u>Letters of Credit</u>.

  (a) <u>General Terms</u>.

  Subject to the terms and conditions of this Agreement and the Other Agreements, during the Original Term or any Renewal Term, Agent may, in its sole discretion, from time to time issue, cause to be issued and co-sign for or otherwise guarantee, upon Borrower's request, commercial and/or standby Letters of Credit; provided, that the aggregate undrawn face amount of all such Letters of Credit shall at no time exceed Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000). Payments made by the issuer of a Letter of Credit to any Person on account of any Letter of Credit shall be immediately payable by Borrower without notice, presentment or demand and Borrower agrees that each payment made by the issuer of a Letter of Credit in respect of a Letter of Credit shall constitute a request by Borrower for a Loan to reimburse such issuer. In the event such Loan is not advanced by Agent or Lenders for any reason, such reimbursement obligations (whether owing to the issuer of the Letter of Credit or Agent or Lenders) shall become part of the Liabilities hereunder and shall bear interest at the rate

16

CHICAGO/#1466603.10

then applicable to Revolving Loans constituting Prime Rate Loans until repaid. Borrower shall remit to Agent, for the benefit of Lenders, a Letter of Credit fee equal to three and one-half percent (3.5 %) per annum for the period beginning on the Closing Date through the date upon which Agent receives Borrower's audited financial statements for the Fiscal Year ended December 31, 2006, and thereafter in an amount equal to the Applicable Margin for LIBOR Rate Loans on the aggregate undrawn face amount of all Letters of Credit outstanding, which fee shall be payable monthly in arrears on the last Business Day of each month. Borrower shall also pay on demand the normal and customary administrative charges of the issuer of the Letter of Credit for issuance, amendment, negotiation, renewal or extension of any Letter of Credit.

(b)   Requests for Letters of Credit.

Borrower shall make requests for Letters of Credit in writing at least three (3) Business Days prior to the date such Letter of Credit is to be issued. Each such request shall specify the date such Letter of Credit is to be issued, the amount thereof, the name and address of the beneficiary thereof and a description of the transaction to be supported thereby. Any such notice shall be accompanied by the form of Letter of Credit requested and any application or reimbursement agreement required by the issuer of such Letter of Credit. If any term of such application or reimbursement agreement is inconsistent with this Agreement, then the provisions of this Agreement shall control to the extent of such inconsistency.

(c)   Obligations Absolute.

Borrower shall be obligated to reimburse the issuer of any Letter of Credit, or Agent and/or Lenders if Agent and/or Lenders have reimbursed such issuer on Borrower's behalf, for any payments made in respect of any Letter of Credit, which obligation shall be unconditional and irrevocable and shall be paid regardless of: (i) any lack of validity or enforceability of any Letter of Credit, (ii) any amendment or waiver of or consent or departure from all or any provisions of any Letter of Credit, this Agreement or any Other Agreement, (iii) the existence of any claim, set off, defense or other right which Borrower or any other Person may have against any beneficiary of any Letter of Credit or Agent, any Lender or the issuer of the Letter of Credit, (iv) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid, or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, (v) any payment under any Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, and (vi) any other act or omission to act or delay of any kind of the issuer of such Letter of Credit, Agent, any Lender or any other Person or any other event or circumstance that might otherwise constitute a legal or equitable discharge of Borrower's obligations hereunder absent gross negligence or willful misconduct. It is understood and agreed by Borrower that the issuer of any Letter of Credit may accept documents that appear on their face to be in order without further investigation or inquiry, regardless of any information to the contrary.

(d)   Expiration Dates of Letters of Credit.

The expiration date of each Letter of Credit shall be no later than the earlier of (i) one (1) year from the date of issuance and (ii) the thirtieth (30th) day prior to the end of the

Original Term or any Renewal Term. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiration date for one or more one (1) year periods, so long as the issuer thereof has the right to terminate the Letter of Credit at the end of each one (1) year period and no extension period extends past the thirtieth (30th) day prior to the end of the Original Term or any Renewal Term.

   (e)  Participation.

Immediately upon the issuance of a Letter of Credit in accordance with this Agreement, each Lender shall be deemed to have irrevocably and unconditionally purchased and received from Agent, without recourse or warranty, an undivided interest and participation therein to the extent of such Lender's Pro Rata Share (including, without limitation, all obligations of Borrower with respect thereto). Borrower hereby indemnifies Agent and each Lender against any and all liability and expense it may incur in connection with any Letter of Credit and agrees to reimburse Agent and each Lender for any payment made by Agent or any Lender to the issuer.

  4.  Interest, Fees and Charges.

   (a)  Interest Rate.

