such Lender could have achieved but for such adoption, change or compliance (taking into consideration such party's policies with respect to capital adequacy) by a material amount, then from time to time, after submission by Agent to Borrower of a written demand therefor ("**Capital Adequacy Demand**") together with the certificate described below, Borrower shall pay to such party such additional amount or amounts ("**Capital Adequacy Charge**") as will compensate such party for such reduction, such Capital Adequacy Demand to be made with reasonable promptness following such determination. A certificate of Agent or such Lender claiming entitlement to payment as set forth above shall be conclusive in the absence of manifest error. Such certificate shall set forth the nature of the occurrence giving rise to such reduction, the amount of the Capital Adequacy Charge to be paid to Agent or such Lender, and the method by which such amount was determined. In determining such amount, the applicable party may use any reasonable averaging and attribution method, applied on a non-discriminatory basis.

    (d)    <u>Maximum Interest</u>.

It is the intent of the parties that the rate of interest and other charges to Borrower under this Agreement and the Other Agreements shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Agent or any Lender may lawfully charge Borrower, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrower.

5.    <u>Collateral</u>.

    (a)    <u>Grant of Security Interest to Agent</u>.

As security for the payment of all Loans now or in the future made by Agent and Lenders to Borrower hereunder and for the payment or other satisfaction of all other Liabilities, Borrower hereby collaterally assigns to Agent, for the benefit of Agent and Lenders, and grants to Agent, for the benefit of Agent and Lenders, a continuing security interest in the following property of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located: (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory (whether or not Eligible Inventory); (d) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (e) all Investment Property; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) Commercial Tort Claims listed on <u>Exhibit C</u> hereto; (i) all real estate; (j) any other property of Borrower now or hereafter in the possession, custody or control of Agent or any Lender or any agent or any parent, affiliate or subsidiary of Agent or any Lender or any participant with any Lender in the Loans,

22

for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise); and (k) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business. Notwithstanding the foregoing, "Collateral" shall not include, and Borrower shall not be deemed to have granted a security interest in any rights or interests in any lease, license, contract or agreement (and property or assets subject thereto) to which Borrower is a party to the extent, but only to the extent, that such a grant would, under the terms of such license, lease, contract or agreement, result in a breach of the terms of, or constitute a default under, such license, lease, contract or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407 or 9-408 or of the UCC or other applicable law).

    (b)    <u>Other Security</u>.

Agent, in its sole discretion, without waiving or releasing any obligation, liability or duty of Borrower under this Agreement or the Other Agreements or any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of any security interest, lien, encumbrance or claim asserted by any Person in, upon or against the Collateral. All sums paid by Agent in respect thereof and all costs, fees and expenses including, without limitation, reasonable attorney fees, all court costs and all other charges relating thereto incurred by Agent shall constitute Liabilities, payable by Borrower to Agent on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

    (c)    <u>Possessory Collateral</u>.

Immediately upon Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Tangible Chattel Paper and any Investment Property consisting of certificated securities, Borrower shall deliver the original thereof to Agent together with an appropriate endorsement or other specific evidence of assignment thereof to Agent (in form and substance acceptable to Agent). If an endorsement or assignment of any such items shall not be made for any reason, Agent is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact, to endorse or assign the same on Borrower's behalf.

    (d)    <u>Electronic Chattel Paper</u>.

To the extent that Borrower obtains or maintains any Electronic Chattel Paper, Borrower shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided in clauses (iv), (v) and (vi) below, unalterable, (ii) the authoritative copy identifies Agent as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by the Agent or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Agent, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and

CHICAGO/#1466603.10

(vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

6. <u>Preservation of Collateral and Perfection of Security Interests Therein</u>.

Borrower shall, at Agent's request, at any time and from time to time, authenticate, execute and deliver to Agent such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary by Agent) and do such other acts and things or cause third parties to do such other acts and things as Agent may deem necessary in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Agent (free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral. Borrower irrevocably hereby makes, constitutes and upon an Event of Default that has occurred and is continuing appoints Agent (and all Persons designated by Agent for that purpose) as Borrower's true and lawful attorney and agent-in-fact to execute and file such documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Agent's security interest in the Collateral. In addition, Borrower hereby authorizes Agent at any time to execute and file on Borrower's behalf such financing statements as Agent deems necessary to preserve and perfect Agent's security interest in the Collateral. Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement. Borrower further ratifies and confirms the prior filing by Agent of any and all financing statements which identify the Borrower as debtor, Agent as secured party and any or all Collateral as collateral.

