(j) Checking Accounts and Cash Management Services.

Borrower shall maintain its general checking/controlled disbursement account with LaSalle Bank. Normal charges shall be assessed thereon. In addition, Borrower shall enter into agreements with LaSalle Bank for standard cash management services. Borrower shall be responsible for all normal charges assessed thereon.

(k) Patriot Act, Bank Secrecy Act and Office of Foreign Assets Control.

As required by federal law and the Agent's, LaSalle's and each Lender's policies and practices, the Agent, LaSalle and each Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services and Borrower agrees to provide such information. In addition, and without limiting the foregoing sentence, the Borrower shall (a) ensure, and cause each Subsidiary to ensure, that no Person who owns a controlling interest in or otherwise controls the Borrower or any Subsidiary is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act ("BSA") laws and regulations, as amended.

13. Negative Covenants.

Until payment and satisfaction in full of all Liabilities (other than contingent indemnification liabilities) and termination of this Agreement, unless Borrower obtains Requisite Lenders' prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, Borrower agrees as follows:

(a) Guaranties.

Borrower shall not assume, guarantee or endorse, or otherwise become liable in connection with, the obligations of any Person, except by endorsement of instruments for deposit or collection or similar transactions in the ordinary course of business.

(b) Indebtedness.

Borrower shall not create, incur, assume or become obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans, except that Borrower may (i) borrow money from a Person other than Agent and Lenders on an unsecured and subordinated basis if a subordination agreement in favor of Agent and Lenders and in form and substance satisfactory to Agent is executed and delivered to Agent relative thereto; (ii) maintain its present indebtedness listed on Schedule 11(n) hereto; (iii) incur unsecured indebtedness to trade creditors in the ordinary course of business; (iv) incur purchase money indebtedness or capitalized lease obligations in connection with Capital Expenditures permitted pursuant to subsection 14(d) hereof; (v) incur operating lease obligations requiring payments not to exceed $500,000 in the aggregate during any Fiscal Year of Borrower;

(vi) unsecured letters of credit, bankers' acceptances and/or (a) secured Hedging Agreements between Borrower and Agent or a Lender or one of their respective Affiliates and/or (b) unsecured Hedging Agreements between Borrower and any other financial institution acceptable to the Requisite Lenders, obtained in the ordinary course of Borrower's business and for reasonable amounts providing for the transfer or mitigation of foreign exchange risks or interest rate risks either generally or under specific contingencies; and (vii) unsecured Indebtedness incurred solely to finance insurance coverages to the extent that the aggregate amount of such Indebtedness outstanding at any time does not exceed Five Hundred Thousand Dollars ($500,000).

(c) Liens.

Borrower shall not grant or permit to exist (voluntarily or involuntarily) any lien, claim, security interest or other encumbrance whatsoever on any of its assets, other than Permitted Liens.

(d) Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business.

Neither Borrower nor any Subsidiary shall (i) enter into any merger or consolidation; (ii) change the state of its organization or enter into any transaction which has the effect of changing Borrower's state of organization; (iii) sell, lease or otherwise dispose of any of its assets other than in (a) the ordinary course of business or (b) an asset disposition of Equipment in the ordinary course of business to the extent such Equipment is replaced, or is intended to be replaced, with Equipment of similar kind and function, provided that if the Equipment is not simultaneously replaced (1) the replacement Equipment shall be purchased or otherwise acquired no later than one hundred eighty (180) days following the asset disposition, and (2) except for Permitted Liens (other than purchase money security interests), the replacement Equipment (which shall constitute Collateral) shall be free and clear of Liens; (iv) purchase the stock, other equity interests or all or a material portion of the assets of any Person or division of such Person; or (v) enter into any other transaction outside the ordinary course of Borrower's business, including, without limitation, any purchase, redemption or retirement of any shares of any class of its stock or any other equity interest, and any issuance of any shares of, or warrants or other rights to receive or purchase any shares of, any class of its stock or any other equity interest. Notwithstanding the foregoing, Blackhawk Automotive Plastics, Ltd. may sell certain operating losses provided that all of the proceeds of such sale are utilized to pay the Term Loans in such order as Agent shall determine.

