**07 C 6438**

**JUDGE PALLMEYER**
**MAGISTRATE JUDGE BROWN**

# EXHIBIT C

## FORBEARANCE AGREEMENT AND AMENDMENT TO LOAN AGREEMENT AND LETTER AGREEMENT

Borrower:     Blackhawk Automotive Plastics, Inc.

Address:      800 Pennsylvania Avenue
          Salem, Ohio 44460
          Attention: President

Date:        March 28, 2007

THIS FORBEARANCE AGREEMENT AND AMENDMENT TO LOAN AGREEMENT AND LETTER AGREEMENT (this "Agreement"), effective as of the above-referenced date, is made by and among **BLACKHAWK AUTOMOTIVE PLASTICS, INC.**, a Delaware corporation (the "**Borrower**"), **LASALLE BUSINESS CREDIT, LLC**, a Delaware limited liability company (in its individual capacity, "**LaSalle**"), as agent ("**Agent**") for the lenders (the "**Lenders**") party hereto, and the Lenders.

### RECITALS:

A.  The Borrower, the Lenders and the Agent have entered into that certain Loan and Security Agreement dated as of October 4, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), pursuant to which the Lenders made certain loans and other financial accommodations to the Borrower, subject to the terms thereof;

B.  Pursuant to the terms of the Loan Agreement and certain Other Agreements (as defined in the Loan Agreement), the Lenders made certain loans and other extensions of credit available to the Borrower, and in consideration thereof the Borrower has granted to the Lenders liens on and first priority security interests in substantially all of the assets of the Borrower, including, without limitation, Borrower's accounts, general intangibles, inventory, equipment and all other goods, chattel paper, instruments, documents, investment property, deposits, policies and certificates of insurance, securities, choses in action, cash and certain other assets and property as set forth in the Loan Agreement and the Other Agreements (collectively, the "**Loan Documents**");

C.  Pursuant to the terms of that certain Letter Agreement dated as of January 29, 2007, as extended by that certain Letter Agreement dated as of March 12, 2007 (as so extended, the "**Letter Agreement**"), the Lenders previously agreed to provide the Borrower with a temporary one-time over advance under the Revolving Loan Commitment as of January 29, 2007 not to exceed $1,000,000 (the "**Over Advance**") at any time subject to, among other items, (i) the Borrower's agreement to repay such Over Advance in full to the Lenders on or before the close of business on March 31, 2007 (the

"Over Advance Termination Date") and (ii) the execution and delivery by Key Equity Capital Corporation, an Ohio corporation ("**Key Equity Capital**"), of that certain Limited Guaranty Agreement dated as of January 29, 2007 (the "**Key Guaranty**") in favor of Agent and Lenders;

D.    Pursuant to the Loan Documents, the Lenders have continued to make certain loans and other extensions of credit available to the Borrower. The outstanding balance of the Liabilities to the Lenders as of March 26, 2007 is $40,172,783.94 consisting of $29,029,968.94 in outstanding principal of Revolving Loans, $9,642,820.00 in outstanding principal of Term Loan A and $1,500,000.00 in outstanding principal of Term Loan B, plus all accrued and accruing interest, costs and expenses incurred by the Lenders in connection with the Loan Documents;

E.    The Events of Default set forth on <u>Schedule A</u> attached hereto have occurred and are continuing under the Loan Documents as of the date hereof (collectively referred to herein as the "**Current Defaults**") and the Borrower is on notice of such Current Defaults;

F.    As a result of the Current Defaults, the Agent and Lenders have, *inter alia*, the right to take one or more of the actions set forth in <u>Section 16</u> of the Loan Agreement;

G.    The Borrower acknowledges all of the foregoing and states that the Current Defaults have occurred and are continuing under the Loan Documents; and

H.    The Borrower has requested that the Agent and Lenders forbear in the exercise and enforcement of their rights, powers and remedies under the Loan Documents, and the Agent and Lenders are willing to forbear from the exercise and enforcement of such rights and remedies for a limited time only upon the Borrower's compliance with and fulfillment of the terms and conditions set forth herein and under the Loan Documents in the manner hereinafter stated, provided that the Agent's and Lenders' rights and remedies under the Loan Documents are not otherwise waived or impaired as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the agreements, promises and covenants set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>DEFINITIONS</u>. The following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined; provided, however that terms not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement):

(i)    "**Claims**" shall have the meaning set forth in <u>Section 9(a)</u> hereof.

(ii)    "**Forbearance Period**" means the period commencing on the date hereof and ending on the earliest to occur of (A) the date of the termination of the Forbearance Period by the Lenders pursuant to <u>Section 7</u> hereof, (B) the date on

which all of the Liabilities have been paid in full (other than contingent and indemnification obligations which survive such payment in accordance with the terms of the Loan Documents) and the Loan Documents have been terminated, and (C) the Forbearance Termination Date.

(iii)    "**Forbearance Event of Default**" shall have the meaning set forth in Section 7 of this Agreement.

(iv)    "**Forbearance Termination Date**" means June 30, 2007.

(v)    "Section" means a numbered section of this Agreement, unless another document is specifically referenced.