Subject to the terms and conditions set forth below, the Loans shall bear interest at the per annum rate of interest set forth in subsection (i), (ii) or (iii) below:

    (i)  The Prime Rate in effect from time to time plus the Applicable Margin, payable on the second Business Day of each month in arrears. Said rate of interest shall increase or decrease by an amount equal to each increase or decrease in the Prime Rate effective on the effective date of each such change in the Prime Rate.

    (ii)  The LIBOR Rate for the applicable Interest Period plus the Applicable Margin, such rate to remain fixed for such Interest Period. "Interest Period" shall mean any continuous period of (1) one, two (2), three (3) or six (6) months, as selected from time to time by Borrower by irrevocable notice (in writing, by telecopy, telex, electronic mail or cable) given to Agent not less than three (3) Business Days prior to the first day of each respective Interest Period; provided that: (A) each such period occurring after such initial period shall commence on the day on which the immediately preceding period expires; (B) the final Interest Period shall be such that its expiration occurs on or before the end of the Original Term or any Renewal Term; and (C) if for any reason Borrower shall fail to timely select a period, then such Loans shall continue as, or revert to, Prime Rate Loans. Interest shall be payable on the last Business Day of such Interest Period; provided that for Interest Periods of six (6) months, interest shall be payable every ninety (90) days.

    (iii)  Upon the occurrence of an Event of Default, the Loans shall bear interest at the rate of two percent (2.0%) per annum in excess of the highest interest rate otherwise payable thereon, which interest shall be payable on demand. All interest shall be calculated on the basis of a 360-day year.

18

CHICAGO/#1466603.10

(b)     Other LIBOR Provisions.

(i)     Subject to the provisions of this Agreement, Borrower shall have the option (A) as of any date, to convert all or any part of the Prime Rate Loans to, or request that new Loans be made as, LIBOR Rate Loans of various Interest Periods, (B) as of the last day of any Interest Period, to continue all or any portion of the relevant LIBOR Rate Loans as LIBOR Rate Loans; (C) as of the last day of any Interest Period, to convert all or any portion of the LIBOR Rate Loans to Prime Rate Loans; and (D) at any time, to request new Loans as Prime Rate Loans; provided, that Loans may not be continued as or converted to LIBOR Rate Loans if the continuation or conversion thereof would violate the provisions of subsections 4(b)(ii) or 4(b)(iii) of this Agreement or if an Event of Default has occurred.

(ii)    Agent's determination of the LIBOR Rate as provided above shall be conclusive, absent manifest error. Furthermore, if Agent or any Lender determines, in good faith (which determination shall be conclusive, absent manifest error), prior to the commencement of any Interest Period that (A) U.S. Dollar deposits of sufficient amount and maturity for funding the Loans are not available to Agent or such Lender in the London Interbank Eurodollar market in the ordinary course of business, or (B) by reason of circumstances affecting the London Interbank Eurodollar market, adequate and fair means do not exist for ascertaining the rate of interest to be applicable to the Loans requested by Borrower to be LIBOR Rate Loans or the Loans bearing interest at the rates set forth in subsection 4(a)(ii) of this Agreement shall not represent the effective pricing to such Lender for U.S. Dollar deposits of a comparable amount for the relevant period (such as for example, but not limited to, official reserve requirements required by Regulation D to the extent not given effect in determining the rate), Agent shall promptly notify Borrower and (1) all existing LIBOR Rate Loans shall convert to Prime Rate Loans upon the end of the applicable Interest Period, and (2) no additional LIBOR Rate Loans shall be made until such circumstances are cured.

(iii)   If, after the date hereof, the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any governmental authority or any central bank or other fiscal, monetary or other authority having jurisdiction over Agent or any Lender or its lending offices (a "**Regulatory Change**"), shall, in the opinion of counsel to Agent or such Lender, make it unlawful for Agent or such Lender to make or maintain LIBOR Rate Loans, then Agent shall promptly notify Borrower and (A) the LIBOR Rate Loans shall immediately convert to Prime Rate Loans on the last Business Day of the then existing Interest Period or on such earlier date as required by law and (B) no additional LIBOR Rate Loans shall be made until such circumstance is cured.

(iv)    If, for any reason, a LIBOR Rate Loan is paid prior to the last Business Day of any Interest Period or if a LIBOR Rate Loan does not occur on a date specified by Borrower in its request (other than as a result of a default by Agent or a Lender), Borrower agrees to indemnify Agent and each Lender against any loss (including any loss on redeployment of the deposits or other funds acquired by Agent or

such Lender to fund or maintain such LIBOR Rate Loan) cost or expense incurred by Agent or such Lender as a result of such prepayment.