7. <u>Possession of Collateral and Related Matters</u>.

Until an Event of Default has occurred, Borrower shall have the right, except as otherwise provided in this Agreement, in the ordinary course of Borrower's business, to (a) sell, lease or furnish under contracts of service any of Borrower's Inventory normally held by Borrower for any such purpose; and (b) use and consume any raw materials, work in process or other materials normally held by Borrower for such purpose; provided, however, that a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by Borrower.

8. <u>Collections</u>.

(a) Borrower shall direct all of its Account Debtors to make all payments on the Accounts directly to a post office box (the "Lock Box") designated by, and under the exclusive control of, Agent, at LaSalle Bank or such other financial institution acceptable to Agent. Borrower shall establish an account (the "Lock Box Account") in Agent's name with a financial institution acceptable to Agent, into which all payments received in the Lock Box shall be deposited, and into which Borrower will immediately deposit all payments received by Borrower on Accounts in the identical form in which such payments were received, whether by cash or check. If Borrower, any Affiliate or Subsidiary, any shareholder, officer, director, employee or agent of Borrower or any Affiliate or Subsidiary, or any other Person acting for or

in concert with Borrower shall receive any monies, checks, notes, drafts or other payments relating to or as Proceeds of Accounts or other Collateral, Borrower and each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Agent and, immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Lock Box Account. The financial institution with which the Lock Box Account is established shall acknowledge and agree, in a manner reasonably satisfactory to Agent, that the amounts on deposit in such Lock Box and Lock Box Account are the sole and exclusive property of Agent, that such financial institution will follow the instructions of Agent with respect to disposition of funds in the Lock Box and Lock Box Account without further consent from Borrower, that such financial institution has no right to setoff against the Lock Box or Lock Box Account or against any other account maintained by such financial institution into which the contents of the Lock Box or Lock Box Account are transferred, and that such financial institution shall wire, or otherwise transfer in immediately available funds to Agent in a manner reasonably satisfactory to Agent, funds deposited in the Lock Box Account on a daily basis as such funds are collected. Borrower agrees that all payments made to such Lock Box Account or otherwise received by Agent, whether in respect of the Accounts or as Proceeds of other Collateral or otherwise, will be applied on account of the Liabilities in accordance with the terms of this Agreement; provided, that so long as no Event of Default has occurred, payments received by Agent shall not be applied to the unmatured portion of the LIBOR Rate Loans, but shall be held in an interest bearing cash collateral account maintained by Agent, until the earlier of (i) the last Business Day of the Interest Period applicable to such LIBOR Rate Loan and (i) the occurrence of an Event of Default; provided further, that so long as no Event of Default has occurred, the immediately available funds in such cash collateral account may be disbursed, at Borrower's discretion, to Borrower so long as after giving effect to such disbursement, Borrower's availability under subsection 2(a) hereof at such time, equals or exceeds the outstanding Revolving Loans at such time. Borrower agrees to pay all fees, costs and expenses in connection with opening and maintaining the Lock Box and Lock Box Account. All of such fees, costs and expenses if not paid by Borrower, may be paid by Agent and in such event all amounts paid by Agent shall constitute Liabilities hereunder, shall be payable to Agent by Borrower upon demand, and, until paid, shall bear interest at the rate then applicable to Loans hereunder. All checks, drafts, instruments and other items of payment or Proceeds of Collateral shall be endorsed by Borrower to Agent, and, if that endorsement of any such item shall not be made for any reason, Agent is hereby irrevocably authorized to endorse the same on Borrower's behalf. For the purpose of this section, Borrower irrevocably hereby makes, constitutes and appoints Agent (and all Persons designated by Agent for that purpose) as Borrower's true and lawful attorney and agent-in-fact (i) upon an Event of Default that has occurred and is continuing to endorse Borrower's name upon said items of payment and/or Proceeds of Collateral and upon any Chattel Paper, Document, Instrument, invoice or similar document or agreement relating to any Account of Borrower or Goods pertaining thereto; (ii) upon an Event of Default that has occurred and is continuing to take control in any manner of any item of payment or Proceeds thereof and (iii) upon the occurrence and during the continuance of an Event of Default, to have access to any postal box into which any of Borrower's mail is deposited, and open and process all mail addressed to Borrower and deposited therein.