(e) Dividends and Distributions.

Borrower shall not declare or pay any dividend or other distribution (whether in cash or in kind) on any class of its stock (if Borrower is a corporation) or on account of any equity interest in Borrower (if Borrower is a partnership, limited liability company or other type of entity). Notwithstanding the foregoing, so long as no Event of Default exists or would be caused by the payment thereof, Borrower may pay the following: (i) dividends to the Parent for the purpose of paying regularly scheduled dividends on the preferred stock of the Parent which dividends have been previously approved in writing by the Lenders in their sole discretion;

CHICAGO/#1466603.10

(ii) dividends to the Parent for the redemption of stock of the Parent owned by employees of Borrower or any of its Subsidiaries upon termination of the employment of such employees in accordance with the terms of the Executive Purchase Agreement dated May 27, 1999; provided that such dividends shall not exceed $100,000 in the aggregate in any Fiscal Year; (iii) payments and distributions paid pursuant to that certain Management Services Agreement, dated as of May 27, 1999 between the Borrower (as successor in interest to Worthington Custom Plastics, Inc.) and Blue Point Capital Partners LLC (as assignee of Key Equity Capital Corporation) not in excess of $300,000 in the aggregate in any Fiscal Year, and (iv) out of pocket expenses incurred by Parent as a result of its ownership of Borrower not in excess of $10,000 in the aggregate in any fiscal year.

(f)     Investments; Loans.

Borrower shall not purchase or otherwise acquire, or contract to purchase or otherwise acquire, the obligations or stock of any Person, other than direct obligations of the United States; nor shall Borrower lend or otherwise advance funds to any Person except for:

(i)     any advance to an officer or employee of Borrower for travel or other business expenses in the ordinary course of business to the extent that the aggregate of all such advances to all officers or employees outstanding at any time does not exceed $50,000;

(ii)    any investment in Cash Equivalents, which are pledged to the Agent, for the ratable benefit of the Lenders, with respect to, and as collateral security for, the Liabilities;

(iii)   trade credit extended to customers in the ordinary course of business;

(iv)    those investments more particularly set forth in Schedule 14(f) attached hereto and made a part hereof;

(v)     unsecured letters of credit, bankers' acceptances and/or (1) secured Hedging Agreements between Borrower and Agent or a Lender or one of their respective Affiliates and/or (2) unsecured Hedging Agreements between Borrower and any other financial institution acceptable to the Requisite Lenders, providing for the transfer or mitigation of foreign exchange risks or interest rate risks either generally or under specific contingencies;

(vi)    deposits or pledges to secure obligations under leases (other than the deposit required in connection with the Sale and Leaseback) in the ordinary course of business not to exceed $50,000 in the aggregate at any time;

(vii)   a rent deposit of one year's lease payments amounting to $1,938,750 in connection with the Sale and Leaseback;

(viii)  securities acquired by an issued to Borrower in connection with the reorganization or bankruptcy of any of its Account Debtors or suppliers; provided that the

40

Agent is granted a first priority perfected Lien on and security interest in such securities, for the ratable benefit of the Lenders; and

(ix) additional investments occurring after the date hereof in Blackhawk Automotive Plastics, Ltd in an aggregate amount not to exceed $100,000 at any time.

(g) Fundamental Changes. Line of Business.

Borrower shall not amend its organizational documents (including changing its corporate name) in a manner materially adverse to Agent and Lenders without the prior written consent of Agent or change its Fiscal Year or enter into a new line of business materially different from Borrower's current business.

(h) Equipment.

Borrower shall not (i) permit any Equipment to become a Fixture to real property unless such real property is owned by Borrower and is subject to a mortgage in favor of Agent, or if such real property is leased, is subject to a landlord's agreement in favor of Agent on terms acceptable to Agent, or (ii) permit any Equipment to become an accession to any other personal property unless such personal property is subject to a lien in favor of Agent second in priority only to a lien in favor of the Term Loan lenders.