2.    AMENDMENTS TO THE LOAN AGREEMENT AND LETTER AGREEMENT.

(a)    The Loan Agreement is hereby amended on and after the date of this Agreement through the Forbearance Period as follows:

(i)    The Loan Agreement is hereby amended by adding a new sentence immediately following the first sentence of Section 2(a) of the Loan Agreement, to read as follows:

Notwithstanding the foregoing, the "Maximum Loan Limit" shall equal Thirty-Two Million and No/100 Dollars ($32,000,000) during the period beginning on March 28, 2007 and ending on April 9, 2007 (the "**MLL Increase Period**").

(ii)    LaSalle's "Revolving Loan Commitment" as set forth on the signature page to the Loan Agreement is amended and restated in its entirety, to read as follows:

Revolving Loan Commitment:  (x) during the MLL Increase Period, $16,000,000, and (y) at any time other than the MLL Increase Period, $15,000,000

(iii)    Citizens Bank's "Revolving Loan Commitment" as set forth on the signature page to the Loan Agreement is amended and restated in its entirety, to read as follows:

Revolving Loan Commitment:  (x) during the MLL Increase Period, $16,000,000, and (y) at any time other than the MLL Increase Period, $15,000,000

(b)    The Letter Agreement is hereby amended on and after the date of this Agreement through the Forbearance Period as follows:

(i)     The reference to "$1,000,000" appearing in the second paragraph of the Letter Agreement is hereby deleted and "$2,000,000" is inserted in place thereof.

(ii)     The Over Advance Termination Date is hereby extended from March 31, 2007 to June 30, 2007.

3.     **ACKNOWLEDGMENT**.  The Borrower hereby acknowledges, agrees, and reaffirms that:

(a)     The Current Defaults have occurred and are continuing and are the only Events of Default in existence as of the date hereof;

(b)     The Borrower waives any requirement in the Loan Documents that the Agent or Lenders provide written notice of any Current Defaults and the Borrower acknowledges that the Agent and Lenders have not, as of the date of execution of this Agreement, otherwise expressly or impliedly waived any of the Current Defaults;

(c)     The Agent and Lenders maintain valid, properly perfected security interests in and liens on all of the Collateral described in the Loan Documents, which liens are paramount in priority and interest to all other liens and security interests, if any, of any other parties relating to the Collateral except as expressly stated in the Loan Documents;

(d)     The Loan Documents constitute legal, valid and binding obligations enforceable in accordance with their terms by the Agent and Lenders against the Borrower subject to bankruptcy, insolvency, reorganization moratorium and other laws with general application affecting the rights and remedies of creditors and secured parties, and general principles of equity regardless of whether applied in a proceeding in equity or at law.  The Borrower reaffirms its obligations under the Loan Documents including, without limitation, the Liabilities.  The Borrower also agrees that it shall not dispute the validity or enforceability of this Agreement or the Loan Documents or any of its obligations hereunder or thereunder, or the validity, priority, enforceability or extent of the Agent's and Lenders' security interest in and lien on any Collateral in any judicial, administrative or other proceeding, either during or following the termination or expiration of the Forbearance Period;

(e)     The Agent and Lenders have the right to immediately enforce their right to payment of all Liabilities and, in connection therewith, to immediately enforce their security interests in, and liens on, the Collateral and to exercise all other rights, powers and remedies provided to Agent and/or Lenders under the Loan Documents or at law, in equity or by statute;

(f)     Nothing contained in this Agreement shall, at any time, require the Agent or Lenders to make loans or other extensions of credit to the Borrower or to provide for the issuance of Letters of Credit for the account of the Borrower or to permit overdrafts in any account maintained by or on behalf of the Borrower and any such

obligations of the Agent and Lenders shall be governed only by, and shall remain subject only to, the terms of the Loan Documents (as amended hereby);

(g)    Borrower does not intend to file a petition for relief under any Chapter of the United States Bankruptcy Code or any other state or federal insolvency laws or laws providing relief of debtors and the Agent and Lenders have relied on such representation; and

(h)    Attached hereto as Schedule B is a projected weekly Cash Receipt and Disbursement Budget for the 13-week period beginning on the date of this Agreement and ending on June 30, 2007 (the "**Budget**").

4.    <u>LIMITED FORBEARANCE AND FURTHER CONSIDERATION</u>.

(a)    During the Forbearance Period, so long as no Forbearance Event of Default shall have occurred and be continuing and subject to compliance by the Borrower with the terms and conditions of this Agreement and the Loan Documents, Agent and Lenders hereby agree to forbear from exercising and enforcing their rights, powers and remedies afforded under the Loan Documents or at law, in equity or by statute with respect to the Current Defaults during the Forbearance Period. The foregoing limited forbearance shall not be construed to impair the ability of the Agent or Lenders to enforce any such rights, powers or remedies after the Forbearance Period regardless of whether or not such enforcement relates to actions taken or payments received during the Forbearance Period, or during the Forbearance Period for Forbearance Events of Default other than the Current Defaults.

(b)    Unless earlier terminated in accordance with the terms of this Agreement, the Agent's and Lenders' forbearance, as provided herein, shall immediately cease without notice on the Forbearance Termination Date, and the Agent and Lenders at that time shall have the right to exercise and enforce any of their rights, powers and remedies afforded under the Loan Documents or at law, in equity or by statute with respect to the Current Defaults.

(c)    The Borrower agrees that any Forbearance Event of Default under this Agreement will also constitute an Event of Default under the Loan Documents. The Borrower further agrees that the occurrence of any Forbearance Event of Default shall constitute sufficient cause for the immediate termination by the Agent and Lenders of this Agreement, without further notice.