(v) If any Regulatory Change (whether or not having the force of law) shall (A) impose, modify or deem applicable any assessment, reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of or loans by, or any other acquisition of funds or disbursements by, Agent or any Lender; (B) subject Agent or any Lender or the LIBOR Rate Loans to any Tax or change the basis of taxation of payments to Agent or any Lender of principal or interest due from Borrower to Agent or such Lender hereunder (other than a change in the taxation of the overall net income of Agent or such Lender); or (C) impose on Agent or any Lender any other condition regarding the LIBOR Rate Loans or Agent's or any Lender's funding thereof, and Agent or any Lender shall determine (which determination shall be conclusive, absent any manifest error) that the result of the foregoing is to increase the cost to Agent or such Lender of making or maintaining the LIBOR Rate Loans or to reduce the amount of principal or interest received by Agent or such Lender hereunder, then Borrower shall pay to such party, on demand, such additional amounts as such party shall, from time to time, determine are sufficient to compensate and indemnify such party from such increased cost or reduced amount.

(vi) Each of Agent and each Lender shall receive payments of amounts of principal of and interest with respect to the LIBOR Rate Loans free and clear of, and without deduction for, any Taxes. If (A) Agent or any Lender shall be subject to any Tax in respect of any LIBOR Rate Loans or any part thereof or, (B) Borrower shall be required to withhold or deduct any Tax from any such amount, the LIBOR Rate applicable to such LIBOR Rate Loans shall be adjusted by Agent or such Lender to reflect all additional costs incurred by Agent or such Lender in connection with the payment by Agent or such Lender or the withholding by Borrower of such Tax and Borrower shall provide Agent or such Lender with a statement detailing the amount of any such Tax actually paid by Borrower. Determination by Agent or any Lender of the amount of such costs shall be conclusive, absent manifest error. If, after any such adjustment, any part of any Tax paid by Agent or any Lender is subsequently recovered by Agent or such Lender, such party shall reimburse Borrower to the extent of the amount so recovered. A certificate of an officer of Agent or any Lender setting forth the amount of such recovery and the basis therefor shall be conclusive, absent manifest error.

(vii) Each request for LIBOR Rate Loans shall be in an amount not less than One Million and No/100 Dollars ($1,000,000), and in integral multiples of, Five Hundred Thousand and No/100 Dollars ($500,000).

(viii) Unless otherwise specified by Borrower, all Loans shall be Prime Rate Loans.

(ix) No more than three Interest Periods may be in effect with respect to outstanding LIBOR Rate Loans at any one time.

(c)     Fees and Charges.

(i)     Fees. Borrower shall pay to Agent such fees as set forth in the fee side letter of even date herewith.

(ii)     Unused Line Fee: Borrower shall pay to Agent, for the benefit of Lenders, an unused line fee of .375% of the difference between the Maximum Revolving Loan Limit and the average daily balance of the Revolving Loans plus the Letter of Credit Obligations for each month, which fee shall be fully earned by Lenders and payable monthly in arrears on the second Business Day of each month. Said fee shall be calculated on the basis of a 360 day year.

(iii)     Costs and Expenses: Borrower shall reimburse Agent for all costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees (whether for internal or outside counsel), incurred by Agent in connection with the (i) documentation and consummation of this transaction and any other transactions among Borrower, Agent and Lenders, including, without limitation, Uniform Commercial Code and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs; (ii) collection, protection or enforcement of any rights in or to the Collateral; (iii) collection of any Liabilities; and (iv) administration and enforcement of any of Agent's and/or any Lender's rights under this Agreement or any Other Agreement (including, without limitation, any costs and expenses of any third party provider engaged by Agent for such purposes). Borrower shall also pay all normal service charges with respect to all accounts maintained by Borrower with any Lender and LaSalle Bank and any additional services requested by Borrower from any Lender and LaSalle Bank. All such costs, expenses and charges shall, if owed to LaSalle Bank, be reimbursed by Agent and Lenders and in such event, or in the event such costs and expenses are owed to Agent or a Lender, shall constitute Liabilities hereunder, shall be payable by Borrower to Agent on demand, and until paid, shall bear interest at the highest rate then applicable to Loans hereunder. In the event that such costs, expenses and/or charges remain outstanding more than three (3) days following the due date thereof, Agent shall have the right to debit the Revolving Loan Commitment for any amount due and owing to Agent or the Lenders pursuant to this Agreement or the Other Agreements. In addition, following the occurrence of an Event of Default, Borrower shall reimburse each Lender for all costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees, incurred by such Lender in connection with the (i) collection, protection or enforcement of any rights in or to the Collateral; (ii) collection of any Liabilities; and (iii) administration and enforcement of any of Lenders' rights under this Agreement.

(iv)     Capital Adequacy Charge. If Agent or any Lender shall have determined that the adoption of any law, rule or regulation regarding capital adequacy, or any change therein or in the interpretation or application thereof, or compliance by Agent or such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any central bank or governmental authority enacted after the date hereof, does or shall have the effect of reducing the rate of return on such party's capital as a consequence of its obligations hereunder to a level below that which Agent or

21

CHICAGO/#1466603.10