(b)   Agent may, at any time and from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Liabilities, (i) enforce

25

collection of any of Borrower's Accounts or other amounts owed to Borrower by suit or otherwise; (ii) exercise all of Borrower's rights and remedies with respect to proceedings brought to collect any Accounts or other amounts owed to Borrower; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to Borrower, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign any Account of Borrower or other amount owed to Borrower upon such terms, for such amount and at such time or times as Agent deems advisable; (v) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to Borrower; and (vi) do all other acts and things which are necessary, in Agent's sole discretion, to fulfill Borrower's obligations under this Agreement and the Other Agreements and to allow Agent to collect the Accounts or other amounts owed to Borrower. In addition to any other provision hereof, Agent may at any time, after the occurrence of an Event of Default, at Borrower's expense, notify any parties obligated on any of the Accounts to make payment directly to Agent of any amounts due or to become due thereunder.

(c) For purposes of calculating interest and fees, Agent shall, within one (1) Business Day after receipt by Agent at its office in Chicago, Illinois of (i) checks and (ii) cash or other immediately available funds from collections of items of payment and Proceeds of any Collateral, apply the whole or any part of such collections or Proceeds against the Liabilities in such order as Agent shall determine in its sole discretion. For purposes of determining the amount of Loans available for borrowing purposes, checks and cash or other immediately available funds from collections of items of payment and Proceeds of any Collateral shall be applied in whole or in part against the Liabilities, in such order as Agent shall determine in its sole discretion, on the day of receipt, subject to actual collection.

(d) On a monthly basis, Agent shall deliver or otherwise make available to Borrower an account statement showing all Loans, charges and payments, which shall be deemed final, binding and conclusive upon Borrower absent manifest error unless Borrower notifies Agent in writing, specifying any error therein, within thirty (30) days of the date such account statement is sent to Borrower and any such notice shall only constitute an objection to the items specifically identified.

9. Collateral, Availability and Financial Reports and Schedules.

(a) Weekly Reports.

Borrower shall deliver to Agent and each Lender an executed weekly loan report in summary form and certificate in Agent's then current form on the first Business Day of each week, or more frequently as Agent may require in its discretion or as Borrower may elect to deliver, which shall be accompanied by copies of Borrower's sales journal, cash receipts journal and credit memo journal for the relevant period. Such report shall reflect the activity of Borrower with respect to Accounts for the immediately preceding week and shall be in a form and with such specificity as is reasonably satisfactory to Agent and shall contain such Tooling Accounts, additional information concerning Accounts (including, but not limited to, a current listing of all Non-PPAP Tooling Accounts and accounts payable associated with the purchase or acquisition of any Tooling) and Inventory as may be reasonably requested by Agent including,

without limitation, but only if specifically reasonably requested by Agent, copies of all invoices prepared in connection with such Accounts.

(b) <u>Monthly Reports</u>.

Borrower shall deliver to Agent and each Lender, in addition to any other reports reasonably requested by Agent from time to time including, without limitation, such inventory reports reasonably requested by Agent, in each case in form and substance acceptable to Agent, as soon as practicable and in any event: (i) within twenty (20) days after the end of each month, (A) a detailed trial balance of Borrower's Accounts aged per invoice date, in form and substance reasonably satisfactory to Agent including, without limitation, the names and addresses of all Account Debtors of Borrower, (B) a summary and detail of all accounts payable, including, but not limited to, all accounts payable due to Tooling vendors (such Accounts and accounts payable divided into such time intervals as Agent may require in its sole discretion), including a listing of any held checks, and (C) a reconciliation of Accounts in form and substance reasonably acceptable to Agent; and (ii) within twenty (20) days after the end of each month, the general ledger inventory account balance, a perpetual inventory report and Agent's standard form of Inventory report then in effect or the form most recently requested from Borrower by Agent, for Borrower by each category of Inventory.

(c) <u>Financial Statements</u>.

Borrower shall deliver to Agent and each Lender the following financial information, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied, and shall be accompanied by a compliance certificate in the form of <u>Exhibit B</u> hereto, which compliance certificate shall include calculations of the financial covenants as required by <u>Section 14</u> in this Agreement: (i) no later than thirty (30) days after each calendar month, copies of internally prepared financial statements, including, without limitation, balance sheets and statements of income and cash flow of Borrower, certified by the Chief Financial Officer of Borrower; (ii) no later than one hundred twenty (120) days after the end of each of Borrower's Fiscal Years, consolidated and consolidating audited annual financial statements with an unqualified opinion by independent certified public accountants selected by Borrower and reasonably satisfactory to Agent.