(i) Affiliate Transactions.

Except as set forth on Schedule 11(i) hereto or as permitted pursuant to subsection 11(c) hereof, Borrower shall not conduct, permit or suffer to be conducted, transactions with Affiliates other than transactions for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to Borrower than the terms upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

(j) Settling of Accounts.

Following the occurrence and during the continuance of an Event of Default, Borrower shall not settle or adjust any Account identified by the Borrower as an Eligible Account without the consent of Agent.

(k) Management Fees; Compensation.

Borrower shall not pay any management (except as permitted in paragraph (e) of this Section 13) or consulting fees to any Persons, or pay annual aggregate compensation, whether as salary, bonus or otherwise, to all directors or officers of Borrower in excess of such amounts as approved by the Compensation Committee and the Board of Directors of Borrower as determined in their reasonable business judgment and paid in the ordinary course of business.

(l)     Sale and Leaseback Documentation.

Borrower shall not amend or modify the Sale and Leaseback Documentation without the prior written consent of the Agent.

14.     Financial Covenants.

Borrower shall maintain and keep in full force and effect each of the financial covenants set forth below:

(a)     EBITDA.

Borrower shall not permit its EBITDA at any time to be less than the amounts set forth below for the corresponding periods set forth below:

| Period | Amount |
|---|---|
| Month ended October 31, 2006 | 700,000 |
| October 1, 2006 – November 30, 2006 | 1,400,000 |
| October 1, 2006 – December 31, 2006 | 1,750,000 |
| October 1, 2006 – January 31, 2007 | 2,100,000 |
| October 1, 2006 – February 28, 2007 | 2,800,000 |
| October 1, 2006 – March 31, 2007 | 3,500,000 |
| October 1, 2006 – April 30, 2007 | 4,200,000 |
| October 1, 2006 – May 31, 2007 | 4,900,000 |
| October 1, 2006 – June 30, 2007 | 5,600,000 |
| October 1, 2006 – July 31, 2007 | 4,600,000 |
| October 1, 2006 – August 31, 2007 | 5,300,000 |
| October 1, 2006 – September 30, 2007 and each trailing twelve month period ended thereafter | 6,000,000 |

(b)     Debt Service Coverage.

Borrower shall not permit Debt Service Coverage to be less than the ratio set forth below for the corresponding periods set forth below:

| Period | Ratio |
|---|---|
| October 1, 2006 - December 31, 2006 | 1.10:1.0 |
| October 1, 2006 - March 31, 2007 | 1.10:1.0 |
| October 1, 2006 – September 30, 2007 | 1.10:1.0 |
| January 1, 2007 - December 31, 2007 and each rolling four quarter period ended thereafter | 1.10:1.0 |

CHICAGO/#1466603.10

(c) <u>Maximum Capital Expenditure Limitation</u>.

Borrower shall not make any Capital Expenditure if, after giving effect to such Capital Expenditure, the aggregate cost of all Capital Expenditures would exceed $2,000,000 during any Fiscal Year.

15. <u>Default</u>.

The occurrence of any one or more of the following events shall constitute an "**Event of Default**" by Borrower hereunder:

(a) <u>Payment</u>.

The failure of any Obligor to pay when due, declared due, or demanded by Agent, at the request of the Requisite Lenders, any of the Liabilities.

(b) <u>Breach of this Agreement</u>.

The failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under this Agreement or any of the Other Agreements.

(c) <u>Breaches of Other Obligations</u>.

The failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under any other agreement with any Person if such failure might have a Material Adverse Effect on such Obligor.

(d) <u>Breach of Representations and Warranties</u>.