(d)    The Agent's and Lenders' forbearance is further expressly subject to and conditioned upon the Borrower's compliance with each and every term and provision of this Agreement, and except with respect to Current Defaults, the Borrower's compliance with each and every term and provision of the Loan Documents.

(e)    Upon a Forbearance Event of Default, the Agent and Lenders, at their option, may withdraw their forbearance hereunder. Upon such withdrawal, all Liabilities shall be due and payable and the Agent and Lenders shall have the undisputed and absolute right to exercise and enforce all other rights, powers and remedies which

may exist pursuant to the Loan Documents or at law, in equity or by statute, all without further demand or notice of any kind, all of which are hereby waived (to the extent permitted by applicable law) by the Borrower.

(f)    The Borrower acknowledges and agrees that neither the Agent nor the Lenders shall be under any obligation to extend the Forbearance Termination Date and that the Agent's or Lenders' failure to enforce any or all of their remedies under this Agreement, the Loan Documents, or under law or at equity after the expiration of the current Forbearance Period will not give rise to a further extension of the Forbearance Period absent a written agreement executed by the Agent and Lenders to extend the Forbearance Termination Date.

(g)    The Borrower further acknowledges and agrees that Agent's and Lenders' decision to allow the Borrower to use the Collateral during the Forbearance Period is of great value to the Borrower, and that such forbearance is, independent of the other consideration received by the Borrower hereunder, sufficient consideration for each and every one of the Borrower's obligations under this Agreement.

(h)    During the Forbearance Period, the Borrower is permitted to defer payment of the Applicable Monthly Principal Installments (as defined below) until the Forbearance Termination Date; provided, however, that the Borrower shall pay the entire amount of all Applicable Monthly Principal Installments to the Agent on the Forbearance Termination Date. "**Applicable Monthly Principal Installments**" shall mean (x) the monthly principal installments of Term Loan A required to be paid by the Borrower in April 2007, May 2007, and June 2007 pursuant to Section 2(d)(ii) of the Loan Agreement, and (y) the monthly principal installments of Term Loan B required to be paid by the Borrower in April 2007, May 2007, and June 2007 pursuant to Section 2(d)(iii) of the Loan Agreement.

(i)    During the Forbearance Period, the Borrower shall continue to perform and comply with each term, condition and provision of this Agreement and the Loan Documents and no Forbearance Event of Default or other breach or default shall have occurred and be continuing under this Agreement, the Loan Documents or any other Loan Document except the Current Defaults, as such Current Defaults exist as of the date of this Agreement.

5.    <u>CONDITIONS TO LIMITED FORBEARANCE.</u>  In addition to the other provisions set forth in this Agreement, the Agent's and Lenders' forbearance is expressly subject to and conditioned upon the continual compliance by the Borrower with the following terms, conditions and provisions:

(a)    This Agreement shall have been executed and delivered to the Agent by the Borrower;

(b)    On or before the date of this Agreement, the Agent shall have received a reaffirmation of and amendment to the Key Guaranty, duly executed by Key Equity Capital and in form and substance acceptable to Agent;

(c)    On or before the date of this Agreement, the Agent shall have received (x) an amended and restated revolving note made by the Borrower in favor of LaSalle in the original principal amount of Sixteen Million and No/100 Dollars ($16,000,000), and (y) an amended and restated revolving note made by the Borrower in favor of Citizens Bank in the original principal amount of Sixteen Million and No/100 Dollars ($16,000,000), in each case duly executed by the Borrower and in each case in form and substance acceptable to Agent;

(d)    On every Wednesday of each week during the Forbearance Period, the Borrower shall furnish to Agent and each Lender a schedule of actual to budget receipts and disbursements, with an explanation for any variances between the projected weekly budgets and the actual results, in form and substance reasonably acceptable to Agent;

(e)    During the Forbearance Period, the Borrower shall realize at least eighty-five percent (85%) of the projected revenues reflected in the Budget on a cumulative basis from March 26, 2007;

(f)    During the Forbearance Period, the Borrower shall not make payments in excess of one hundred fifteen percent (115%) of the cash disbursements reflected in the Budget on a cumulative basis from March 26, 2007;

(g)    The Borrower shall pay to the Agent, for the ratable benefit of the Lenders, an amendment fee in an amount equal to One Hundred Thousand and No/100 Dollars ($100,000), which amendment fee shall be fully earned by the Lenders as of the date hereof and shall be due and payable as follows: fifty percent (50%) of such amendment fee shall be due and payable on April 2, 2007 and fifty percent (50%) of such amendment fee shall be due and payable on May 2, 2007;

(h)    On or before May 31, 2007, (x) the Borrower shall sell enough of the Borrower's equipment located at the Borrower's facility in Upper Sandusky, Ohio to raise a cash purchase price of not less than One Million Five Hundred Thousand and No/100 Dollars ($1,500,000) (such cash purchase price being referred to herein as the "**Equipment Sale Amount**"), and (y) the Borrower shall pay the Equipment Sale Amount in immediately available funds to Agent as a mandatory prepayment of the Liabilities for application in the manner specified in Section 2(d)(iv) of the Loan Agreement;