(d) <u>Annual Projections</u>.

As soon as practicable and in any event within fifteen (15) days prior to the first day of each Fiscal Year, Borrower shall deliver to Agent and each Lender projected balance sheets, statements of income and cash flow for Borrower, for each of the twelve (12) months during such Fiscal Year, which shall include the assumptions used therein, together with appropriate supporting details as reasonably requested by Agent.

(e) <u>Reserved</u>.

(f) <u>Public Reporting</u>.

Promptly upon the filing thereof, Borrower shall deliver to Agent and each Lender copies of all registration statements and annual, quarterly, monthly or other regular

27

reports which Borrower or any of its Subsidiaries files with the Securities and Exchange Commission, as well as promptly providing to Agent and each Lender copies of any reports and proxy statements delivered to its shareholders.

(g) Other Information.

Promptly following request therefor by Agent, such other business or financial data, reports, appraisals and projections as Agent may reasonably request.

10. Termination; Automatic Renewal.

THIS AGREEMENT SHALL BE IN EFFECT FROM THE DATE HEREOF UNTIL OCTOBER 3, 2009 (THE "ORIGINAL TERM") AND SHALL AUTOMATICALLY RENEW ITSELF FROM YEAR TO YEAR THEREAFTER (EACH SUCH ONE-YEAR RENEWAL BEING REFERRED TO HEREIN AS A "RENEWAL TERM") UNLESS (A) AGENT, AT THE REQUEST OF THE REQUISITE LENDERS MAKES DEMAND FOR REPAYMENT PRIOR TO THE END OF THE ORIGINAL TERM OR THE THEN CURRENT RENEWAL TERM; (B) THE DUE DATE OF THE LIABILITIES IS ACCELERATED PURSUANT TO SECTION 16 HEREOF; OR (C) BORROWER OR ANY LENDER ELECTS TO TERMINATE THIS AGREEMENT AT THE END OF THE ORIGINAL TERM OR AT THE END OF ANY RENEWAL TERM BY GIVING THE OTHER PARTIES HERETO WRITTEN NOTICE OF SUCH ELECTION AT LEAST NINETY (90) DAYS PRIOR TO THE END OF THE ORIGINAL TERM OR THE THEN CURRENT RENEWAL TERM. UPON TERMINATION OF THIS AGREEMENT, BORROWER SHALL PAY ALL OF THE LIABILITIES IN FULL. If one or more of the events specified in clauses (A), (B) or (C) occurs or this Agreement otherwise expires, then (i) Agent and Lenders shall not make any additional Loans on or after the date identified as the date on which the Liabilities are to be repaid; and (ii) this Agreement shall terminate on the date thereafter that the Liabilities are paid in full. At such time as Borrower has repaid all of the Liabilities and this Agreement has terminated, Borrower shall deliver to Agent and Lenders a release, in form and substance satisfactory to Agent, of all obligations and liabilities of Agent and Lenders and their officers, directors, employees, agents, parents, subsidiaries and affiliates to Borrower, and if Borrower is obtaining new financing from another lender, Borrower shall deliver such lender's indemnification of Agent and Lenders, in form and substance satisfactory to Agent, for checks which Agent has credited to Borrower's account, but which subsequently are dishonored for any reason or for automatic clearinghouse or wire transfers not yet posted to Borrower's account. If, during the term of this Agreement, Borrower prepays all of the Liabilities and this Agreement is terminated (including in connection with any payment of the Liabilities in any bankruptcy proceeding), Borrower agrees to pay to Agent, for the benefit of Lenders, as a prepayment fee, in addition to the payment of all other Liabilities, if such prepayment occurs (i) on or prior to the first anniversary of the Closing Date, an amount equal to three percent (3.0%) of the amount of the Revolving Loan Commitment plus the outstanding principal amount of Term Loan A outstanding at such time, and (ii) the day following the first anniversary of the Closing Date until the day which is on or prior to the second anniversary of the Closing Date, an amount equal to one-half of one percent (0.5%) of the amount of the Revolving Loan Commitment plus the outstanding principal amount of Term Loan A outstanding at such time.

11. <u>Representations and Warranties</u>.

Borrower hereby represents and warrants to Agent and each Lender, which representations and warranties shall be true at the time of Borrower's execution hereof and shall be remade by Borrower at the time each Loan is made pursuant to this Agreement (except to the extent such representation or warranty specifically refers to an earlier date).

(a) <u>Financial Statements and Other Information</u>.