The making or furnishing by any Obligor, Agent or any Lender of any representation, warranty, certificate, schedule, report or other communication within or in connection with this Agreement or the Other Agreements or in connection with any other agreement between such Obligor and Agent or any Lender, which is untrue or misleading in any respect which, if capable of being cured, shall remain unremedied for more than twenty (20) days after the occurrence thereof.

(e) <u>Loss of Collateral</u>.

The loss, theft, damage or destruction of, or (except as permitted hereby) sale, lease or furnishing under a contract of service of, any of the Collateral which is reasonably likely to result in a Material Adverse Effect.

(f) <u>Levy, Seizure or Attachment</u>.

The making or any attempt by any Person to make any levy, seizure or attachment upon any of the Collateral which is reasonably likely to result in a Material Adverse Effect.

43

CHICAGO/#1466603.10

(g) <u>Bankruptcy or Similar Proceedings</u>.

The commencement of any proceedings in bankruptcy by or against any Obligor or for the liquidation or reorganization of any Obligor, or alleging that such Obligor is insolvent or unable to pay its debts as they mature, or for the readjustment or arrangement of any Obligor's debts, whether under the United States Bankruptcy Code or under any other law, whether state or federal, now or hereafter existing, for the relief of debtors, or the commencement of any analogous statutory or non-statutory proceedings involving any Obligor; provided, however, that if such commencement of proceedings against such Obligor is involuntary, such action shall not constitute an Event of Default unless such proceedings are not dismissed within sixty (60) days after the commencement of such proceedings, though Agent and Lenders shall have no obligation to make Loans to or issue, or cause to be issued, Letters of Credit on behalf of Borrower during such sixty (60) day period or, if earlier, until such proceedings are dismissed.

(h) <u>Appointment of Receiver</u>.

The appointment of a receiver or trustee for any Obligor, for any of the Collateral or for any substantial part of any Obligor's assets or the institution of any proceedings for the dissolution, or the full or partial liquidation, or the merger or consolidation, of any Obligor which is a corporation, limited liability company or a partnership; provided, however, that if such appointment or commencement of proceedings against such Obligor is involuntary, such action shall not constitute an Event of Default unless such appointment is not revoked or such proceedings are not dismissed within sixty (60) days after the commencement of such proceedings, though Agent and Lenders shall have no obligation to make Loans to or issue, or cause to be issued Letters of Credit on behalf of Borrower during such sixty (60) day period, or, if earlier, until such appointment is revoked or such proceedings are dismissed.

(i) <u>Judgment</u>.

The entry of any judgment or order against any Obligor in excess of $50,000 which remains unsatisfied or undischarged and in effect for forty-five (45) days after such entry without a stay of enforcement or execution.

(j) <u>Dissolution of Obligor</u>.

The dissolution of any Obligor which is a partnership, limited liability company, corporation or other entity except as otherwise permitted hereunder.

(k) <u>Default or Revocation of Guaranty</u>.

The occurrence of an event of default under, or the revocation or termination of, any agreement, instrument or document executed and delivered by any Person to Agent or any Lender pursuant to which such Person has guaranteed to Agent and Lenders the payment of all or any of the Liabilities or has granted Agent a security interest in or lien upon some or all of such Person's real and/or personal property to secure the payment of all or any of the Liabilities.

(l) <u>Criminal Proceedings</u>.

The institution in any court of a criminal proceeding against any Obligor, or the indictment of any Obligor for any crime.

(m) <u>Change of Control</u>.

Either (a) Tier-e shall cease to own and control at least ninety percent (90%) of the issued and outstanding voting stock of the Borrower or (b) Key Entities and their Affiliates shall cease to own at least fifty-one percent (51%) of the issued and outstanding voting stock of Tier-e.

(n) <u>Change of Management</u>.

If at any time there is a change in the Chief Financial Officer or President of Borrower which is unacceptable to Agent in its reasonable discretion.

(o) <u>Material Adverse Change</u>.

Any material adverse change in the Collateral, business, property, assets, prospects, operations or condition, financial or otherwise of any Obligor, as determined by Requisite Lenders in their sole judgment or the occurrence of any event which, in Requisite Lenders' sole judgment, could have a Material Adverse Effect.