(i)    On or before April 2, 2007, the Borrower shall deliver to Agent and each Lender copies of internally prepared financial statements for the calendar months ended December 31, 2006, January 31, 2007 and February 28, 2007, including, without limitation, balance sheets and statements of income and cash flow of Borrower, certified by the Chief Financial Officer of Borrower, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied, and which shall be accompanied by a compliance certificate for each calendar month in the form of Exhibit B to the Loan Agreement, which compliance certificates shall include calculations of the financial covenants as required by Section 14 in the Loan Agreement;

CHICAGO/#1611547.6                    7

(j)     On or before April 9, 2007, the Borrower shall obtain a subordinated second priority lien secured loan from Key Equity Capital and Key Equity Partners 2000, a Delaware general partnership (together with Key Equity Capital, collectively referred to herein as "**Junior Creditors**"), in the aggregate original principal amount of One Million and No/100 Dollars ($1,000,000), and shall furnish reasonably satisfactory evidence thereof to Agent, provided, however, that (x) such loan (and the liens and security interests securing such loan) shall be subordinated to the Liabilities pursuant to a subordination agreement in substantially the same form as that certain Subordination Agreement dated as of February 28, 2007 among Agent and Junior Creditors, and (y) such loan (and the liens and security interests securing such loan) shall be made on terms, including, without limitation, payment terms, substantially the same as the terms set forth in those certain Subordinated Promissory Notes dated as of February 28, 2007 made by the Borrower in favor of Junior Creditors;

(k)     The Borrower shall notify the Agent, promptly upon becoming aware thereof, if any of the Borrower's customers begins a pricing assessment on products manufactured or sold by the Borrower;

(l)     The Borrower hereby acknowledges and agrees that it shall not (i) pay any dividends or make any other distribution of any kind during the Forbearance Period to any party, or (ii) make any payments of principal or interest, scheduled or otherwise, during the Forbearance Period on any subordinated debt, if any;

(m)     The Borrower shall pay on demand (i) all legal fees and expenses incurred by Agent on, prior and following the date hereof in connection with the preparation, drafting, negotiation, monitoring and enforcement of this Agreement, the Loan Documents and all other documents provided for herein or delivered or to be delivered in connection herewith (including any amendment, supplement or waiver to any Loan Document or this Agreement) and (ii) all costs, fees and expenses of third-party auditors and consultants engaged by the Lenders or their counsel. In order to cause timely payment to be made to Agent and Lenders of Borrower's Liabilities (including, but not limited to, the costs, fees and expenses set forth above) as and when due, the Borrower authorizes and directs Agent to (x) debit the amount of Borrower's Liabilities to any deposit account of the Borrower of which and Lender maintains control or (y) add any such Liabilities to the outstanding amount of Revolving Loans under the Revolving Loan Commitment;

(n)     All of the warranties and representations of the Borrower contained herein and in the Loan Documents shall be true and correct in all material respects as of the date hereof (other than as a result of the existence of the Current Defaults), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all respects as of such earlier date; and

(o)     On or prior to April 6, 2007, the Borrower shall deliver to Agent and Lenders copies of resolutions or written consents of the board(s) of directors of the Borrower authorizing the execution and delivery and the consummation of the

transactions contemplated by this Agreement and all other documents or instruments to be executed and delivered in conjunction herewith certified by the Secretary or Manager, as applicable, of the Borrower as of the delivery date, in form and substance reasonably satisfactory to Agent.

6.    **REPRESENTATIONS AND WARRANTIES**.  All of the Borrower's representations and warranties contained in this Agreement shall survive the execution, delivery and acceptance of this Agreement by the Agent and Lenders.  The Borrower hereby represents and warrants to the Agent and Lenders that:

(a)    The execution and delivery of this Agreement and the performance by the Borrower of its obligations hereunder are within the Borrower's corporate powers and authority, have been duly authorized by all necessary corporate action and do not and will not contravene or conflict with the articles of incorporation, bylaws or other organizational documents of the Borrower.  This Agreement has been duly executed and delivered by the Borrower, and constitutes the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, subject to the effect of any applicable Bankruptcy, insolvency, reorganization or similar law affecting creditors' rights generally;

(b)    As of the date of this Agreement, no Event of Default, or Defaults which, except for the passage of time or notice would constitute an Event of Default, exist under the Loan Documents other than the Current Defaults;

(c)    All representations and warranties contained in the Loan Documents are true and correct in all material respects on the date hereof (other than as a result of the existence of the Current Defaults) and the Borrower hereby acknowledges and reaffirms such representations and warranties with respect to the Loan Documents as of the date of this Agreement, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respect as of such earlier date; and

(d)    The Borrower has read and understands the contents of this Agreement and has had an opportunity to review and consider the terms of this Agreement with counsel of its choice.