The financial statements and other written information delivered by Borrower to Agent or any Lender at or prior to the date of this Agreement accurately reflect in all material respects the financial condition of Borrower, and, as of the Closing Date, there has been no adverse change in the financial condition, the operations or any other status of Borrower since the date of the financial statements were delivered to Agent most recently prior to the date of this Agreement. All written information now or heretofore furnished by Borrower to Agent or any Lender is true and correct in all material respects as of the date with respect to which such information was furnished.

(b) <u>Locations</u>.

The office where Borrower keeps its books, records and accounts (or copies thereof) concerning the Collateral, Borrower's principal place of business and all of Borrower's other places of business, locations of Collateral and post office boxes and locations of bank accounts are as set forth in <u>Exhibit A</u> and at other locations within the continental United States of which Agent has been advised by Borrower in accordance with <u>subsection 12(b)(i)</u>. The Collateral, including, without limitation, the Equipment (except any part thereof which Borrower shall have advised Agent in writing consists of Collateral normally used in more than one state or as may be in transit between Borrower's facilities) is kept, or, in the case of vehicles, based, only at the addresses set forth on <u>Exhibit A</u>, and at other locations within the continental United States of which Agent has been advised by Borrower in writing in accordance with <u>subsection 12(b)(i)</u> hereof.

(c) <u>Loans by Borrower</u>.

Except as set forth on Schedule 11(c), Borrower has not made any loans or advances to any Affiliate or other Person except for advances authorized hereunder to employees, officers and directors of Borrower for travel and other expenses arising in the ordinary course of Borrower's business.

(d) <u>Accounts and Inventory</u>.

Each Account or item of Inventory which Borrower shall request Agent to classify as an Eligible Account or as Eligible Inventory per the Borrowing Base Certificate, respectively, shall, as of the time when such request is made, conform in all respects to the requirements of such classification as set forth in the respective definitions of "Eligible Account" and "Eligible Inventory" as set forth herein and as otherwise established by Agent from time to time.

(e) <u>Liens</u>.

Borrower is the lawful owner of all Collateral now purportedly owned or hereafter purportedly acquired by Borrower, free from all liens, claims, security interests and encumbrances whatsoever, whether voluntarily or involuntarily created and whether or not perfected, other than the Permitted Liens.

(f) <u>Organization, Authority and No Conflict</u>.

Borrower is a corporation duly organized, validly existing and in good standing in the State of Delaware, its state organizational identification number is 3043103 and Borrower is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary and where failure to qualify would not be reasonably expected to result in a Material Adverse Effect. Borrower has the right and corporate power and is duly authorized and empowered to enter into, execute and deliver this Agreement and the Other Agreements and perform its obligations hereunder and thereunder. Borrower's execution, delivery and performance of this Agreement and the Other Agreements does not conflict with the provisions of the organizational documents of Borrower, any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on Borrower except where such conflict would not be reasonably expected to result in a Material Adverse Effect, and Borrower's execution, delivery and performance of this Agreement and the Other Agreements shall not result in the imposition of any lien or other encumbrance upon any of Borrower's property under any existing indenture, mortgage, deed of trust, loan or credit agreement or other agreement or instrument by which Borrower or any of its property may be bound or affected.

(g) <u>Litigation</u>.

Other than as set forth on Schedule 11(g), there are no actions or proceedings which are pending or threatened against Borrower which could be reasonably expected to have a Material Adverse Effect on Borrower, and Borrower shall, promptly upon becoming aware of any such pending or threatened action or proceeding, give written notice thereof to Agent. Borrower has no Commercial Tort Claims pending other than those set forth on <u>Exhibit C</u> hereto as <u>Exhibit C</u> may be amended from time to time.

(h) <u>Compliance with Laws and Maintenance of Permits</u>.

Borrower has obtained all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on Borrower. Borrower is in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure to comply with which would have a Material Adverse Effect on Borrower.

30

(i)  Affiliate Transactions.

Except as set forth on Schedule 11(i) hereto or as permitted pursuant to subsection 11(c) hereof, Borrower is not conducting, permitting or suffering to be conducted, transactions with any Affiliate other than transactions with Affiliates for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to Borrower than the terms upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

(j)  Names and Trade Names.

For the past 5 years, Borrower's name has always been as set forth on the first page of this Agreement and Borrower uses no trade names, assumed names, fictitious names or division names in the operation of its business, except as set forth on Schedule 11(j) hereto.

(k)  Equipment.