16. <u>Remedies Upon an Event of Default</u>.

(a) Upon the occurrence of an Event of Default described in <u>subsection 15(g)</u> hereof, all of the Liabilities shall immediately and automatically become due and payable, without notice of any kind. Upon the occurrence of any other Event of Default, all Liabilities may, at the option of Requisite Lenders, and without demand, notice or legal process of any kind, be declared, and immediately shall become, due and payable.

(b) Upon the occurrence of an Event of Default, Agent may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any of the Other Agreements and all of Agent's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law. In particular, but not by way of limitation of the foregoing, Agent may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which it already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may enter onto any of Borrower's premises where any of the Collateral may be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of, and Agent shall have the right to store the same at any of Borrower's premises without cost to Agent or Lenders. At Agent's request, Borrower shall, at Borrower's expense, assemble the Collateral and make it available to Agent at one or more places to be designated by Agent and reasonably convenient to Agent and Borrower. Borrower recognizes that if Borrower fails to perform, observe or discharge any of its Liabilities under this Agreement or the Other Agreements, no remedy at law will provide adequate relief to Agent and

Lenders, and agrees that Agent and Lenders shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. Any notification of intended disposition of any of the Collateral required by law will be deemed to be a reasonable authenticated notification of disposition if given at least ten (10) days prior to such disposition and such notice shall (i) describe Agent and Borrower, (ii) describe the Collateral that is the subject of the intended disposition, (iii) state the method of the intended disposition, (iv) state that Borrower is entitled to an accounting of the Liabilities and state the charge, if any, for an accounting and (v) state the time and place of any public disposition or the time after which any private sale is to be made. Agent and Lenders may disclaim any warranties that might arise in connection with the sale, lease or other disposition of the Collateral and has no obligation to provide any warranties at such time. Any Proceeds of any disposition by Agent of any of the Collateral may be applied by Agent to the payment of expenses in connection with the Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such Proceeds may be applied by Agent toward the payment of such of the Liabilities, and in such order of application, as Agent may from time to time elect.

17. Conditions Precedent.

The obligation of Agent and Lenders to fund the initial Revolving Loan, and to issue or cause to be issued the initial Letter of Credit, is subject to the satisfaction or waiver on or before the date hereof of the following conditions precedent:

(a) Agent shall have received each of the agreements, opinions, reports, approvals, consents, certificates and other documents set forth on the closing document list attached hereto as Schedule 17(a) (the "Closing Document List") in each case in form and substance satisfactory to Agent;

(b) Since July 31, 2006, no event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect on any Obligor;

(c) Agent shall have received payment in full of all fees and expenses payable to it by Borrower or any other Person in connection herewith, on or before disbursement of the initial Loans hereunder;

(d) Immediately after giving effect to (A) the making of the initial Loans, including without limitation the Revolving Loans, if any, requested to be made on the date hereof, (B) the issuance of the initial Letter of Credit, if any, requested to be made on such date, (C) the payment of all fees due upon such date, (D) the payment or reimbursement by Borrower of Agent for all closing costs and expenses incurred in connection with the transactions contemplated hereby, Borrower has Excess Availability of not less than Four Million Dollars ($4,000,000), on a pro-forma basis as if all accounts payable greater than sixty (60) days past due (excluding Tooling accounts payable) were paid; and

(e) The Obligors shall have executed and delivered to Agent all such other documents, instruments and agreements which Agent determines are reasonably necessary to consummate the transactions contemplated hereby.