7.    **FORBEARANCE EVENTS OF DEFAULT**.  A "Forbearance Event of Default" shall mean the occurrence of any one or more of the following events:

(a)    Borrower shall fail to observe or perform any term, covenant or agreement binding on it contained in this Agreement, or any agreement, instrument or document executed in connection herewith, including, without limitation, any term, condition or provision contained in Section 5 of this Agreement;

(b)    An Event of Default or a Default which, except for passage of time or notice would constitute an Event of Default, shall have occurred and be continuing under the Loan Documents (other than the Current Defaults that exist as of the date of this Agreement);

CHICAGO/#1611547.6                                9

(c)     The Borrower files a petition for relief under any Chapter of the Bankruptcy Code or an order for relief under the Bankruptcy Code is entered against the Borrower or an involuntary petition under the Bankruptcy Code against the Borrower is not dismissed within 45 days of the filing thereof; or

(d)     Any instrument, document, report, schedule, agreement, representation or warranty, oral or written, made or delivered to the Agent and/or Lenders by the Borrower in connection with this Agreement is untrue or incorrect in any material respect when made or delivered; provided, however, that it is agreed and understood by the Agent and Lenders that all projections concerning the Borrower that have been delivered to Agent and Lenders have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time of the preparation thereof.

Upon the occurrence of any Forbearance Event of Default, without notice or demand of any kind, the Agent and Lenders may immediately terminate the Forbearance Period and/or accelerate and declare all of the Liabilities immediately due and payable. Upon the occurrence of any Forbearance Event of Default, the Agent and Lenders shall be entitled to exercise all of their rights and remedies under this Agreement, the Loan Documents and applicable law.  The Borrower hereby consents (i) to the *ex parte* appointment of a receiver by the Agent and Lenders in any action initiated by the Agent or Lenders pursuant to this Agreement, and the Borrower waives (to the extent permitted by applicable law) any requirement for notice or posting of a bond in connection therewith; and (ii) to the appointment of a Chapter 11 Trustee, and the Borrower waives (to the extent permitted by applicable law) any requirements for notice or posting of a bond in connection therewith.  The Borrower acknowledges that it shall have no claim for damages or otherwise against the Agent or Lenders with respect to any such termination of the Forbearance Period or acceleration of the Liabilities in accordance with the terms of this Agreement.

8.     **RESERVATION OF RIGHTS.**  The forbearance set forth herein shall be limited precisely as written and, except as expressly set forth herein, neither the fact of the Agent's and Lenders' forbearance nor any other term or provisions herein shall, or shall be deemed or construed to, (i) be a consent to any additional forbearance, waiver, amendment or modification of any term, provision or condition of the Loan Documents, (ii) affect, impair, operate as a waiver of, or prejudice any right, power or remedy which the Agent and/or Lenders may now or hereafter have pursuant to the Loan Documents or any other document, agreement, security agreement or instrument executed in connection with or related to the Loan Documents, or at law or in equity or by statute including, without limitation, with regard to any existing or hereafter arising Event of Default, (iii) impose upon the Agent or Lenders any obligation, express or implied, to consent to any amendment or further modification of the Loan Documents or (iv) be a consent to any waiver of any existing Event of Default (including, without limitation, the Current Defaults), all such Events of Defaults remaining outstanding.  The Agent and Lenders hereby expressly reserve all rights, powers and remedies specifically given to them under the Loan Documents or now or hereafter existing at law, in equity or by statute.

9.     **RELEASES; INDEMNITIES.**

(a)     In further consideration of the Agent's and Lenders' execution of this Agreement, the Borrower, individually and on behalf of its successors (including, without limitation, any trustees acting on behalf of the Borrower and any debtor-in-possession with respect to the Borrower), assigns, subsidiaries and affiliates (collectively, the "Releasors"), hereby forever releases the Agent, Lenders and their successors, assigns, parents, subsidiaries, affiliates, past or present officers, employees, directors, agents and attorneys (collectively, the "**Releasees**") from any and all debts, claims, demands, liabilities, responsibilities, disputes, causes, damages, actions, causes of actions (whether at law or in equity) and obligations of every nature whatsoever, whether liquidated or unliquidated, whether known or unknown, matured or unmatured, fixed or contingent (collectively, "**Claims**") that Releasors may have against the Releasees which arise from or relate to any actions which the Releasees may have taken or omitted to take prior to the date this Agreement was executed, including, without limitation, with respect to the Liabilities, any Collateral, the Loan Documents, or any third parties liable in whole or in part for the Liabilities, except for the actions arising from the gross negligence or willful misconduct of the Releasees as determined by a final non-appealed judgment from a court of competent jurisdiction. This provision shall survive and continue in full force and effect whether or not (i) the Borrower shall satisfy all other provisions of this Agreement or the Loan Documents, including payment in full of all Liabilities, (ii) this Agreement otherwise is terminated, or (iii) the Agent's and Lenders' forbearance ceases pursuant to this Agreement.

(b)     Releasors hereby agree to indemnify and hold the Releasees harmless with respect to any and all liabilities, claims, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding, whether threatened or initiated, asserting any claim for legal or equitable remedy under any statutes, regulations or common law principles arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Loan Documents, this Agreement or any other document executed in connection herewith, except for the claims arising from the gross negligence or willful misconduct of the Releasees as determined by a final non-appealed judgment from a court of competent jurisdiction. The foregoing indemnity shall survive the payment in full of the Liabilities and the termination of this Agreement and the Loan Documents.

10.     **ACKNOWLEDGMENT OF VALIDITY AND ENFORCEABILITY OF LOAN DOCUMENTS.** The Borrower expressly acknowledges and agrees that the Loan Documents constitute legal, valid and binding obligations enforceable in accordance with their terms by the Agent and Lenders against the Borrower subject to bankruptcy, insolvency, reorganization moratorium and other laws with general application affecting the rights and remedies of creditors and secured parties, and general principles of equity regardless of whether applied in a proceeding in equity or at law, and expressly reaffirms its obligations under the Loan Documents (as amended by this Agreement), including, without limitation, the Liabilities and the security interests

granted therein. The Borrower further expressly acknowledges and agrees that the Agent and Lenders have a valid, duly perfected, fully enforceable security interest in and lien on the Collateral except as otherwise expressly stated in the Loan Documents.