Borrower has good title to and ownership of all Equipment except for Permitted Liens. No Equipment is a Fixture to real estate unless such real estate is owned by Borrower and is subject to a mortgage in favor of Agent, or if such real estate is leased, is subject to a landlord's agreement in favor of Agent on terms reasonably acceptable to Agent, or an accession to other personal property unless such personal property is subject to a lien in favor of Agent second in priority only to a lien in favor of the Term Loan lenders.

(l)  Enforceability.

This Agreement and the Other Agreements to which Borrower is a party are the legal, valid and binding obligations of Borrower and are enforceable against Borrower in accordance with their respective terms subject to bankruptcy, insolvency, reorganization moratorium and other laws with general application affecting the rights and remedies of creditors and secured parties, and general principals of equity regardless of whether applied in a proceeding in equity or at law.

(m)  Solvency.

Borrower is, after giving effect to the transactions contemplated hereby, solvent, able to pay its debts as they become due, has capital sufficient to carry on its business, now owns property having a present fair saleable value on a going concern basis greater than the amount required to pay its debts, as determined in accordance with GAAP, and will not be rendered insolvent by the execution and delivery of this Agreement or any of the Other Agreements or by completion of the transactions contemplated hereunder or thereunder.

(n)  Indebtedness.

Except as set forth on Schedule 11(n) hereto, Borrower is not obligated (directly or indirectly), for any loans or other indebtedness for borrowed money (other than the Loans) which is not otherwise permitted by Section 13(b).

31

(o) <u>Margin Security and Use of Proceeds</u>.

Borrower does not own any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

(p) <u>Parent, Subsidiaries and Affiliates</u>.

Except as set forth on <u>Schedule 11(p)</u> hereto, Borrower has no Parents, Subsidiaries or other Affiliates or divisions, nor is Borrower engaged in any joint venture or partnership with any other Person. Blackhawk Automotive Plastics, Ltd. is a wholly owned Subsidiary of Borrower which does not conduct any business or own any assets other than certain operating losses.

(q) <u>No Defaults</u>.

Borrower is not in default under any material contract, lease or commitment to which it is a party or by which it is bound, nor does Borrower know of any dispute regarding any contract, lease or commitment which, if adversely determined with respect to the Borrower, would have a Material Adverse Effect on Borrower.

(r) <u>Employee Matters</u>.

There are no controversies pending or threatened between Borrower and any of its employees, agents or independent contractors other than employee grievances arising in the ordinary course of business which would if determined adversely to the Borrower, in the aggregate, have a Material Adverse Effect on Borrower, and Borrower is in compliance with all federal and state laws respecting employment and employment terms, conditions and practices except for such non-compliance which would not have a Material Adverse Effect on Borrower.

(s) <u>Intellectual Property</u>.

Borrower possesses adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue to conduct its business as heretofore conducted by it.

(t) <u>Environmental Matters</u>.

Borrower has not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder in a manner which could reasonably be expected to result in a Material Adverse Effect and the operations of the Borrower comply in all material respects with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder expect to the extent such failure would not result in a Material Adverse Effect. There has been no investigation, proceeding,

32

complaint, order, directive, claim, citation or notice by any governmental authority nor is any pending or to Borrower's knowledge threatened with respect to any non-compliance with or violation of the requirements of any Environmental Law by the Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter, which affects the Borrower or its business, operations or assets or any properties at which the Borrower has transported, stored or disposed of any Hazardous Materials. Borrower has no material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

(u) ERISA Matters.

Borrower has paid and discharged all obligations and liabilities arising under ERISA of a character which, if unpaid or unperformed, would result in the imposition of a lien against any of its properties or assets.

12. Affirmative Covenants.

Until payment and satisfaction in full of all Liabilities arising under this Agreement (other than contingent indemnification liabilities) and termination of this Agreement, unless Borrower obtains Requisite Lenders' prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, Borrower covenants and agrees as follows:

(a) Maintenance of Records.

Borrower shall at all times keep accurate and complete books, records and accounts with respect to all of Borrower's business activities, in accordance with sound accounting practices and, when applicable, generally accepted accounting principles consistently applied, and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Exhibit A except upon the prior written consent of Agent.

(b) Notices.

Borrower shall:

(i) Locations. Promptly (but in no event less than ten (10) days prior to the occurrence thereof) notify Agent of the proposed opening of an new place of business or new location of Collateral, the closing of any existing place of business or location of Collateral, any change of in the location of Borrower's books, records and accounts (or copies thereof), the opening or closing of any post office box, the opening or closing of any bank account or, if any of the Collateral consists of Goods of a type normally used in more than one state, the use of any such Goods in any state other than a state in which Borrower has previously advised Agent that such Goods will be used.