46

18. <u>Settlements, Distributions and Apportionment of Payments.</u>

On a weekly basis (or more frequently if requested by Agent (a "Settlement Date"), Agent shall provide each Lender with a statement of the outstanding balance of the Liabilities as of the end of the Business Day immediately preceding the Settlement Date (the "Pre-Settlement Determination Date") and the current balance of the Loans funded by each Lender (whether made directly by such Lender to Borrower or constituting a settlement by such Lender of a previous Disproportionate Advance made by Agent on behalf of such Lender to Borrower). If such statement discloses that such Lender's current balance of the Loans as of the Pre-Settlement Determination Date exceeds such Lender's Pro Rata Share of the Loans outstanding as of the Pre-Settlement Determination Date, then Agent shall, on the Settlement Date, transfer, by wire transfer, the net amount due to such Lender in accordance with such Lender's instructions, and if such statement discloses that such Lender's current balance of the Loans as of the Pre-Settlement Determination Date is less than such Lender's Pro Rata Share of the Loans outstanding as of the Pre-Settlement Determination Date, then such Lender shall, on the Settlement Date (to the extent such Lender is notified of such deficiency prior to 12:00 P.M. Troy, Michigan time and if notified after such time, on the following Business Day), transfer, by wire transfer the net amount due to Agent in accordance with Agent's instructions. In addition, payments actually received by Agent with respect to the following items shall be distributed by Agent to Lenders as follows:

(a) Within one (1) Business Day of receipt thereof by Agent, payments to be applied to interest on the Loans shall be paid to each Lender in proportion to its Pro Rata Share, subject to any adjustments for any Disproportionate Advances as provided in <u>subsection 2(a)(i)</u>, so that Agent shall receive interest on the Disproportion Advances and each Lender shall only receive interest on the amount of funds actually advanced by such Lender;

(b) Within one (1) Business Day of receipt thereof by Agent, payments to be applied to the Letter of Credit fee set as provided in <u>Section 3(a) hereof</u> shall be paid to each Lender in proportion to its Pro Rata Share;

(c) Within one (1) Business Day of receipt thereof by Agent, payments to be applied to the closing fee as provided in <u>subsection 4(c)(i)</u> shall be paid to each Lender in proportion to its Pro Rata Share;

(d) Within one (1) Business Day of receipt thereof by Agent, payments to be applied to the unused line fee set forth in <u>subsection 4(c)(ii)</u> hereof shall be paid to each Lender in proportion to its Pro Rata Share; and

(e) Within one (1) Business Day of receipt thereof by Agent, payments to be applied to the prepayment fee set forth in <u>Section 10</u> hereof shall be paid to each Lender in proportion to its Pro Rata Share.

Notwithstanding the foregoing, Agent shall not be obligated to transfer to any Defaulting Lender any payment made by Borrower to Agent, nor shall such Defaulting Lender be entitled to share any interest, fees or other payment hereunder, until payment is made by such Defaulting Lender to Agent as required in this Agreement.

19. <u>Agent</u>.

(a) <u>Appointment of Agent</u>.

(i) Each Lender hereby designates LaSalle as Agent to act as herein specified. Each Lender hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the notes and any other instruments and agreements referred to herein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto. Except as otherwise provided herein, Agent shall hold all Collateral and all payments of principal, interest, fees, charges and expenses received pursuant to this Agreement or any of the Other Agreements for the benefit of Lenders. Agent may perform any of its duties hereunder by or through its agents or employees.

(ii) The provisions of this <u>Section 19</u> are solely for the benefit of Agent and Lenders, and neither Borrower nor any other Obligor shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Obligor.

(b) <u>Nature of Duties of Agent</u>.

Agent shall not have duties, obligations or responsibilities except those expressly set forth in this Agreement and the Other Agreements. Neither Agent nor any of its officers, directors, employees or agents shall be liable for any action taken or omitted by it as such hereunder or in connection herewith, unless caused by its or their gross negligence or willful misconduct. The duties of Agent shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement or the Other Agreements a fiduciary relationship in respect of any Lender; and nothing in this Agreement or the Other Agreements, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or the Other Agreements except as expressly set forth herein.

(c) <u>Lack of Reliance on Agent</u>.