11.    **AMENDMENTS.**  No amendment or modification of any provision of this Agreement shall be effective without the written agreement of the Agent, Lenders and the Borrower, and no termination or waiver or any provision of this Agreement, or consent to any departure by the Borrower from such provisions, shall in any event be effective without the written concurrence of the Agent and Lenders. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

12.    **NO WAIVER.**  The Agent's or Lenders' failure at any time to require strict performance by the Borrower of any provision or term of the Loan Documents or this Agreement shall not waive, affect or diminish any right of the Agent or Lenders thereafter to demand strict compliance and performance therewith. Any suspension or waiver by the Agent and Lenders of a Forbearance Event of Default or any Event of Default shall not, except as may be expressly set forth herein, suspend, waive or affect any other Forbearance Event of Default or any Event of Default (other than the Current Defaults), whether the same is prior or subsequent thereto and whether of the same or of a different kind or character. None of the undertakings, agreements, warranties, covenants and representations of the Borrower contained in this Agreement or the Loan Documents, and no Forbearance Event of Default or Event of Default, shall be deemed to have been suspended or waived by the Agent and Lenders unless such suspension or waiver is (a) in writing and signed by the Agent and Lenders, and (b) delivered to the Borrower.

13.    **SUCCESSORS AND ASSIGNS.**  This Agreement shall be binding upon the Borrower and its successors and assigns and shall inure to the benefit of the Agent, Lenders and their successors and assigns.

14.    **LIMITATION ON RELATIONSHIP BETWEEN PARTIES.**  The relationship of the Agent and Lenders, on the one hand, and the Borrower, on the other hand, has been and shall continue to be, at all times, that of creditors and debtors and not as joint venturers or partners. Nothing contained in this Agreement, any instrument, document or agreement delivered in connection herewith or in the Loan Documents shall be deemed or construed to create a fiduciary relationship between or among the parties.

15.    **NO ASSIGNMENT.**  This Agreement shall not be assignable by the Borrower without the written consent of the Agent and Lenders. The Agent and Lenders may freely assign to one or more Persons all or any part of, or any participation interest in, the Agent's and Lenders' rights, obligations and benefits hereunder.

16.    **SECTION TITLES.**  The Section titles contained in this Agreement are included for the sake of convenience only, shall be without substantive meaning or content of any kind whatsoever, and are not a part of the agreement among the parties.

CHICAGO/#1611547.6                              12

17.    GOVERNING LAW; CONSENT TO FORUM.  THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF ILLINOIS.  THIS AGREEMENT AND THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS; PROVIDED, HOWEVER, THAT IF ANY OF THE COLLATERAL SHALL BE LOCATED IN ANY JURISDICTION OTHER THAN THE STATE OF ILLINOIS, THE LAWS OF SUCH JURISDICTION SHALL GOVERN THE METHOD, MANNER AND PROCEDURE FOR FORECLOSURE OF THE LENDERS' LIEN UPON SUCH COLLATERAL AND THE ENFORCEMENT OF THE LENDERS' OTHER REMEDIES IN RESPECT OF SUCH COLLATERAL TO THE EXTENT THAT THE LAWS OF SUCH JURISDICTION ARE DIFFERENT FROM OR INCONSISTENT WITH THE INTERNAL LAWS OF THE STATE OF ILLINOIS.  AS PART OF THE CONSIDERATION FOR NEW VALUE RECEIVED, AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE BORROWER, THE BORROWER, AGENT AND THE LENDERS HEREBY CONSENT AND AGREE THAT THE FEDERAL OR STATE COURTS OF ILLINOIS, OR, AT THE AGENT'S OR LENDERS' OPTION, ANY OTHER COURT IN WHICH THE AGENT OR LENDERS SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE BORROWER AND THE AGENT AND LENDERS PERTAINING TO THIS AGREEMENT OR THE LOAN DOCUMENTS.  THE BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND THE BORROWER HEREBY WAIVES ANY OBJECTION WHICH THEY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING FOR SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  THE BORROWER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO THE PARENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF THE PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAIL, PROPER POSTAGE PREPAID.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO AFFECT THE RIGHT OF THE LENDERS TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR TO PRECLUDE THE ENFORCEMENT BY THE AGENT OR LENDERS OF ANY JUDGMENT OR ORDER OBTAINED IN SUCH FORUM OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE SAME IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION.

18.    WAIVERS BY BORROWER.  THE BORROWER WAIVES (i) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR

COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL; (ii) PRESENTMENT, DEMAND AND PROTEST AND NOTICE OF PRESENTMENT, PROTEST, DEFAULT, NONPAYMENT, MATURITY, RELEASE, COMPROMISE, SETTLEMENT, EXTENSION OR RENEWAL OF ANY OR ALL COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, LOAN DOCUMENTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY THE AGENT OR LENDERS ON WHICH THE BORROWER MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER THE AGENT OR LENDERS MAY DO IN THIS REGARD; (iii) NOTICE PRIOR TO TAKING POSSESSION OR CONTROL OF THE COLLATERAL OR ANY BOND OR SECURITY WHICH MIGHT BE REQUIRED BY ANY COURT PRIOR TO ALLOWING THE AGENT AND LENDERS TO EXERCISE ANY OF THE AGENT'S AND LENDERS' REMEDIES; AND (iv) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS AND ALL RIGHTS WAIVABLE UNDER ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE.