33

CHICAGO/#1466603.10

(ii)     Eligible Accounts and Inventory. Promptly upon becoming aware thereof, notify Agent if any Account or Inventory identified by Borrower to Agent as an Eligible Account or Eligible Inventory becomes ineligible for any reason.

(iii)    Litigation and Proceedings. Promptly upon becoming aware thereof, notify Agent of any actions or proceedings which are pending or threatened against Borrower which might have a Material Adverse Effect on Borrower and of any Commercial Tort Claims of Borrower which may arise, which notice shall constitute Borrower's authorization for Agent to amend Exhibit C to add such Commercial Tort Claim.

(iv)    Names and Trade Names. Notify Agent within ten (10) days of the change of its name or the use of any trade name, assumed name, fictitious name or division name not previously disclosed to Agent in writing.

(v)     ERISA Matters. Promptly notify Agent of (x) the occurrence of any "reportable event" (as defined in ERISA) which might result in the termination by the Pension Benefit Guaranty Corporation (the "PBGC") of any employee benefit plan ("Plan") covering any officers or employees of the Borrower, any benefits of which are, or are required to be, guaranteed by the PBGC, (y) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor or (z) its intention to terminate or withdraw from any Plan.

(vi)    Environmental Matters. Promptly notify Agent upon becoming aware of any investigation, proceeding, complaint, order, directive, claim, citation or notice with respect to any non-compliance with or violation of the requirements of any Environmental Law by Borrower or the generation, use, storage, treatment, transportation, manufacture handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects Borrower or its business operations or assets or any properties at which Borrower has transported, stored or disposed of any Hazardous Materials.

(vii)   Default; Material Adverse Change. Promptly advise Agent of any material adverse change in the business, property, assets, prospects, operations or condition, financial or otherwise, of Borrower, the occurrence of any Event of Default hereunder or the occurrence of any event which, if uncured, will become an Event of Default after notice or lapse of time (or both).

All of the foregoing notices shall be provided by Borrower to Agent and the Lenders in writing.

(c)     Compliance with Laws and Maintenance of Permits.

Borrower shall maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on Borrower and Borrower shall remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes,

34

employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure with which to comply would have a Material Adverse Effect on Borrower. Following any determination by Agent that there is non-compliance, or any condition which requires any action by or on behalf of Borrower in order to avoid non-compliance, with any Environmental Law, at Borrower's expense cause an independent environmental engineer acceptable to Agent to conduct such tests of the relevant site(s) as are appropriate and prepare and deliver a report setting forth the results of such tests, a proposed plan for remediation and an estimate of the costs thereof.

(d)   Inspection and Audits.

Borrower shall permit Agent and Lenders, or any Persons designated by Agent upon reasonable notice, to call at Borrower's places of business at any reasonable times, and, during normal business hours, to inspect the Collateral and to inspect, audit, check and make extracts from Borrower's books, records, journals, orders, receipts and any correspondence and other data relating to Borrower's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning Borrower's business as Agent may consider reasonable under the circumstances; provided, however, upon the occurrence and during the continuance of an Event of Default, or if Agent in its reasonable discretion believes an Event of Default has occurred and is continuing, Agent and the Lenders may conduct inspections and audits at any time with no advance notice. Prior to any Event of Default, Borrower acknowledges that the Agent contemplates conducting field examinations at least every one hundred twenty (120) days. Borrower shall furnish to Agent such information relevant to Agent's and/or any Lender's rights under this Agreement and the Other Agreements as Agent shall at any time and from time to time request. Agent, through its officers, employees or agents shall have the right, at any time and from time to time, in Agent's name, to verify the validity, amount or any other matter relating to any of Borrower's Accounts, by mail, telephone, telecopy, electronic mail or otherwise. Borrower authorizes Agent and Lenders to discuss the affairs, finances and business of Borrower with any officers, employees or directors of Borrower or with its Parent or any Affiliate or the officers, employees or directors of its Parent or any Affiliate, and to discuss the financial condition of Borrower with Borrower's independent public accountants, so long as Borrower is given the right to participate in such discussions. Any such discussions shall be without liability to Agent or any Lender or to Borrower's independent public accountants. Borrower shall pay to Agent all customary fees (currently $800 per person per day) and all costs and out-of-pocket expenses incurred by Agent in the exercise of its rights hereunder, and all of such fees, costs and expenses shall constitute Liabilities hereunder, shall be payable on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder provided that so long as no Event of Default has occurred and is continuing, Borrower shall not pay for more than one (1) such inspection per calendar quarter.