(i) Independently and without reliance upon Agent, each Lender, to the extent it deems appropriate, has made and shall continue to make (A) its own independent investigation of the financial or other condition and affairs of Agent, each Obligor and any other Lender in connection with the taking or not taking of any action in connection herewith and (B) its own appraisal of the creditworthiness of Agent, each Obligor and any other Lender, and, except as expressly provided in this Agreement, Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.

48

CHICAGO/#1466603.10

(ii) Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, collectibility, priority or sufficiency of this Agreement or the Other Agreements or any notes or the financial or other condition of any Obligor. Agent shall not be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or the Other Agreements, or the financial condition of any Obligor, or the existence or possible existence of any Event of Default.

(d) Certain Rights of Agent.

Agent shall have the right to request instructions from Requisite Lenders or all Lenders, as applicable, pursuant to this Agreement, by notice to each Lender. If Agent shall request instructions from Requisite Lenders or all Lenders, as applicable, with respect to any act or action (including the failure to act) in connection with this Agreement, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Requisite Lenders or all Lenders, as applicable, and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting hereunder in accordance with the instructions of Requisite Lenders or all Lenders, as applicable.

(e) Reliance by Agent.

Agent shall be under no duty to examine, inquire into, or pass upon the validity, effectiveness or genuineness of this Agreement, any of the Other Agreements or any instrument, document or communication furnished pursuant hereto or thereto or in connection herewith or therewith. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order, electronic mail or other documentary, teletransmission or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person. Agent may consult with legal counsel (including counsel for any Obligor with respect to matters concerning any Obligor), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

(f) Indemnification of Agent.

To the extent Agent is not promptly reimbursed and indemnified by Borrower, each Lender will reimburse and indemnify Agent, in proportion to its Pro Rata Share, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, in any way relating to or arising out of this Agreement; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from

49

Agent's gross negligence or willful misconduct. If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnities and cease to do, or not commence, the acts to be indemnified against, even if so directed by Requisite Lenders or all Lenders, as applicable, until such additional indemnification is provided. The obligations of Lenders under this subsection 9(f) shall survive the payment in full of the Liabilities and the termination of this Agreement.

    (g)    Agent in its Individual Capacity.

With respect to the Loans made by it pursuant hereto, Agent shall have the same rights and powers hereunder as any other Lender or holder of a note or participation interest and may exercise the same as though it was not performing the duties specified herein; and the terms "**Lenders**," "**Requisite Lenders**" or any similar terms shall, unless the context clearly otherwise indicates, include Agent in its individual capacity. Agent may accept deposits from, lend money to, acquire equity interests in, and generally engage in any kind of banking, trust, financial advisor or other business with Borrower or any Affiliate of Borrower as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower for services in connection with this Agreement and otherwise without having to account for the same to Lenders, to the extent such activities are not in contravention of the terms of this Agreement.

    (h)    Holders of Notes.

Agent may deem and treat the payee of any promissory note as the owner thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof shall have been filed with Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any promissory note, shall be conclusive and binding on any subsequent holder, transferee or assignee of such promissory note or of any promissory note or notes issued in exchange therefor.

    (i)    Successor Agent.

        (i)    Agent may, upon five (5) Business Days' notice to Lenders and Borrower, resign at any time (effective upon the appointment of a successor Agent pursuant to the provisions of this subsection 19(i)) by giving written notice thereof to Lenders and Borrower. Upon any such resignation, Requisite Lenders shall have the right, upon five (5) days' notice, to appoint a successor Agent. If no successor Agent shall have been so appointed by Requisite Lenders and accepted such appointment, within thirty (30) days after the retiring Agent's giving of notice of resignation, then, upon five (5) days' notice, the retiring Agent may, on behalf of Lenders, appoint a successor Agent, which shall be a bank or a trust company or other financial institution which maintains an office in the United States, or a commercial bank organized under the laws of the United States of America or of any State thereof, or any affiliate of such bank or trust company or other financial institution which is engaged in the banking business, having a combined capital and surplus of at least Fifty Million and No/100 Dollars ($50,000,000.00).