19.    **NOTICES.** Except as otherwise provided herein, all notices, requests and demands to or upon a party hereto to be effective shall be in writing and shall be sent to the addresses and by the means specified in the Loan Agreement.

20.    **EXECUTION IN COUNTERPARTS/FACSIMILE.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimile and electronic ".PDF" signatures shall be binding on the parties.

21.    **INTEGRATION.** This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof, provided, however, that except as expressly modified herein, the Loan Documents shall remain in full force and effect in accordance with their respective terms and conditions.

22.    **TIME OF ESSENCE.** Time is of the essence in this Agreement and the Loan Documents.

* * * * * *

[*signatures follow*]

(Signature Page to Forbearance Agreement and
Amendment to Loan Agreement and Letter Agreement)

BLACKHAWK AUTOMOTIVE
PLASTICS, INC.

By:
Its: CFO

CHICAGO#1611547

(Signature Page to Forbearance Agreement and
Amendment to Loan Agreement and Letter Agreement)

LASALLE BUSINESS CREDIT, LLC, as
Agent and a Lender

By: _____
Its: FIRST VICE PRESIDENT

CHICAGO #1611547

03/28/2007 13:20 FAX 2483248616          CBBF                          ☎002/003

(Signature Page to Forbearance Agreement and
Amendment to Loan Agreement and Letter Agreement)

CITIZENS BANK, a Michigan banking
corporation, as a Lender

By: _____

Its: __VICE PRESIDENT__

THOMAS COUTURE

CHICAGO/#1611547.6

# SCHEDULE A

## CURRENT DEFAULTS

1.     Events of Default under <u>Section 15(b)</u> of the Loan Agreement, due to non-compliance with <u>Section 14(a)</u> of the Loan Agreement as a result of the failure by the Borrower to comply with the EBITDA covenant for the periods ended November 30, 2006, December 31, 2006, January 31, 2007 and February 28, 2007.

2.     Events of Default under <u>Section 15(b)</u> of the Loan Agreement, due to non-compliance with <u>Section 9(c)</u> of the Loan Agreement as a result of the failure by the Borrower to deliver to the Agent financial statements and related certificates for the months ended December 31, 2006 and January 31, 2007.

CHICAGO/#1611547.6

## SCHEDULE B

## BUDGET

See attached.

Blackhawk Automotive Plastics, Inc.
Financial Results of Operations and Cash Flows

25-Mar    [Pre]    [Histor]

In Thousands of Dollars

## STATEMENT OF CASH FLOWS

| | 25-Mar | 30-Mar | 8-Apr | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 27-May | 3-Jun | 10-Jun | 17-Jun | 24-Jun | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | 3,546.3 | 3,022.0 | 3,382.2 | 3,382.2 | 3,382.2 | 3,204.4 | 3,204.4 | 3,204.4 | 3,204.4 | 3,204.4 | 3,204.4 | 3,563.3 | 3,226.3 | 2,525.3 | 50,620 |
| Cash Receipts | | | | | | | | | | | | | | | |
| Accounts Receivable Collections | 1,381.9 | 1,351.9 | 1,300.0 | 1,500.0 | 1,500.0 | 1,300.0 | 1,300.0 | 1,500.0 | 1,500.0 | 10,100.0 | 1,000.0 | 1,500.0 | 1,397.5 | 1,307.5 | 43,376.7 |
| Total   Cash Receipts | 1,363 | 1,363 | 4,330 | 1,500 | 1,565 | 6,348 | 1,450 | 1,809 | 1,080 | 10,000 | 1,099 | 7,500 | 1,818 | 1,308 | 43,777 |
| Operating Disbursements | | | | | | | | | | | | | | | |
| A/P Disbursements | 2,063.0 | 1,823.0 | 2,551.7 | 2,532.7 | 1,770.2 | 1,776.7 | 1,491.0 | 1,341.7 | 1,800.0 | 2,000.0 | 1,800.0 | 2,000.0 | 1,780.0 | 1,780.0 | 26,053.1 |
| Wages, Salaries, Benefits & Taxes | 674.0 | 1,073.0 | 711.0 | 1,030.0 | 640.0 | 795.0 | 1,002.0 | 711.0 | 700.0 | 795.0 | 1,020.0 | 1,020.0 | 795.0 | 1,030.0 | 13,180.0 |
| Insurance | 100.0 | 125.0 | 150.0 | 120.0 | 125.0 | 175.0 | 125.0 | 123.0 | 123.0 | 176.0 | 124.0 | 123.0 | 123.0 | 125.0 | 2,070.0 |
| Rent | | | 182.0 | | | 102.0 | | | | 182.0 | | | | | 466.0 |
| Total   Operating Disbursements | 2,807 | 3,004 | 3,355 | 7,948 | 2,891 | 2,212 | 2,048 | 2,778 | 2,219 | 3,132 | 2,956 | 3,132 | 2,166 | 2,344 | 44,562 |
| Other (Sources)/Uses | | | | | | | | | | | | | | | |
| Unfunded and Funded - Revolving Line of Credit | | | 298.0 | | | 323.6 | | | | | | 274.4 | | | -909.0 |
| (PGT Direct) NEON (TERM LOAN) | | | 103.5 | | | 103.5 | | | | | | 103.5 | | | 3,113.6 |
| Internal Public on Term Loan | | | (1,000.0) | | | | | | | | | | | | (1,000.0) |
| Additional Equity / Exit Capital | | 50.0 | 200.0 | 50.0 | 80.0 | 50.0 | 50.0 | 50.0 | 50.0 | 60.0 | 50.0 | 60.0 | 80.0 | 80.0 | 500.0 |
| Fixed Asset (Sales) / Purchases | | | 75.0 | 75.0 | 75.0 | 80.0 | 90.0 | 60.0 | 60.0 | 60.0 | 80.0 | 60.0 | 60.0 | 60.0 | 850.0 |
| TNQ, Inc. / Conversion Mechanism | | 75.0 | | | 788.0 | | | | | | | | | | 700.0 |
| Total   Other (Sources)/Uses | | 650 | (397) | 150 | 120 | 537 | 110 | 110 | 110 | 110 | 110 | 494 | 110 | 110 | 2,346 |
| Operating Cash Flow | (1,415) | (1,562) | 4,275.1 | (7,464) | (1,330) | 4,348 | (1,546) | (1,374) | (1,772) | (1,455) | (1,935) | 6,998 | (1,410) | (1,543) | |
| Accumulated | (1,516) | (2,917) | 1,614 | 90 | (1,217) | 3,069 | 1,947 | 695 | (1,005) | 2,903 | (3,109) | 1,109 | 741 | (99) | (905) |
| Net Cash Flow | (1,415) | (1,962) | 5,163 | (7,409) | (2,177) | 4,919 | (1,444) | (1,358) | (1,883) | (1,484) | (2,048) | 6,971 | (1,340) | (1,459) | 17,431 |
| Accumulated | (1,516) | 1,755 | 5,163 | (1,290) | 3,401 | 7,203 | 377 | (1,813) | (2,191) | 1,420 | (4,356) | 1,423 | (1,205) | (1,031) | |