(e)   Insurance.

Borrower shall:

(i)   Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured

35

against by Persons engaged in businesses similar to that of Borrower, with such companies, in such amounts, with such deductibles, and under policies in such form, as shall be satisfactory to Agent. Original (or certified) copies of such policies of insurance have been or shall be, within ninety (90) days of the date hereof, delivered to Agent, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance acceptable to Agent, showing loss under such insurance policies payable to Agent, for the benefit of Agent and Lenders. Such endorsement, or an independent instrument furnished to Agent, shall provide that the insurance company shall give Agent at least thirty (30) days written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of Borrower or any other Person shall affect the right of Agent to recover under such policy of insurance in case of loss or damage. In addition, Borrower shall cause to be executed and delivered to Agent an assignment of proceeds of its business interruption insurance policies. Borrower hereby directs all insurers under all Property/Business Interruption policies of insurance to pay all proceeds payable thereunder directly to Agent as its interest appears. Borrower irrevocably makes, constitutes and appoints Agent (and all officers, employees or agents designated by Agent) as Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance. Borrower irrevocably makes, constitutes and appoints Agent (and all officers, employees or agents designated by Agent) as Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance.

      (ii)    Maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of Borrower with such companies and in such amounts, with such deductibles and under policies in such form as shall be satisfactory to Agent and original (or certified) copies of such policies have been or shall be, within ninety (90) days after the date hereof, delivered to Agent, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing Agent and Lenders as additional insureds as their interest appears thereunder and providing that the insurance company shall give Agent at least thirty (30) days written notice before any such policy shall be altered or canceled.

If Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium relating thereto, then Agent, without waiving or releasing any obligation or default by Borrower hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Agent deems advisable. Such insurance, if obtained by Agent, may, but need not, protect Borrower's interests or pay any claim made by or against Borrower with respect to the Collateral. Such insurance may be more expensive than the cost of

insurance Borrower may be able to obtain on its own and may be cancelled only upon Borrower providing evidence that it has obtained the insurance as required above. All sums disbursed by Agent in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall constitute Loans hereunder, shall be payable on demand by Borrower to Agent and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

  (f)  <u>Collateral</u>.

  Borrower shall keep the Collateral in good condition, repair and order (ordinary wear and tear and damage by casualty excepted) and shall make all necessary repairs to the Equipment and replacements thereof (to the extent such repair/replacement is reasonable in the Borrower's business judgment) so that the operating efficiency and the value thereof shall at all times be preserved and maintained. Borrower shall permit Agent and Lenders to examine any of the Collateral at any time and wherever the Collateral may be located and, Borrower shall, promptly upon request therefor by Agent, deliver to Agent original documents (if applicable) evidencing ownership of any of the Equipment including, without limitation, certificates of title and applications of title (subject to the rights of any permitted senior lender with respect thereto). Borrower shall, at the request of Agent, indicate on its records concerning the Collateral a notation, in form satisfactory to Agent, of the security interest of Agent hereunder.

  (g)  <u>Use of Proceeds</u>.

  All monies and other property obtained by Borrower from Agent and Lenders pursuant to this Agreement shall be used solely for business purposes of Borrower.

  (h)  <u>Taxes</u>.

  Borrower shall file all required tax returns and pay all of its taxes when due, including, without limitation, taxes imposed by federal, state or municipal agencies, and shall cause any liens for taxes to be promptly released; provided, that Borrower shall have the right to contest the payment of such taxes in good faith by appropriate proceedings so long as (i) the amount so contested is shown on Borrower's financial statements; (ii) the contesting of any such payment does not give rise to a lien for taxes; and (iii) Agent may, in its discretion, establish a reserve under the Revolving Loan Limit in an amount equal to the amount of such contested tax. If Borrower fails to pay any such taxes and in the absence of any such contest by Borrower, Agent may (but shall be under no obligation to) advance and pay any sums required to pay any such taxes and/or to secure the release of any lien therefor, and any sums so advanced by Agent shall constitute Loans hereunder, shall be payable by Borrower to Agent on demand, and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

  (i)  <u>Intellectual Property</u>.

  Borrower shall maintain adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue its business as heretofore conducted by it or as hereafter conducted by it.