(ii) Upon the acceptance of any appointment as an Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 19 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement.

(j) Collateral Matters.

(i) Each Lender authorizes and directs Agent to enter into the Other Agreements for the benefit of Lenders. Each Lender hereby agrees that, except as otherwise set forth herein, any action taken by Requisite Lenders in accordance with the provisions of this Agreement or the Other Agreements, and the exercise by the Requisite Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all Lenders. Agent is hereby authorized on behalf of all Lenders, without the necessity of any notice to or further consent from any Lender to take any action with respect to any Collateral or Other Agreements which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to this Agreement and the Other Agreements.

(ii) Agent will not, without the verbal consent of all Lenders, which consent shall (a) be confirmed promptly thereafter in writing and (b) not be unreasonably withheld or delayed, execute any release of Agent's security interest in any Collateral except for releases relating to dispositions of Collateral (x) permitted by this Agreement and (y) in connection with the repayment in full of all of the Liabilities by Borrower and the termination of all obligations of Agent and Lenders under this Agreement and the Other Agreements; provided, that with the consent of Requisite Lenders, Agent may release its liens on Collateral having a book value not greater than ten percent (10%) of the total book value of all Collateral, as determined by Agent, either in a single transaction or series of related transactions, not to exceed twenty percent (20%) of the market value of all Collateral in any Fiscal Year. Agent shall not be required to execute any such release on terms which, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such liens without recourse or warranty. In the event of any sale or transfer of any of the Collateral, Agent shall be authorized to deduct all of the expenses reasonably incurred by Agent from the proceeds of any such sale or transfer.

(iii) Lenders hereby agree that the lien granted to Agent in any property sold or disposed of in accordance with the provisions of the Agreement shall be automatically released; provided, however that Agent's lien shall attach to and continue for the benefit of Agent and Lenders in the proceeds and products of such property arising from any such sale or disposition.

(iv) To the extent, pursuant to the provisions of this subsection 19(j), Agent's execution of a release is required to release its lien upon any sale and transfer of

51

Collateral which is consented to in writing by Requisite Lenders or all Lenders, as applicable, and upon at least five (5) business days' prior written request by Borrower, Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of the liens granted to Agent for the benefit of Lenders herein or pursuant hereto upon the Collateral that was sold or transferred.

(v)    Agent shall not have any obligation whatsoever to Lenders or to any other Person to assure that the Collateral exists or is owned by Borrower or any other Obligor or is cared for, protected or insured or that the liens granted to Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to Agent in this Section 19 or in any of the Other Agreements, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, Agent may act in any manner it may deem appropriate, in its sole discretion, given Agent's own interest in the Collateral as one of Lenders and that Agent shall have no duty or liability whatsoever to Lenders, except for its gross negligence or willful misconduct.

(vi)    In the event that any Lender receives any Proceeds of any Collateral by setoff, exercise of any banker's lien or otherwise, in an amount in excess of such Lender's Pro Rata Share of such Proceeds, such Lender shall purchase for cash (and other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Liabilities as would be necessary to cause all Lenders to share the amount so set off or otherwise received with each other Lender in accordance with their respective Pro Rata Shares. No Lender shall exercise any right of set off or banker's lien without the prior written consent of Agent.

(k)    Actions with Respect to Defaults.

In addition to Agent's right to take actions on its own accord as permitted under this Agreement, Agent shall take such action with respect to an Event of Default as shall be directed by Requisite Lenders or all Lenders, as applicable, under this Agreement; provided, that until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable and in the best interests of Lenders. No Lender shall have any right individually to enforce or seek to enforce this Agreement or any Other Agreement or to realize upon any Collateral, unless instructed to do so by Agent.

(l)    Delivery of Information.

Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by Agent from Borrower or any other Obligor, Requisite Lenders, any Lender or any other Person under or in connection with this Agreement or any Other Agreement except (i) as specifically provided in this Agreement or any Other Agreement and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written

52

CHICAGO/#1466603.10