10/22/2007 22:04 FAX 312 609 5005    VEDDER PRICE KAUFMAN    Ø105

**Blackhawk Automotive Plastics, Inc.**
Projected Results of Operations and Cash Flow

22-Mar    Prior    16-Jan

*In Thousands of Dollars*

**SCHEDULE OF AVAILABILITY**

| | 22-Mar | 30-Mar | 6-Apr | 13-Apr | 20-Apr | 27-Apr | 4-May | 11-May | 18-May | 25-May | 1-Jun | 8-Jun | 15-Jun | 22-Jun | 29-Jun | CHANGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Eligible Accounts Receivable** | | | | | | | | | | | | | | | | |
| Accounts Receivable - No Same Day Sales | | | | | | | | | | | | | | | | |
| Same Day Sales | | | | | | | | | | | | | | | | |
| Undisputed Cash | | | | | | | | | | | | | | | | |
| Less: Ineligibles | | | | | | | | | | | | | | | | |
| Net Eligible Accounts Receivable | | | | | | | | | | | | | | | | |
| A/R Advance Rate | | | | | | | | | | | | | | | | |
| Accounts Receivable Available | | | | | | | | | | | | | | | | |
| **Inventory** | | | | | | | | | | | | | | | | |
| Raw Materials | | | | | | | | | | | | | | | | |
| Work in Process | | | | | | | | | | | | | | | | |
| Finished Goods | | | | | | | | | | | | | | | | |
| Total Inventory | | | | | | | | | | | | | | | | |
| Ineligible Inventory | | | | | | | | | | | | | | | | |
| Analysis | | | | | | | | | | | | | | | | |
| Total Ineligible Inventory | | | | | | | | | | | | | | | | |
| **Eligible Inventory** | | | | | | | | | | | | | | | | |
| Net Eligible Inventory | | | | | | | | | | | | | | | | |
| Inventory Advance Rate | | | | | | | | | | | | | | | | |
| Inventory Availability | | | | | | | | | | | | | | | | |
| **Total Collateral Availability** | | | | | | | | | | | | | | | | |
| Line of Credit Outstanding | | | | | | | | | | | | | | | | |
| A/P Trading Balance | | | | | | | | | | | | | | | | |
| Overdraft Reserve | | | | | | | | | | | | | | | | |
| TRW Trading Reserve | | | | | | | | | | | | | | | | |
| Use of Credit Outstanding and/or Overdraws | | | | | | | | | | | | | | | | |
| Use of Checks Cap | | | | | | | | | | | | | | | | |
| **Excess Availability / (Shortfall)** | | | | | | | | | | | | | | | | |
| Key Bank Overdraft | | | | | | | | | | | | | | | | |
| Allowable Overadvance | | | | | | | | | | | | | | | | |
| **Availability Less Fixed (Bank)** | | | | | | | | | | | | | | | | |
| Estimated Fees | | | | | | | | | | | | | | | | |
| **Availability Net of Overadvance (Bank)** | | | | | | | | | | | | | | | | |